PAMELA L. JOHNSTON CA Bar No. 132558
    pjohnston@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:    213.972.4500
Facsimile:      213.486.0065

JASON B. ALLEN, CA CA BAR NO. 251759
    Jason.allen@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
ONE MARKET, SPEAR STREET TOWER
SAN FRANCISCO, CA 94105-1126
TELEPHONE:    415.442.1000
FACSIMILE:    415.442.1001

Attorneys for Defendant VINAYAK S. GOWRISH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No:  3:09-cv-05883-SI |
| Plaintiff, | **DEFENDANT VINAYAK S. GOWRISH'S UNSEALED APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANT VINAYAK S. GOWRISH'S OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT** |
| v. | |
| VINAYAK S. GOWRISH, ADNAN S. ZAMAN, PASCAL S. VAGHAR and SAMEER S. KHOURY, | VOLUME I (PAGES 1-220) |
| Defendant. | Date:  June 10, 2011 |
| | Time:  9:00 a.m. |
| | Location:  Courtroom 10, 19th Floor |
| | 450 Golden Gate Avenue |
| | San Francisco, CA 94102 |
| | Judge:      Hon. Susan Illston |
| | Date Complaint Filed:  12/16/2009 |

LACA_2910580.1

Defendant Vinayak Gowrish respectfully submits this Volume I Unsealed Appendix of Evidence in Support of the Opposition to Plaintiff's Motion for Entry of Final Judgment, which attaches the documents set forth in the index below. Unredacted versions of the declarations of Vinayak Gowrish, Yvonne Ying, Christopher Zand, David Garcia, and Manoj Parvataneni are attached to the Sealed Appendix of Evidence in Support of the Opposition to Plaintiff's Motion for Entry of Final Judgment, which will be filed concurrently with Mr. Gowrish's *ex parte* application to file certain documents under seal.

| Ex | Title | Pages |
|----|-------|-------|
| 1. | Declaration of Vinayak Gowrish (REDACTED version – unredacted version filed in sealed appendix) | 1-11 |
| 2. | Declaration of Yvonne Ying (REDACTED version – unredacted version filed in sealed appendix) | 12-16 |
| 3. | Declaration of Carl Zimmerman | 17-20 |
| 4. | Declaration of Blake Warner | 21-24 |
| 5. | Declaration of Christopher Zand (REDACTED version – unredacted version filed in sealed appendix) | 25-28 |
| 6. | Declaration of David Garcia (REDACTED version – unredacted version filed in sealed appendix) | 29-32 |
| 7. | Declaration of Manoj Parvataneni (REDACTED version – unredacted version filed in sealed appendix) | 33-35 |
| 8. | Declaration of Shreya Chopra | 36-38 |
| 9. | Declaration of Vineela Ravva | 39-44 |

1

VOLUME I GOWRISH'S UNSEALED APPENDIX OF EVIDENCE ISO OPPOSITION TO MOTION FOR
ENTRY OF FINAL JUDGMENT
CASE NO. 3:09-CV-05883-SI

LACA_2910580.1

| 10. | Declaration of Mukunda Raghavan | 45-47 |
|-----|--------------------------------|-------|
| 11. | Declaration of Hooman Kamel | 48-50 |
| 12. | Pascal Vaghar Trial Testimony Excerpts (Pages 141-413 with gaps) | 51-220 |

Dated:  May 6, 2011

**FOLEY & LARDNER LLP**
PAMELA L. JOHNSTON


By: _____/s/ Pamela L. Johnston
PAMELA L. JOHNSTON
Attorneys for Defendant VINAYAK S. GOWRISH

LACA_2910580.1

LACA_2910580.1

**PROOF OF SERVICE Electronic Filing with Mail Service**

I HEREBY CERTIFY that on **May 6, 2011**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Anthony S. Kelly ,
Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549
202-551-4545
Email: KellyA@sec.gov

James Andrew Kidney
Securities and Exchange
Commission
100 F St., NE
Stop 4010
Washington, DC 20549-4010
202-551-4441
Fax: 202-772-9246
Email: kidneyj@sec.gov

Julie M. Riewe ,
Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549
202-551-4546
Email: riewej@sec.gov

Scott W. Friestad
Securities And Exchange
Commission
100 F Street, NE
Washington, DC 20549-4010-A
(202) 551-4431
Email: friestads@sec.gov

Jason Bruce Allen
Morgan, Lewis & Bockius
LLP
One Market
Spear Street Tower
San Francisco, CA 94105
415-442-1288
Fax: 415-442-1001
jason.allen@morganlewis.com

John Henry Hemann
Morgan Lewis & Bockius
One Market
Spear Street Tower
San Francisco, CA 94115
415-442-1355
Fax: 415-442-1001
jhemann@morganlewis.com

Thomas Edward Stevens
United States Attorney's Office
450 Golden Gate Avenue
P.O. Box 36055
San Francisco, CA 94102-3495
415 436-6559
Fax: 415 436-7234
Thomas.Stevens@usdoj.gov

/s/ Bill J. Symes
**Bill J. Symes**

# Exhibit 1

## DECLARATION OF VINAYAK GOWRISH

I, Vinayak Gowrish, declare:

1.      I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.  If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.      I provide this declaration to provide the Court with some additional background on myself and well as to address a few other items.  I hope that this will be helpful to the Court in considering the remedies to be ordered here.

3.      I am a native of the San Francisco Bay Area, and I grew up in Fremont, a child of two engineers who worked in Silicon Valley.  My parents gave me a love for how things worked, and the principles of engineering – applying research, science and mathematics to develop solutions for problems – were instilled in me from an early age.  When it came time for college, I like my parents, elected a technical education.  I attended UC Berkeley and graduated with a degree in Electrical Engineering and Computer Science.  When considering career options, I found that my quantitative training was highly applicable to investment banking and later investment management; both fields require the application of quantitative analysis and qualitative research to "get to the right answer."  I have always been intellectually curious and passionate about my work; further, I have always strived to be the best professional I can be.

4.      My vocation is a very demanding one, and since entering the workforce, I have tried to succeed, not by taking shortcuts or engaging in misdeeds, but rather, I have succeeded the only way I know how – through hard work and dedication.  While employed at TPG, I returned early from my honeymoon because my team at TPG needed me.  I cannot count the number of missed holidays and cancelled social plans I have had to support the TPG team.  More broadly, my goals in life are quite simple; I am passionate about excelling in my career, starting a family, and being a respected member of the community.  I am trying to pick up the pieces of

my life and move forward, but I cannot do so until I know if I will be able to work in the field

that I love and for which I've been trained over the last decade.

5.        In retrospect, I can see that I was not as cautious as I could have been, partially

because of a poor understanding of the insider trading laws, resulting in an adherence to the

informal "rules of engagement" as practiced day-to-day in the financial services industry.  This

experience has taught me that the rules, as written, are there for a reason – specifically to prevent

situations like this.   Even though I was not consciously involved in a scheme to defraud, the

fact still remains that there were others who would jump at the chance for self-enrichment, and it

was my responsibility to safeguard against that.  I should have been more judicious about not

speaking a word about my work to anyone outside the firm, regardless of the "industry norms,"

and not a day goes by where I don't wish that I had never sought guidance from or uttered a

word to Adnan.  It is important to me that the Court understands that I took this case to trial to

clear my good name – I am not a fraudster, and I did not want to be labeled as such.  While the

SEC will likely argue that I have not embraced my "wrongdoing" by saying this, I need to be

truthful with the Court:  <u>I was never a knowing participant in an insider trading scheme, and I</u>

<u>most certainly did not receive any payment or financial benefit as a result of any such scheme.</u>

6.        A big regret is my behavior upon learning of what happened.  I was shocked when

I learned after the fact from Adnan of his and Pascal's trading.  I should have marched straight

into my general counsel's office.  Instead, I took the coward's way out.  I stuck my head in the

sand and prayed that everything would just go away.  I had just been promoted in my firm; I was

newly married; I was looking forward to having children. I didn't want anything to upset that.

To this day, I wince when I think back on my failure to come forward when Adnan told me after

the fact what he did.

7.        I understand that actions have consequences, and those consequences are for the

Court to determine.  This case has utterly destroyed every aspect of my life.  Beyond just the

financial impact – defending myself has consumed every cent I have saved – this case has

destroyed my career and my reputation, and has impacted my family by delaying when my wife

and I are able to begin having children.  This case has derailed every aspect of what I value in life, and this impact is permanent.

8.	I respectfully ask the Court to consider not issuing a fraud injunction.  I know that on face value, a fraud injunction simply says "you are enjoined from committing fraud."  However, as I have come to learn during this case, a fraud injunction is a de facto lifetime bar – SEC and FINRA rules disqualify anyone with a fraud injunction from employment in virtually every aspect of the financial services industry.  Over the last two years, I have been trying to pick up the pieces of my life.  I have been consulting with a small business to help them get started.  This business was started not with high profile venture funding but with two client contracts, a modest checking account, and 900 square feet of office space.  Since then, through hard work and dedication, the business has slowly grown.  I hope to join this business pending the resolution of this case.  Because this business was recently granted a broker dealer license, a fraud injunction would disqualify me from working for this company and others like it.

9.	In its remedies brief, the SEC states I will likely "continue to seek employment in closely allied, but unregulated, fields."  With the passage of Dodd-Frank legislation, virtually the entire industry is now subject to SEC regulation.  The business I hope to join is no exception, and if I am allowed to do so, I would be subject to SEC and FINRA oversight.

10.





11.     As I mentioned earlier, my goals are my career, my family, and being a respected member of the community.  This experience has been extraordinarily destructive to everything I value in life.  To me, it is simply not worth it to be in the "gray area" of the law – even unknowingly.  These days when a friend asks me what I am doing, I say "I can't talk about it."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 6th day of May, 2011 in San Mateo, CA.


By:     _____
        VINAYAK GOWRISH

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

Exhibit 2

## DECLARATION OF YVONNE YING

I, Yvonne Ying, declare:

1.     I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.     I grew up in the Bay Area and attended U.C. Berkeley for my undergraduate degree, which is where I met Vinayak Gowrish. I then attended U.C. Davis for my M.B.A. Currently I am the Management Assistant at an interior design showroom in San Francisco.

3.     I am writing to share with you my experience being acquainted with Vinayak Gowrish for over ten years. When I first met Vinnie, I can honestly say that I could not stand him! He was uncommonly awkward and blunt. It was with time that I came to see that what first appeared as just limited social skills was that Vinnie is unabashedly his own person in his truthfulness, independence and confidence.

4.     What I initially thought was rudeness; I have come to realize is honesty.   As a young college kid, when I first met Vinnie, he would call me or others out on things that would disconnect him from people upon first meeting.  Vinnie is inherently straightforward.  For example, the other day I was with him at an art gallery fund raiser for the Japanese Red Cross and we were talking about Andy Warhol. I started to give my opinion and was struggling a little when he looked at me earnestly and just said, "You have no idea what you're talking about do you?" Vinnie was not trying to belittle or insult me, but he was right. Later that night, I observed him discussing the exhibits with one of the artists. He would always say, "I don't know anything about art, but here is what I think." That is just the way Vinnie is. From my relationship with Vinnie over the last 13 years, as well as from my knowledge of his reputation in our community, I have always known him to be a trustworthy and truthful person.

5.     Although Vinnie is intellectually complex, he is ultimately a simple man. We may all have had our share of wild nights throughout our friendship, but ultimately we have always said that our favorite nights are the ones where we go out to dinner and then go home and have drinks around a fireplace. This is most true with Vinnie. On more than one occasion, although he feels compelled to spend time with his friends by going out for a night on the town, I have found that he will hurry the night along so that he can get home. On one occasion he came to meet a group of my friends at a bar in San Francisco, Vinnie hurriedly paid for a couple back to back rounds and after the second round he softly said goodbye to me and ran home to be with Priya, his wife. Although I will admit that the rest of us have sometimes valued social status amongst our, "party friends," and how it affects the places we get into, Vinnie has never cared. From what I know of Vinnie, the idea that he committed insider trading to increase his social status or to impress friends is absolutely ridiculous.

6.

7.

8.

9.

10.

3

11. 

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of May, 2011 in San Francisco, CA.

By: _____
    Yvonne Ying

4

# Exhibit 3

## DECLARATION OF CARL ZIMMERMAN

I, Carl G. Zimmerman, declare:

1.     I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.     By way of background, I have been employed in the investment banking and private equity industries for roughly six years. I graduated with high honors from the Haas School of Business at the University of California, Berkeley in 2004. Upon graduation, I joined the Technology Mergers & Acquisitions group as analyst within Morgan Stanley's investment banking practice in Menlo Park, California. In that role, I focused primarily on transaction advisory assignments for large public company clients in the technology industry and completed over $1 Billion in transactions. In October, 2005, I left Morgan Stanley to join a middle market private equity firm, Behrman Capital, as an Associate investment professional, where I focused on the identification, evaluation and execution of investments in mid-market private companies on behalf of the institutional limited partners of our investment funds. At Behrman Capital, I completed over $850 million of transactions that consisted primarily of leveraged buyout investments, add-on acquisitions and leveraged recapitalizations across the healthcare, defense and manufacturing industries. In July 2008, I left Behrman Capital to form my own investment partnership and advisory firm focused on distressed debt and equity investments in the real estate industry, where I completed over $31 million in transactions on behalf of high-net worth individuals and my personal account. In January, 2011, I joined Health Evolution Partners as an investment professional focused on the identification, evaluation and execution of growth equity and leveraged buyout investments in the healthcare industry.

3.     Vinnie Gowrish and I first met as investment banking analysts in Morgan Stanley's Technology Mergers and Acquisitions group. When I joined the group, Vinnie was the

senior-most analyst and was highly regarded for his intelligence, work ethic, business acumen and professionalism. Given his sterling reputation within the group, he was someone that I immediately sought to align myself with. Working closely together, we quickly developed a strong personal and professional relationship based on our shared interests in finance and private equity investing, the shared ideals of humility, teamwork, self-improvement and intellectual curiosity and our complimentary self-deprecating senses of humor. For these reasons, Vinnie and I have kept in touch over the last six years, despite career progressions that diverged after Morgan Stanley. I attended Vinnie's wedding in 2006 and he will be attending my wedding this year. We speak regularly on the phone and meet socially as often as our professional and personal lives will permit.

4.    Vinnie conducts himself with a high standard of morality. Amongst our analyst class at Morgan Stanley, Vinnie was viewed largely as a mentor and strived to live up to the obligations inherent in that role. He often worked overtime to train other analysts, build analysis templates that were utilized by our entire group and set a high standard of work ethic and work product quality. He was the first person that others went to for help and was a true culture-carrier in a team-based environment. With respect to Vinnie's personal character, I have only known him to conduct himself with the utmost professionalism, integrity and ethical standards. Private equity, like any investment-related profession, is information driven and in my experience, it is industry practice to share knowledge and ideas in the context of self-improvement and continual learning. However, your reputation is also a huge driver of success and can be affected by the way you handle information. Transacting private equity investments requires intense person-to-person engagements, which necessitates trust among the parties involved and building trust begins with your reputation. This is an understanding and balance that I believe Vinnie embraces whole-heartedly. During the time Vinnie worked for TPG's private equity division, we interacted regularly as private equity professionals at different firms for the purpose of improving our knowledge base and skill-set. In my experience, this type of broad-based and non-specific knowledge sharing is commonplace in the industry and largely

2

promoted amongst private equity employers. Learning from the experiences of others is instrumental in generating investment ideas and shaping investment theses and ultimately benefits the quality of investments. To that end, our discussions often involved the sharing of information around investment strategies in attractive industries and business models. However, the depth of our conversations went only as far as discussing high-level, macro-economic trends or ideas and never delved into the specifics of a particular company or public equity. While my investment focus centered primarily on non-public companies, Vinnie worked extensively in the public markets and was often privy to material non-public information. Through my years of interacting with Vinnie in this context, I cannot recall a single instance where he jeopardized the confidentiality of such information. To the contrary, he was always forthcoming about the fact that he was unable to disclose sensitive information. Vinnie is intensely career-focused and I've never seen him act in a way that would jeopardize his reputation or diminish his ability to continue in the private equity career that he enjoys. Needless to say, based on my experiences with Vinnie, I was very surprised to learn of the allegations brought against him. To that end, I cannot foresee Vinnie ever again putting himself in a situation where his personal or professional conversations could be viewed as inappropriate disclosures of confidential information.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 2nd day of May, 2011 in San Francisco, California.


By: _____
CARL G. ZIMMERMAN

3

# Exhibit 4

# DECLARATION OF BLAKE WARNER

I, Blake Warner, declare:

1.      I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.      I have been an investment banker for 17 years and a licensed securities professional for nearly 16 years, having worked at Bank of America and Thomas Weisel Partners prior to founding my own firm, Silicon Valley Partners. I have advised companies across a range of financial transactions, including mergers and acquisitions, and debt and equity placements (both public and private). In addition, I have managed dozens of finance professionals through the years in the development of my practice area.

3.      I have known Vinayak Gowrish since 2002 when he worked as an investment banking analyst in my group at Thomas Weisel Partners. For the two years that Mr. Gowrish worked at Thomas Weisel Partners, I had direct daily interactions with him as we worked on client-related matters. After Mr. Gowrish left Thomas Weisel Partners, I kept in regular contact with him as his career developed at Morgan Stanley and Texas Pacific Group ("TPG"). It is through my professional and personal interaction with Mr. Gowrish that I can opine on his character for truthfulness or untruthfulness.

4.      I believe Mr. Gowrish is not only one of the most talented professionals with whom I've had the pleasure to work, but he is also a man of high integrity. Mr. Gowrish has the strongest work ethic of <u>anyone</u> I have ever known. When Mr. Gowrish started at Thomas Weisel Partners, he literally slept at the office on numerous occasions because he wanted to be involved in every transaction, take on increasing amounts of work and responsibility, learn more about the business and ultimately impress the senior professionals at the firm. He is a competitive person but he competes on the basis of his work ethic in order to be a better professional than his peers.

Specifically, he would read more, research more and develop additional analyses that would present financial alternatives in a different light. He is inherently intellectually curious, so he would go to great lengths to study industry structures and comparable deals to try to arrive at intellectually superior views on the elements of a transaction. The most important element of my assessment of Mr. Gowrish's character is that he does not cheat; he does not cut corners; he truly wants to put in the effort to arrive at these intellectually superior views to be the best financial professional he can be. I believe this drive served him well in his investing capacity at TPG. Mr. Gowrish is so passionate about being a good investor, he has few outside interests and is constantly discussing investing-related topics. For example, he will regularly educate and sometimes debate me on the global supply/demand imbalance for aluminum as opposed to copper or steel and how this dynamic will lead to various compelling investment trends. To add a human element to this declaration, he is a "geek" for finance-related topics and is extraordinarily passionate about the profession and practice of investing.

5. I recall when he was at TPG, he would call me when he was evaluating a deal and ask me about industry structure and competitive dynamics. At no time did Mr. Gowrish disclose the companies he was looking at. He would ask me questions such as, "I am looking at a deal in a certain industry. What are the key trends and metrics you think I should focus on?" We would discuss the general framework about how he was analyzing the transaction and he would want to know if I had any concurring or dissenting views. He would also call me to discuss structural elements of various debt instruments in order to best determine how to invest in a company's capital structure. These discussions are commonplace throughout the industry, as investment professionals seek to form a view on the merits or drawbacks of a given investment. Mr. Gowrish spent a good amount of time with me so he was not missing any key investment risks for the investments he was evaluating on behalf of TPG. The most concerning thing for me about this trial is that the allegations in this case stem from Mr. Gowrish's attempts to be a better investor for the benefit of TPG and its limited partners. Mr. Gowrish should have been able to

2

rely on the confidences of Mr. Zaman as a licensed securities professional, just as Mr. Gowrish used me as a sounding board in forming his investment views.

6.      It is my sincere hope and faith in the justice system that you can "right the wrong" of the jury verdict. Mr. Gowrish is an exemplary professional and person of high moral character. In my opinion, Mr. Gowrish conducts himself with a character for truthfulness. Further, his reputation amongst our mutual friends and work colleagues is also that of one who has a character for truthfulness. It is my hope that Mr. Gowrish will be able to continue working productively in the securities industry.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of May, 2011 in San Mateo, California.

By:                            
BLAKE WARNER

# Exhibit 5

# DECLARATION OF CHRISTOPHER ZAND

I, Christopher Zand, declare:

1.    I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.  If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.    I am writing to you on behalf of my friend Vinayak Gowrish.  I understand that Vinayak, or as I call him Vinnie, is facing a very serious charge before your court.  The purpose of this letter to briefly share some of my experiences with Vinnie as a friend, share my thoughts regarding Vinnie's character and the character of Pascal Vaghar.

3.    I met Vinnie in 2000 when we were both students at U.C. Berkeley.  At the time, Vinnie was a senior and I was a junior transfer student from De Anza Junior College in Cupertino, California.  I was new to Berkeley, without many friends, and was instantly impressed with Vinnie's friendliness and willingness to help me with my classes.  Vinnie took it upon himself to show me around campus, recommend classes, and even tutor me in my finance classes.  Vinnie was always very generous with his time and had a true passion for being an educator.

4.    After college, Vinnie and I maintained our friendship and saw each other from time to time.  We would catch up on personal news and Vinnie's immense professional success was something I was always very proud of.  After family and loved ones, Vinnie cared most about his profession and career.  He was never arrogant about his success and would always make time to talk with me about the finance – even though my understanding of the industry was nowhere near the level of sophistication that Vinnie's was.  Vinnie just liked educating people on new developments and innovations in the industry and always conducted himself in a professional manner.  I recall in one instance for example, I asked Vinnie how the commodities industry worked and he spent a good 2 hours explaining the inter-workings of the industry, who

all the relevant parties were and how the industry had evolved over the years. Put simply, Vinnie has a special ability to absorb huge amounts of information and then explain it to others in a thoughtful and insightful way. I think he does this because he is truly passionate about his work and he enjoys sharing his passion with others. I know Vinnie is a man of integrity that would never deceive the company or the industry he loved so very much.

5. 

2

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct. Executed this 25th day of April, 2011 in San Francisco, CA.

By: _____
Christopher K. Zand

# Exhibit 6

# DECLARATION OF DAVID GARCIA

I, David Garcia, declare:

1.     I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.     I have known Vinayak Gowrish for the past 28 years. During this time we have been classmates as well close friends. Vinayak and I grew up as neighbors - our homes were separated only by a public park in our hometown. Beginning in middle school, we attended different schools, yet we still spent our summers together exploring our town, visiting the local library, and attending classes at the local junior college. He was always my most studious friend, and I always knew he was destined for great things. Over the years, our paths have diverged. Mine had led me into the residential construction business. I am currently an employee at the largest solar company in the nation. I go to work in jeans and boots. Though our lives are very different, our friendship remains vital and interesting.

3.     Despite the cultural differences between our two families, we have always managed to create a level playing field on which ideas could be discussed freely and openly. We find it easy to be honest, and our friendship has been a rewarding and enriching part of my life. The best aspects of our friendship have endured and to this day, I count him as my closest friend.

4.     Over the years, I have had the pleasure of getting to know most of Vinnie's family. I can attribute his hard work ethic to his mother and father who always had their children's best interests in mind. Family has always come first in Vinnie's household. I have also had the pleasure of seeing Vinnie and his wife, Priya, fall in love and begin their life together. She has been a great addition to his family and is a formidable mind in her own right. Throughout the years, I have met and interacted with many of Vinnie's colleagues and professional friends. Aside from the occasional ribbing, I always had the feeling that his hard

work and intellect were never lost on his peers. Vinnie has an insatiable desire to make sense of things and to see the bigger picture. Vinnie is one of those special minds who can converse on almost any topic and relate to anyone. I always had the sense that his peers held him in high regard. It was a pleasure seeing him in his element, talking finance, economics, politics or culture. Some of my fondest memories are of our debates ranging from politics to economics. He has a way of collating data from all over the map and forming a cohesive story line. He possesses a truly inspired mind and the hard work ethic to achieve his goals.

5.

6.

7.

2

8. 

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 3rd day of May, 2011 in Oakland, CA.

By: _____
DAVID GARCIA

# Exhibit 7

## DECLARATION OF MANOJ PARVATANENI

I, Manoj Parvataneni, declare:

1.      I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.      I have known Vinnie Gowrish for approximately ten years from my time at Lazard Freres when I was finishing my internship and he was starting there full time. At that time he was dating his future wife, Priya Pandurangi, whom I have known since elementary school, as our families are close friends. I worked in the investment banking industry from 2002 to 2008 at Lazard and JPMorgan. Since 2008 I have been working for public investment funds. I am currently a Principal at Casablanca Capital, based in New York.

3.      Over the years Vinnie and I have discussed investment ideas with each other frequently as we both share a passion for the financial world. Vinnie has a strong investment acumen and I have always respected his opinions. From my interactions with Vinnie it is clear that he is a diligent worker and never cuts any corners or takes short cuts in life. Never in my encounters with Vinnie did he divulge any confidential information related to investments that TPG was working on. To the contrary, he tended to be careful in safeguarding confidential information. Based on my dealings with Vinnie and his reputation in the investment community, participating in this alleged insider trading scheme is highly inconsistent with his behavior.

4.



I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of May, 2011 in New York, NY.

By:_____
MANOJ PARVATANENI

Exhibit 8

# DECLARATION OF SHREYA CHOPRA

I, Shreya Chopra, declare:

1.      I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.  If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.      I am currently in staffing and compliance at Splunk, Inc. Since I graduated law school in 2005, I have worked both in a legal capacity at big firms as well as in compliance in house. I met Vinayak Gowrish in 2002 through a close friend.  Vinayak shared an apartment with a boyfriend of mine from 2003 to 2004.  He and his wife also rented their home to me for a period from 2009 though 2010.  Over the last 9 years, I have interacted with Vinayak, in one on one settings and in social settings, on a monthly and sometimes weekly basis. Vinayak and I have had numerous conversations ranging from discussions about our personal lives to our thoughts on people, society, business, and ethics.  I consider him to be one of my closest friends.

3.      Through all of my experiences with Vinayak, I have never doubted his character for truthfulness and, to my knowledge, neither have any of our mutual friends.  He is one of the most ethical and well-regarded people I know.  Vinayak has always been forthcoming about himself and his life.  I have never questioned his intent or honesty.  To the contrary, his honesty has always been a predominant trait in his personality.  Over the course of our lengthy friendship and even our relationship as landlord and tenant, Vinayak has conducted himself with the utmost integrity and proven himself to be extremely trustworthy.  In short, I have experienced Vinayak to be a caring and selfless friend as well as an honest and ethical human being.

4.      Though I have participated in many discussions with Vinayak regarding business and the stock market, I have never heard Vinayak divulge sensitive or confidential information to me or anyone else.  Rather, I have observed Vinayak being extremely cautious to protect any confidential information he may have learned through his employment.  He has been this way

even in conversations with his closest friends. I am particularly sensitive to employee confidentiality issues, having addressed them in work in the legal field and in human resources. However, I have never felt that Vinayak crossed any lines or gave me cause to even wonder about whether he was revealing too much.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of May, 2011 in San Francisco, California.

By:_____
     SHREYA CHOPRA

2

138

# Exhibit 9

## DECLARATION OF VINEELA PODDATOORI

I, Vineela Poddatoori, declare:

1. I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2. I am an Obstetrician/gynecologist with Sutter East Bay Medical Group and practice at Alta Bates Medical Center in Berkeley. I went to medical school at Ohio State University and completed my residency at Santa Clara Valley Medical Center in San Jose in 2009. I have known Vinayak Gowrish since freshman year of college at UC. Berkeley (1996). We were extremely close friends during college and I still consider him to be one of my best friends. I introduced him to his wife Priya who has been my best friend since we were toddlers. Vinnie and I were inseparable during college. Not only was he the most brilliant person I knew, but the most caring, trustworthy and genuine person I had ever encountered. I could trust him with my life and always did. For more than a few months, he thoughtfully cared for me after I had surgery in college. I fondly remember many of his other selfless acts. He once wheeled a homeless woman a whole mile to the Bart station, just because she asked. We used to tease him about this, but also knew that this was just a brief glimpse of his heart of gold. Since college we have managed to stay very close (speak on the phone weekly) and meet quite often (2-3/month) because of my close relationship with both him and his wife (I even spoke at their wedding).

3. I can always count on Vinnie to give me the most honest opinion about anything. While most people will lie to you if the answer to your question could be negative, Vinnie would not. He doesn't make up things just so that he can be the "nice guy", he will tell you straight and always will. If I did things that weren't right (i.e.-hurt someone's feelings), he would tell me to my face, be my conscience and make me correct my

40

actions.

4. One thing me and Vinnie can never do without almost killing each other is have an intellectual discussion. Vinnie is quite knowledgeable about pretty much everything, and he makes it known; we argue endlessly about various topics. Since I don't know much about business/finance he often will try to educate me in these manners. It is quite obvious how passionate he is about his profession. It is actually very inspiring to see someone so engaged by their career. Although he talked often about his job, he never discussed specific details of any deals or projects he was working on with me or my family. He spoke so abstractly about his work that I often couldn't understand what he talked about.

5. Vinnie is like no other. People can only aspire to be as truthful, trustworthy and caring as him. It is unfathomable to me that Vinnie's character is under question. If there is one thing he is it is honest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 5th day of May, 2011 in Pleasanton, CA.

By: _____

VINEELA PODDÁTOORI

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

# Exhibit 10

## DECLARATION OF MUKUNDA V. RAGHAVAN

I, Mukunda V. Raghavan, declare:

1.      I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.      My name is Mukunda V. Raghavan and I am a New York licensed attorney. I graduated from Boston University School of Law in 2005. I was a juvenile prosecutor with the New York City Office of the Corporation Counsel in New York City for over three and half years. I prosecuted over 120 cases ranging from simple assaults to complex hate crimes, fraud and robberies. As a prosecutor, I was held to a much higher ethical standard than any other attorney. In fact, I had a reputation in my office for never proceeding with a case if I felt we could not support our case at trial or if I felt the charges were not appropriate. I would rather focus on the justice of the particular case than advance my career. I knew that my duty was to the citizens and people of the city and the principles on which the legal system stood for.

3.      I have known Vinayak Gowrish for approximately three years. He is a family member and I consider him a close friend. I am related to Vinayak through marriage, he is the brother in law of my cousin Krishna's wife Maya. I have had numerous interactions with Vinayak over these past few years. I see and spend time with Vinayak approximately 3-4 times a year for numerous days at a time. During these periods, Vinayak and I have spoken about our professional and personal lives. I would regale him with stories about the cases that I have prosecuted and Vinayak would help me to understand the financial industry. He would tell me about the work he had previously worked on and completed. We would discuss the larger economic structures and policies that allow the industry to function and the inherent problems of the financial sector. He would only discuss things with generalities with me and was rather careful to avoid speaking about any particular case of his or his organization.

4.     In my time as a prosecutor, I learned to develop my ability to analyze and accurately opine the character of the people I meet and interact with. I can say with personal certainty that Vinayak is a reliable, honest and trust-worthy individual. When I returned to California and was struggling to find a job, Vinayak helped me learn about the financial industry and helped me to learn financial analysis. He also went above and beyond the relationship we have and recommended me to a few of his friends and professional contacts. This was especially telling for me because it was a time of economic downturn and when most other people I knew at the time were more concerned about keeping their jobs rather than trying to help. It is because I know that Vinayak is a trustworthy and honest person that I would make this declaration on his behalf and in fact I volunteered to do so. I hope your Honor will take this individual's declaration to heart. If you have any questions please do not hesitate to contact me.

5.     I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct. Executed this __4th__ day of May, 2011 in Santa Ana, CA.


By: _____

2

# Exhibit 11

# DECLARATION OF HOOMAN KAMEL

I, Hooman Kamel, declare:

1.     I am over the age of 18 and have personal knowledge of the facts stated in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the facts stated in this declaration.

2.     I am a physician currently employed at the University of California, San Francisco. I have known Vinnie Gowrish since our freshman year of high school, and count him as one of my oldest friends. We are both part of a tight circle of friends from high school, and we have all stayed very close over the past 18 years. Although we have lived in different cities for long periods of time, we have made it a point to gather in person for reunions at least three or four times per year. We otherwise keep in touch by phone or email on a weekly basis. And for the past several years that we have both lived in San Francisco, Vinnie and I have established many mutual friends.

3.     In all my interactions with him throughout the 18 years of our friendship, Vinnie has always been honest, trustworthy, and generous. He is loyal and dependable, and yet not afraid to bluntly speak his mind and provide honest and straightforward advice. I have confided in him countless times over the years, with complete trust in his discretion.

4.     Besides being personally very close, our group of friends from high school has always had a tendency towards spirited arguments and discussions about foreign affairs and economics, with Vinnie frequently taking the lead role. Even though as a physician I am no expert in these matters, I have spent countless hours debating with Vinnie about geopolitics, foreign policy, and finance. We email each other links to interesting articles several times a week, and more often than not these topics will form the basis of our conversations when we meet in person. At the same time, during the many years that Vinnie has worked in finance, our talk has never turned to specific deals that Vinnie and his company might have been working on.

Our discussions have always been abstract, and Vinnie has always taken obvious discretion in not divulging any confidential information.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 14th day of April, 2011 in San Francisco, CA.

By: _____

Exhibit 12

Volume 1

Pages 1 - 186

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

SECURITIES AND EXCHANGE              )
COMMISSION,                          )
                                     )
            Plaintiff,               )
                                     )
    VS.                              )   No. C 09-5883 SI
                                     )
VINAYAK S. GOWRISH,                  )
                                     )   San Francisco, California
            Defendant.               )   Monday
_____ )   January 24, 2011


TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:           U.S. SECURITIES AND EXCHANGE COMMISSION
                         100 F Street NE
                         Washington, DC  20549
                    BY:  **JAMES A. KIDNEY, ESQUIRE**
                         **JULIE M. RIEWE, ESQUIRE**
                         **ANTHONY S. KELLY, ESQUIRE**

For Defendant:           MORGAN, LEWIS & BOCKIUS LLP
                         One Market, Spear Street Tower
                         San Francisco, California  94105-1126
                    BY:  **JOHN H. HEMANN, ESQUIRE**
                         **JASON B. ALLEN, ESQUIRE**
                         **STEPHANIE L. JOHNSON, ESQUIRE**


Reported By:    *Katherine Powell Sullivan, CSR #5812*
                *Official Reporter - U.S. District Court*

```
1                    P R O C E E D I N G S
2    JANUARY 24, 2011                           9:11 A.M.
3              THE COURT:  Good morning.  You may all be seated.
4         Welcome.  My name is Susan Illston, and I am the
5    judge that will preside over the case that will start in this
6    courtroom today.
7              First, let me say welcome and thank you for being
8    here.  And I really mean that.  I know that none of you
9    volunteered to come today.  And we are very grateful for your
10   presence.
11             We have a wonderful system of justice in this
12   country.  And it could not function without the assistance of
13   people like you.  So thank you for being here.  We could not
14   get along without you, and we are very grateful to you.
15             We are selecting a jury for a civil matter.  We will
16   be picking eight people.  So if you look around and do the
17   math, most of you will not be chosen.  But you won't know that
18   until the end of the process.  And the process that's going to
19   take place is as follows.
20             First, let me tell you it's a civil case, as I told
21   you.  Meaning that it's not a matter of whether someone is
22   guilty of a crime or not.  It is a matter of a civil, a civil
23   claim.
24             And it's a case that we expect will take five days to
25   try.  And in the peculiar way that the math is going to work
```

 1          Where do you live?

 2    A.    Emeryville, California.

 3    Q.    Is there any reason, such as a medical condition or

 4    prescription drugs or any other reason, that you believe you

 5    might be unable to testify truthfully today?

 6    A.    No, sir.

 7    Q.    Do you have any medically recognized mental or physical

 8    disabilities?

 9    A.    Yes, sir.

10    Q.    Can you describe for the jury what those are.

11    A.    Uhm, when I was in the U.S. military, I was in a car

12    accident.  A drunk driver hit my car, failed to yield

13    right-of-way.  I had a right frontal lobe skull fracture on my

14    skull, and as an outcome from that accident, I retired early

15    from the U.S. military.

16    Q.    And do those -- do the results of that accident have any

17    impact on you today?

18    A.    No, sir.

19    Q.    Are you on disability?

20    A.    Yes, sir.

21    Q.    For what reason?

22    A.    From my medical injuries.

23    Q.    They have no impact on your ability to testify truthfully

24    today; is that right?

25    A.    No, sir.

1  Q.    Do these disabilities prevent you from engaging in

2  physical exercise?

3  A.    No, sir.

4  Q.    Do you exercise?

5  A.    I swim.

6  Q.    Do these disabilities interfere with your ability to earn

7  a living?

8  A.    Yes, sir.

9  Q.    How do the disabilities interfere with that?

10  A.    Well, my -- my injury is to my right frontal lobe, which I

11  have headaches often, and I've tried to return to the workforce

12  previously, but I had issues with my -- my headaches, which

13  made it hard for me to keep a job.

14  Q.    Any other issues?

15  A.    Uhm, no.  I mean, I have -- I have back issues, but my

16  back and my head issues are, you know, just daily pain that I'm

17  used to dealing with.

18  Q.    What do you do now?

19  A.    Currently, I'm volunteering for a nonprofit called City of

20  Dreams, which is -- it's a nonprofit in San Francisco mentoring

21  program with at risk youth in San Francisco.  So I'm actually a

22  mentor for an individual, a 12-year-old named Henry.  And it

23  originally started as part of my -- I guess my punishment for

24  the issues I have with SEC and it actually turned out to be

25  something positive in my life and helping me and changing my

1  life.

2  **Q.**   Do you have any plans for the future?

3  **A.**   I'm currently -- actually, today I have a meeting at -- at

4  the University of Hayward, to talk to the department as a

5  program for a master's in social welfare.  Because doing this

6  nonprofit has got me really interested in going back to school

7  and helping kids.

8  **Q.**   Have you and I met?

9  **A.**   Yes.

10  **Q.**   When did we last speak?

11  **A.**   On Friday.

12  **Q.**   How long did we speak?

13  **A.**   Maybe about two hours.

14  **Q.**   And was that to discuss your testimony here today?

15  **A.**   Yes, sir.

16  **Q.**   And have we met once before or more than once before?

17  **A.**   Yes, sir.

18  **Q.**   When was that?

19  **A.**   Uhm, the last time that we spoke was when I gave my

20  testimony at Mr. Vinnie's attorney's office.

21  **Q.**   Your deposition?

22  **A.**   My deposition, yes.

23  **Q.**   How long did we speak then?

24  **A.**   Directly or how long was I speaking?

25  **Q.**   No, I'm not talking about when -- when you and I may have

1  been in a room together with Mr. Gowrish's counsel and we met

2  for -- for an interview with me, just you and me and your

3  lawyers?

4  A.  Right, yes.

5  Q.  And when was that?

6  A.  I don't remember the exact date.

7  Q.  Okay.  Have we otherwise met --

8  A.  No.

9  Q.  -- besides those two occasions?

10  A.  No.

11  Q.  Do you know the defendant Vinnie Gowrish?

12  A.  Yes, sir.

13  Q.  Now, how do you know him?

14  A.  Uhm, I was introduced to him through Adnan Zaman.

15  Q.  How long have you known him?

16  A.  Since after 2001.  I don't -- I don't remember the exact

17  date.  After graduating from college.

18  Q.  After you graduated.  Did you know him while you were in

19  college?

20  A.  No.

21  Q.  Where did you graduate from?

22  A.  UC Berkeley.

23  Q.  Did you get any help with your disability while you were

24  at UC Berkeley?

25  A.  What do you mean by "help"?

1  Q.   Did the university provide you any assistance?

2  A.   UC Berkeley has a great disability program.  And I was

3  enrolled in the disability program my whole time at UC

4  Berkeley.  And they helped me, you know, graduate.

5  Q.   Thank you.

6        Now, are you friends today with Mr. Gowrish?

7  A.   Unfortunately, I believe not.

8  Q.   Were you friends with him -- let's turn to the period 2006

9  to 2007.

10       Have you got those years kind of in your mind --

11 A.   Right.

12 Q.   -- which is when all the events we're going to talk about

13 today relevant to this case happened?

14       Were you friends with him then?

15 A.   Yes, sir.

16 Q.   Would you consider him a good friend?

17 A.   I mean, initially our friendship was just through mutual

18 friends, through Adnan, which was his very good friend.  And

19 then, as time went on, we became closer friends.

20 Q.   Did you attend a bachelor party held in Mr. Gowrish's

21 honor?

22 A.   Yes, sir.

23 Q.   Where was that?

24 A.   In Cabo San Lucas, Mexico.

25 Q.   Now, I would like you to look at a picture I've -- careful

1   with the water pitcher -- but I put a Post-It note in your jury

2   book, at Plaintiff's Exhibit 150.

3   A.    Okay.  I see it.

4   Q.    Can you identify that?  That's a picture; is it not?

5   A.    Yes, sir.

6   Q.    Can you identify that for the jury, please, tell me who's

7   in it.

8   A.    Uhm --

9   Q.    You don't need to discuss the women.  Just the men.

10  A.    Okay.  On the far left is Mr. Adnan Zaman.  And then I'm

11  sitting next to Vinnie.

12  Q.    Do you know when that picture was taken?  Not the date,

13  but do you know on what occasion it was taken?

14  A.    This was a celebration of his bachelor party.

15  Q.    Okay.  And who took the picture?

16  A.    One of the employees at the bar that we were at.

17  Q.    Whose camera did they use?

18  A.    This was my camera.

19  Q.    So was it a cell phone or --

20  A.    No, an actual camera.

21          MR. KIDNEY:  Your Honor, we offer Plaintiff's Exhibit

22  1050.

23          THE COURT:  Any objection?

24          MR. HEMANN:  No objection, Your Honor.

25          THE COURT:  Thank you.  It will be received.

1          (Plaintiff's Exhibit 1050 received in evidence.)

2          (Document displayed)

3    **BY MR. KIDNEY:**

4    Q.    The jury has seen that picture.

5              So were you friends with the two of them at this

6    time?

7    A.    Yes, sir.

8    Q.    And I believe you started to say so, but the picture is

9    stamped -- the exhibit is stamped at the bottom as July 23rd,

10   2006.  Do you see that?

11   A.    Yes.

12   Q.    Does that time stamp from your camera seem reasonably

13   accurate to you?  Was it on or about that time that the picture

14   was taken?

15   A.    I believe so.

16   Q.    Now, how did you come to know Adnan Zaman?

17   A.    I was introduced to him through a mutual friend.

18   Q.    Who was that?

19   A.    Christopher Zand.

20   Q.    When was this?

21   A.    This was during the time that I was attending UC Berkeley,

22   2000 -- well, I graduated in 2001.

23   Q.    What was your major?

24   A.    Sociology.

25   Q.    So you've known him since before 2001?

1   A.   Yes.

2   Q.   Are you friends now?

3   A.   With Mr. Zaman?

4   Q.   Yes, sir.

5   A.   I mean, I haven't spoke to him since this happened, so I'm

6   assuming no.

7   Q.   Did your friendship change -- since you met in Berkeley,

8   can you describe for the jury how, until the SEC -- until you

9   became aware of the SEC investigation, how your friendship

10  changed, if at all?  Did it grow?  Did it reduce?  Did it stay

11  the same?

12  A.   Since the SEC?

13  Q.   No, before.  Before the SEC.

14  A.   I mean, we met mutually in college and we were friends,

15  but not that close.  Then after I graduated college, I went to

16  Japan for a year and taught English.  And when I came back from

17  my teaching abroad, we became closer friends because he was

18  already working and living in San Francisco.  And we were

19  friends ever since then until now.

20  Q.   Did you become closer friends with Mr. Gowrish during this

21  time, too?

22  A.   Uhm, well, I met him when I came back from Japan.  And in

23  the beginning, we were just acquaintances, and then near the --

24  near -- before the whole SEC thing, we became closer friends.

25  Q.   Okay.  Do you know if Mr. Zaman was a good friend of

1  Mr. Gowrish?

2  A.    They are very good friends.  They grew up with each other.

3  Q.    Did you consider them to be better friends with each other

4  than you were with them?

5  A.    Yes.

6  Q.    Why was that?

7  A.    I mean, they grew up with each other.  They have known

8  each other since high school.  I mean, their relationship --

9  they work in the same field.  I mean, they speak with each

10  other very often.

11  Q.    Okay.  Now, you talked about working in the same field.

12  Turning to the period beginning in the fall of 2006, which is

13  the period that we begin to want to focus on, do you know where

14  Mr. Zaman was employed?

15  A.    Yes.

16  Q.    Where was that?

17  A.    Lazard.

18  Q.    Do you know what kind of business Lazard did?

19  A.    Yes.

20  Q.    What kind of business was that, as far as you knew?

21  A.    Well, he was involved in banking.

22  Q.    What kind?  Check cashing and things like that?

23  A.    No, like acquisitions.

24  Q.    Mergers and acquisitions?

25  A.    Yes.

1   Q.    Did Mr. Zaman get involved in that sort of thing, to your

2   knowledge, at Lazard working on mergers and acquisition issues?

3   A.    Yes.

4   Q.    Do you know where Mr. Gowrish was employed in 2006?

5   A.    Uhm, I didn't -- I didn't know where he worked in the

6   beginning when I first met him.

7   Q.    Well, in 2006 -- later in 2006, did you know -- do you

8   know today what company he worked for?

9   A.    Yes.

10  Q.    What was it?

11  A.    TPG.

12  Q.    Back in 2006, did you have some notion of what Mr. Gowrish

13  did for a living or what his -- let me strike that.

14          Did you have some notion as to what Mr. Gowrish's

15  employer did?

16  A.    Well, I was aware that he worked in the same type of field

17  as Mr. Zaman.

18  Q.    Did you -- so in mergers and acquisition work; is that

19  fair to say?

20  A.    Yes.

21  Q.    Did you have any understanding whether Mr. Zaman had

22  access to secret information about companies that Lazard was

23  working on?

24  A.    Yes.

25  Q.    Did Mr. Zaman tell you he had some secret information?

1  A.   Well, when we started -- when he started giving me tips or

2  when -- when are you talking about?  When --

3  Q.   Pardon me?

4  A.   I'm sorry, I'm confused on when you are talking about he

5  started telling me that he --

6  Q.   When did that -- all right.  When did Mr. Zaman start

7  giving you tips about stocks?

8  A.   I mean, I believe when -- when the first stock -- the

9  first -- when -- I'm confused.  Are you asking me when did he

10 start --

11 Q.   Just tips in general.

12 A.   Okay.  I would say 2006.

13 Q.   Did there come a time when he informed you that he was

14 giving you tips based on inside information?

15          MR. HEMANN:  Objection, Your Honor.  Leading.

16          THE COURT:  Sustained.

17 BY MR. KIDNEY:

18 Q.   Did Mr. Zaman ever give you tips that he said was based on

19 inside information?

20          MR. HEMANN:  Objection, Your Honor.  Leading.

21          THE COURT:  Overruled.  You may answer.

22          THE WITNESS:  Okay.  Yes.

23 BY MR. KIDNEY:

24 Q.   When did that begin?

25 A.   I mean, I don't remember the exact date.

1  Q.   Have you ever heard of a stock called Myogen?

2  A.   Yes.

3  Q.   What do you know about Myogen?

4  A.   I mean, I don't know anything about the stocks.  I just --

5  I recognize the name.

6  Q.   Did you ever trade in -- did you ever buy securities in

7  Myogen?

8  A.   Yes.

9  Q.   Why did you do that?

10  A.   Mr. Zaman passed information to me or he would purchase

11  the stocks with my account.

12  Q.   Mr. Zaman had access to your -- well, let me back up.  Did

13  you have an account in which you could buy and sell securities?

14  A.   Yes.

15  Q.   Did you do that online?

16  A.   Yes.

17  Q.   Where was that account?

18  A.   Charles Schwab.

19  Q.   Did you, at some point, give Mr. -- did Mr. Zaman, at some

20  point, have access to that account?

21  A.   Yes.

22  Q.   Did you give him access to that account?

23  A.   Yes.

24  Q.   Why?

25  A.   Well, when we had -- when we started the agreement that he

1   was going to give me tips in return that I would split the

2   profit with him, I gave him access to the account because I

3   totally trusted him and I didn't see why -- in case he wanted

4   to make a -- if he wanted to make a -- uhm, if he wanted to buy

5   a stock and he wasn't able to pass information to me, he could

6   do it himself.

7   Q.   Through your account?

8   A.   Right.

9   Q.   Under your name?

10  A.   Right.

11  Q.   Have you ever heard of the company called Sabre?

12  A.   Yes.

13  Q.   What do you know about Sabre?

14  A.   I don't know anything about the company itself.

15  Q.   Back in 2006, did you buy securities in Sabre?

16  A.   Yes.

17  Q.   Why?

18  A.   On a tip from Mr. Zaman.

19  Q.   Did Mr. Zaman tell you where he heard that Sabre would be

20  a good stock to buy?

21  A.   Uhm, well, I was told that the information came from --

22  from Vinnie.

23  Q.   Who told you that?

24  A.   Mr. Zaman.

25  Q.   Did you eventually buy Sabre?

1   A.   Yes.

2   Q.   Did you buy puts, calls or stock?

3   A.   We always bought the options.

4   Q.   Options.  How did you know what options to buy?

5   A.   Typically, when Mr. Zaman wanted me to purchase a stock,

6   he would write it on a yellow sticky or he would send me a text

7   message with, I don't know, certain whales written that I could

8   figure out what the -- the symbol that I need to use and how

9   many he wanted me to buy.

10  Q.   Did you follow Mr. Zaman's advice?

11  A.   Yes.

12  Q.   Now, in the fall of 2006, did you ever hang out, so to

13  speak, with Mr. Zaman, go to bars, clubs, anything, socialize?

14  A.   Yes.

15  Q.   How often do you think you socialized with Mr. Zaman on a

16  weekly or monthly basis?  I realize this is difficult to

17  quantify, but as best you can, was it frequent?  Infrequent?

18  A.   Well, when Mr. Zaman was living in San Francisco, we

19  talked, I would say, daily and we would see each other a few

20  times a week.

21  Q.   Did you socialize as often with Mr. Gowrish?

22  A.   No.

23  Q.   About how -- did you socialize at all with Mr. Gowrish?

24  A.   I mean, he was -- he was good friends with Adnan, so some

25  of the times he would be around when we were all hanging out.

1  Q.   Did you hang out with just you and Mr. Gowrish ever --

2  A.   Yes.

3  Q.   -- during this period in 2006?

4  A.   Oh.  No, I think we became closer later towards the end.

5  Q.   Toward the end?

6  A.   Yes.

7  Q.   Before he left for Minneapolis?

8  A.   Right.  Well, after he -- after he left to Minneapolis,

9  you know, he was gone there, and then whenever he would come

10 back into town, we would try to hang out.

11 Q.   Do you know when he went to Minneapolis?

12 A.   I don't know the exact date.

13 Q.   So -- strike that.

14      Do you know a man named Sameer Khoury?

15 A.   Yes.

16 Q.   How long have you known him?

17 A.   About ten years.

18 Q.   How did you meet him?

19 A.   Through mutual friends.

20 Q.   How was that?

21 A.   I mean, different friends from Adnan or Vinnie.  Mutual

22 friends from -- I used to live in Walnut Creek, California, so

23 friends from the East Bay.

24 Q.   What did Mr. Khoury do when you met him?

25 A.   He worked in the mortgage loan business.

1  Q.   But in early April, before you left, were you expecting to

2  take a job in Japan?

3  A.   Yes.

4  Q.   How long was it going to be?

5  A.   For at least a year.

6  Q.   Did you owe Mr. Gowrish money for -- as a result of this

7  insider trading arrangement that you had before you left for

8  Japan?

9  A.   Yes.

10  Q.   Did you pay him before you left?

11  A.   Yes.

12  Q.   You paid him all of what you owed him?

13  A.   I believe so.

14  Q.   Did you owe Mr. Gowrish any money?

15  A.   From the insider --

16  Q.   From the arrangement --

17          THE COURT:  Is that the same question?

18          MR. KIDNEY:  Oh, I'm sorry.  Did I say Gowrish?

19          THE COURT:  Yes.

20  BY MR. KIDNEY:

21  Q.   Let me ask you about Mr. Zaman, then.  Did you owe

22  Mr. Zaman any money from the insider --

23  A.   Yes.

24  Q.   Did you pay him?

25  A.   I still owed him more money when I was leaving.

1          (Jury enters at 8:42 a.m.)

2          **THE COURT:**  Welcome back, ladies and gentlemen.  You

3   may all be seated.

4          Good morning, sir.

5          Tracy, would you swear the witness again.

6                    PASCAL VAGHAR,

7   called as a witness for the Plaintiff herein, having been first

8   duly sworn, was examined and testified as follows:

9          **THE WITNESS:**  Yes, ma'am.

10         **THE CLERK:**  Okay.

11         **THE COURT:**  All right.  You may proceed.

12                 <u>**DIRECT EXAMINATION RESUMED**</u>

13  BY MR. KIDNEY:

14  Q.   Good morning, Mr. Vaghar.

15  A.   Good morning, sir.

16  Q.   When we concluded yesterday, we had just finished -- you

17  had just testified about a trip that you took to Asia and you

18  returned around May 10.

19         **THE CLERK:**  Is that microphone on?

20  BY MR. KIDNEY:

21  Q.   When we had concluded yesterday, to repeat, you had just

22  finished testifying about a trip to Asia, that you came to

23  Honolulu, that you took that concluded in May of 2007.  Do you

24  remember that?

25  A.   Yes, sir.

1    Q.   Did you receive any telephone communications from

2    Mr. Zaman during that trip that you recall?

3    A.   No.

4    Q.   Did not?

5    A.   No.

6    Q.   Well, if Mr. Zaman has testified under oath --

7            MR. HEMANN:   Objection, Your Honor, hearsay.

8            MR. KIDNEY:   Mr. Zaman was deposed and will be in

9    court as the next witness.

10           THE COURT:   Sustained.   Sustained.

11   BY MR. KIDNEY:

12   Q.   Do you have any recollection of --

13           MR. KIDNEY:   I'm trying to refresh his recollection

14   with the testimony of somebody else who was sworn and testified

15   under oath in the deposition and is going to be the next

16   witness in this case.

17           THE COURT:   You can't do that in front of the jury.

18           MR. KIDNEY:   Okay.   One moment, Your Honor.

19   BY MR. KIDNEY:

20   Q.   Before you left on your trip, did anyone tell you you

21   should -- before you left on your trip in the middle of April

22   of 2007, did anybody tell you that you should buy ADS stock or

23   securities?

24   A.   No.

25   Q.   Did you have any practice where Mr. Zaman told you to buy

1 a security as to whether -- as to how quickly you would buy

2 that security after he told you?

3 A.    I mean, typically, if he gave me a tip or a stock to

4 purchase, if he wanted me to purchase it myself, he would tell

5 me or write it on the yellow sticky.  And then I would purchase

6 it within that day or the next day or soon.  It wasn't a time

7 frame.

8 Q.    So you'd do it fairly quickly after he gave you the tip;

9 is that right?

10 A.    Right.

11 Q.    Was there ever an occasion where you would wait two to

12 three weeks or a month to make a trade that he --

13 A.    No.

14 Q.    Did you ever talk to Mr. Zaman about investments in

15 condominiums?

16 A.    Yes.

17 Q.    How frequently did that come up?

18 A.    Well, Mr. Zaman, I guess he was always looking for

19 investment opportunities and he -- sometimes he would contact

20 me and say he found a condominium complex somewhere, I don't

21 know, different countries, that he was interested in purchasing

22 and asking me if I wanted to go in partners with him in

23 purchasing the condominium.

24 Q.    Was anybody else -- when he brought this up, did he

25 mention anybody else as a potential partner?

1   A.    Uhm, I mean, he -- he mentioned -- he mentioned Vinnie.

2   And, you know, I guess the idea of buying the condo would take

3   the fact that, you know, part of the money that I would owe

4   them, they could -- or that I owed Adnan could be used towards,

5   I guess, the down payment or something like that, of purchasing

6   one of the condos or the property.

7   Q.    Did you ever give Mr. Zaman money for a deposit on a

8   condominium?

9   A.    Uhm, no.

10  Q.    Did you ever purchase a condominium with Mr. Zaman?

11  A.    No.

12  Q.    Or with Mr. Gowrish?

13  A.    No.

14        MR. KIDNEY:   Your Honor, if I may, I would like to

15  show the witness the deposition testimony I was referring to.

16        THE COURT:   All right.

17        MR. KIDNEY:   I'm going to put in front of the witness

18  excerpts from Mr. Zaman's deposition at page 205, beginning at

19  line 9.

20  BY MR. KIDNEY:

21  Q.    If you would read the bracketed portion to yourself,

22  Mr. Zaman -- I mean, Mr. Vaghar.  Not out loud.

23  A.    (Witness complies.)   Okay.

24  Q.    All right.  Does what I just showed you in any way refresh

25  your recollection as to whether you received a phone call from

1   Mr. Zaman while you were in Honolulu?

2   **A.**   Well, I mean, I could have spoke to him while we were in

3   Hawaii because we were still in the United States and I

4   probably had my cell phone, but, you know, I spoke to him very

5   often. We were very good friends.

6          **MR. HEMANN:** Objection, Your Honor. Move to strike

7   as nonresponsive.

8          **THE COURT:** Overruled.

9   **BY MR. KIDNEY:**

10   **Q.**   Do you have a specific recollection of receiving a call

11   from -- one or more calls from Mr. Zaman while you were in

12   Honolulu?

13   **A.**   Like I said, we -- we spoke so often that -- I mean, I --

14   I can assume that we spoke in Honolulu just because we were

15   still in the U.S. And if I had my cell phone, why wouldn't I

16   call him? But I can't remember an exact conversation.

17          **MR. KIDNEY:** Okay. Thank you.

18          **MR. HEMANN:** Just note that this is not proper

19   recollection refreshing.

20          **THE COURT:** Well, I will note, ladies and gentlemen,

21   that we can't accept as evidence people's speculation.

22   Speculation won't do. So if the witness can only speculate,

23   then that's not evidence of anything.

24   **BY MR. KIDNEY:**

25   **Q.**   Do you know, did -- did Mr. Zaman ever tell you to provide

1   tips you received from Mr. Zaman to Mr. Khoury?

2   A.   Yes.

3   Q.   Did you do so?

4   A.   Yes.

5   Q.   Do you remember what stocks you did so with?

6   A.   I don't recall.

7   Q.   Did Mr. Zaman ever instruct you not to speak to Mr. Khoury

8   about any -- about a tip that he gave you?

9   A.   Yes.

10  Q.   Do you recall what stocks those were for?

11  A.   No.

12  Q.   Did he tell you why he didn't want you to speak to

13  Mr. Khoury?

14  A.   I --

15  Q.   Do you remember?

16  A.   I -- I just remember him telling me, you know, don't tell

17  Sameer, so...

18  Q.   Have you ever heard of a company called webMethods?

19  A.   Yes.

20  Q.   Do you know what webMethods did?

21  A.   No.

22  Q.   Did you buy securities in webMethods?

23  A.   Yes.

24  Q.   Why did you do that?

25  A.   Because on the -- from Mr. Zaman, either he purchased it

1  himself or he would have had me purchase it, but I know my

2  account purchased it.

3  **Q.**    Okay.  Now, did you ever receive any tip about Sabre

4  Holdings directly from the defendant?

5  **A.**    No.

6  **Q.**  Did you ever receive a tip directly about TXU directly

7  from the defendant?

8  **A.**    No.

9  **Q.**  Did you ever receive a tip about ADS directly from the

10 defendant?

11 **A.**    No.

12 **Q.**    So all of your tips came through Mr. Zaman; is that

13 correct?

14 **A.**    Correct.

15 **Q.**  Can you explain to the -- you've testified that you shared

16 the proceeds of your trading with Mr. Zaman and with

17 Mr. Gowrish.  Can you explain to the jury how you did that.

18 **A.**    Well, uhm, where do I start from?  I mean -- uhm, so

19 the --

20 **Q.**    I mean the mechanics of it.

21 **A.**    Okay.  I mean, typically, you know, there -- they are very

22 cautious, so they didn't want a paper trail to them.  So I

23 would write checks to cash and from cash to myself.  And then

24 from cash, I would give the money to Mr. Zaman or Vinnie.

25 **Q.**    Thank you.

1        Would you please turn -- I think I may have already

2   turned to page -- Plaintiff's Exhibit -- marked for

3   identification as Plaintiff's Exhibit 1011.

4   A.    Yes.

5   Q.    Do you have that in front of you?

6   A.    Yes.

7   Q.    Can you identify what that is?

8   A.    It's a check from my Schwab account written to myself for

9   cash.

10  Q.    Okay.  And this exhibit --

11          MR. KIDNEY:  Let me also introduce -- well, let's

12  flash that up on the screen.

13          THE COURT:  Do you want to offer it into evidence

14  first?

15          MR. KIDNEY:  Oh, I'm sorry.  I'm sorry.  I apologize,

16  Your Honor.

17          We offer 1011.

18          THE COURT:  Any objection?

19          MR. HEMANN:  No objection, Your Honor.

20          THE COURT:  Thank you.  It will be received.

21          (Plaintiff's Exhibit 1011 received in evidence.)

22          (Document displayed)

23  BY MR. KIDNEY:

24  Q.    Now, can you explain the purpose of writing this check?

25  A.    Well, in order for -- for the -- I guess the money that

1  I -- that I owed to the individuals to -- to deduct the money,

2  they would either -- I would either purchase items or give them

3  cash.

4  Q.    I'm sorry, and so -- do you have any recollection as to

5  the purpose to writing this check to yourself?

6  A.    I mean, if I wrote a check at that large amount like that

7  to myself, it was in order to give cash to Mr. Zaman or to

8  Vinnie.

9  Q.    Could you please turn to Plaintiff's Exhibit 1007 marked

10  for identification.

11          **MR. KIDNEY:**  May I approach, Your Honor?

12          **THE COURT:**  You may.

13  BY MR. KIDNEY:

14  Q.    Feel free to look through Plaintiff's Exhibit 1007 as much

15  as you need to.

16          Can you identify the exhibit?

17  A.    Yes.

18  Q.    What is it?

19  A.    It's the carbon copy from the checks.

20  Q.    So I'm not clear what you mean, the carbon copy from the

21  checks.  How did that process work?

22  A.    Well, the checkbooks that I used from Schwab, they have a

23  carbon copy underneath.  So usually, typically, when you write

24  a check, you'll have a copy of what you wrote on that check for

25  your records.

1   Q.   And so this was for your Schwab bank account?

2   A.   Right.  So this was my personal records.

3           MR. KIDNEY:  Your Honor, I move the introduction of

4   Plaintiff's Exhibit 1007.

5           MR. HEMANN:  No objection, Your Honor.

6           THE COURT:  Thank you.  It will be received.

7           (Plaintiff's Exhibit 1007 received in evidence.)

8           (Document displayed)

9   BY MR. KIDNEY:

10  Q.   Now, if we return -- the jury can see the check register.

11          Now, if we turn to Plaintiff's Exhibit 1011, which

12  was the check dated November 3rd, and I believe I've attached

13  for convenience on the next page of that exhibit a copy from

14  the page of Plaintiff's Exhibit 1007.  Do you see that?

15  A.   Yes, sir.

16  Q.   Can you tell us what that is?  It's a part of Plaintiff's

17  Exhibit 1007 in evidence.  It says, "For Rat."  Can you tell us

18  what that is?

19  A.   Well, Rat was a nickname used for Adnan or Vinnie.

20  Q.   Is that your handwriting on PX1011?

21  A.   Yes.

22  Q.   And that is on the same check number.

23          MR. KIDNEY:  If we can blow it up again.  No, the

24  other side.

25          (Document displayed)

1  BY MR. KIDNEY:

2  Q.    And that's for the same check number as we've shown in

3  Plaintiff's Exhibit 1011, correct?

4  A.    Correct.

5  Q.    Can you please explain to the jury why there is a "For

6  Rat" written on the register, but nothing on the "for" line of

7  the check?

8  A.    Well, typically, I mean, in the beginning, you know, Adnan

9  and Vinnie, you know, were very cautious and they didn't, you

10  know, want any kind of paper trail to them or anything.  So the

11  carbon copy, when I put "For Rat," was for my own records to --

12  to remember that that $4,000 check was money that I took out or

13  cashed in order to pay towards the money that I owed them for

14  the insider tips.

15  Q.    And by saying "For Rat," is that -- did that indicate to

16  you that this money went to Mr. Zaman?

17  A.    Yes.

18  Q.    Was this -- was this the first check you wrote as part of

19  this insider trading scheme, as far as you recall, back in

20  November?

21  A.    I believe so.

22  Q.    And that's before you actually bought securities in Sabre,

23  correct?

24  A.    Yes.

25          MR. HEMANN:   Objection, Your Honor, leading.

1      **THE COURT:**  Overruled.  But don't lead him anymore.

2  **BY MR. KIDNEY:**

3  **Q.**   Do you remember from yesterday we flashed your account

4  statements up on Sabre --

5  **A.**   Yes.

6  **Q.**   -- and it showed the first purchase to be in December,

7  correct?

8  **A.**   Right.  This is earlier.

9  **Q.**   Okay.  Could you turn to the next exhibit, not the screen.

10      Marked as Plaintiff's Exhibit 1012 -- no, I'm sorry.

11  Yeah, 1012.  Right.

12      You need help?  Are you there?

13  **A.**   1012 is --

14  **Q.**   Can you identify it, please?

15  **A.**   Okay.  It's a check written on December 1st, '06.

16  **Q.**   The copy that was obtained from Schwab that shows it was

17  cleared just as 1011?  I mean, it shows the cancellation on the

18  back and everything like that, correct?

19  **A.**   Okay.

20  **Q.**   Does it?

21  **A.**   Yes.

22      **MR. KIDNEY:**  Your Honor, I offer Plaintiff's Exhibit

23  1012.

24      **MR. HEMANN:**  No objection, Your Honor.

25      **THE COURT:**  All right.  Thank you.  It will be

1    received.

2             (Plaintiff's Exhibit 1012 received in evidence.)

3             (Document displayed)

4    **BY MR. KIDNEY:**

5    **Q.**   Now, this is a check written on December 1st, 2006, is it

6    not?

7    **A.**   Yes.

8    **Q.**   And it's made out to cash?

9    **A.**   Yes.

10   **Q.**   For $4,000?

11   **A.**   Yes.

12   **Q.**   Do you know what this check was used for, what the cash

13   from this check was used for?

14   **A.**   Yes.

15   **Q.**   What was it used for?

16   **A.**   To -- to give cash to Mr. Zaman.

17   **Q.**   Now, if we could turn to the second page of -- the exhibit

18   that I put in the notebook is the second page of 1012, but it

19   is an excerpt from your check register.  Do you see the entry

20   there, "Cash - for Rat"?

21   **A.**   Yes.

22   **Q.**   Why did you not put "For Rat" on the memo line?  Is it the

23   same answer as before?

24   **A.**   Correct.

25   **Q.**   Now, the next -- please turn to the next exhibit.

1          **MR. KIDNEY:**  Don't display it on the screen.

2    BY MR. KIDNEY:

3    Q.    -- which is Plaintiff's Exhibit 1013 marked for

4    identification.

5    A.    Okay.

6    Q.    Can you identify that, please?

7    A.    You are looking at check number 129?

8    Q.    Referring to Plaintiff's Exhibit 1013, check number -- it

9    has 1013 -- doesn't it say that right on the top?

10   A.    Yeah, that's fine.  Uhm, yes.

11   Q.    What is it?

12   A.    The check written to myself for $4,000.

13         **MR. KIDNEY:**  We move the admission of Plaintiff's

14   Exhibit 1013, Your Honor.

15         **MR. HEMANN:**  No objection, Your Honor.

16         **THE COURT:**  Thank you.  It will be received.

17         (Plaintiff's Exhibit 1013 received in evidence.)

18         (Document displayed)

19   BY MR. KIDNEY:

20   Q.    So this is another cleared check from Schwab written to

21   Pascal Vaghar.  What did you do with the proceeds of this

22   check?

23   A.    Gave the cash to Mr. Zaman.

24   Q.    Now, if you turn to -- for convenience sake, put it

25   under -- this is the second page of Exhibit 1013, an excerpt

1    from Exhibit 1007, which is your check register.

2    A.    Correct.

3    Q.    And then you see that there is the handwriting down there,

4    "Rat"?

5    A.    Correct.

6    Q.    Again, who is that?

7    A.    Mr. Zaman.

8    Q.    And why did you not write it on the memo line, and instead

9    write it on the register?

10   A.    Because they were cautious or they -- they didn't want any

11   paper trail record of anything that had to do with them or

12   Adnan.   Sorry.

13   Q.    Did somebody tell you not to -- not to create a paper

14   trail?

15   A.    Well, Mr. Zaman.   That was the reason why I was writing

16   the checks to cash is because they didn't want a paper trail.

17   Q.    Please turn to the next exhibit, Plaintiff's Exhibit 1014.

18   You've got to turn to it.   It's not going to come up on the

19   screen until it's admitted.

20   A.    Oh.   Okay.

21   Q.    Can you identify that for the jury?

22   A.    Yes.

23   Q.    What is it?

24   A.    It's a check written to myself for $4,000.

25   Q.    Dated February 5, 2007?

1  A.    Correct.

2         MR. KIDNEY:  Your Honor, we move in -- offer in

3  Plaintiff's Exhibit 1014.

4         MR. HEMANN:  No objection, Your Honor.  We don't

5  object to the checks and the registers, so they can just put

6  them up on the screen as they go --

7         THE COURT:  All right.

8         MR. HEMANN:  -- assuming it's the same series of

9  exhibits.

10        THE COURT:  All right.  But I do want to make sure

11 that I admit them so that they are in the record.

12        MR. HEMANN:  Correct.

13        THE COURT:  And 1014 is admitted.

14        (Plaintiff's Exhibit 1014 received in evidence.)

15        MR. HEMANN:  So we have a standing non-objection,

16 Your Honor.

17        THE CLERK:  Can you just read off the exhibit numbers

18 that they don't object to?

19        THE COURT:  No.  We will do them one by one, Tracy.

20        THE CLERK:  Oh, I'm sorry.

21        MR. KIDNEY:  Thank you, Counsel.

22        MR. HEMANN:  You're welcome.

23 BY MR. KIDNEY:

24 Q.    Now, again, we've attached -- there is no memo line on

25 this check either, correct?

1  A.    Correct.

2  Q.    And, again, we've attached for convenience an excerpt from

3  Plaintiff's Exhibit 1007 in the exhibit.  Can you look at that.

4  It's hard to read, but I'll represent that that is for the same

5  check number.  It's a little more legible on the paper copy.

6  And the -- but you can see we've highlighted the check number,

7  although it's still hard to read, and, again, the designation

8  "Rat."  Again, is that the same as your testimony for the

9  earlier checks?

10  A.    Yes, sir.

11  Q.    And then we'll turn to Plaintiff's Exhibit 1015.

12        **MR. KIDNEY:**  Which we offer in evidence, Your Honor.

13        **THE COURT:**  It's received.

14        (Plaintiff's Exhibit 1015 received in evidence.)

15        (Document displayed)

16  BY MR. KIDNEY:

17  Q.    Now, is this another one of your checks?

18  A.    Correct.

19  Q.    This one does have a memo line, "Rat."  Can you explain --

20  this one is for $14,000, in July of 2007.

21        Why does this have a notation on the memo line where

22  the checks we've previously seen did not?

23  A.    Uhm, as -- as time went on, I think we just got more

24  relaxed and I -- I think that I just wrote it on the memo line.

25  I thought it was no big deal.

1  Q.  So you became more casual about it?

2  A.  Well, I -- I believe all of us became more relaxed and

3  more casual.

4  Q.  Do you know what you did with the $14,000 from this check?

5  A.  I mean, I -- from what I recall, it was -- it was money

6  that I -- I pulled out or wrote to cash to pay off -- to pay

7  money towards Mr. Zaman and Vinnie.

8  Q.  This is about -- substantially larger than your earlier

9  checks we've seen.

10 A.  Right.

11 Q.  $14,000.  Does that refresh your recollection in any way

12 why you wrote that large amount?

13 A.  Uhm, it -- for it to be that large an amount, it must have

14 been, you know, money that was for -- for Mr. Zaman and, I

15 believe, for Vinnie, and maybe it was some money for myself,

16 too, like we were going somewhere or doing something or -- I

17 don't remember exactly.

18 Q.  So you don't have a specific recollection?

19 A.  No.

20 Q.  If you'll turn -- turn to page 2 of Exhibit 1016, this one

21 in front of you --

22          THE COURT:  1015?

23          MR. KIDNEY:  1016.

24          THE COURT:  1016.

25          MR. KIDNEY:  We admitted 1016, didn't we?

1          THE CLERK:  Not yet.

2          MR. KIDNEY:  I offer 1016, Your Honor.

3          THE COURT:  All right.  It's received.

4          (Plaintiff's Exhibit 1016 received in evidence.)

5          MR. KIDNEY:  Apologize for that.

6          (Document displayed)

7  BY MR. KIDNEY:

8  Q.   Is this a record for Bank of America?  Yes.

9          And can you see that it says "savings deposit"?

10  You're on page 2 of 10 -- 1016.

11  A.   Correct.

12  Q.   Did you deposit this $14,000 in the Bank of America?

13          MR. HEMANN:  Your Honor, if I could, this one is a

14  little different.  This isn't a check in the check register.

15  So we don't -- I thought we were going to go through them in

16  order and do the check -- check registers.  This is a deposit

17  slip.

18          THE COURT:  Yes.

19          MR. HEMANN:  I think we just need more of a

20  foundation.

21          THE COURT:  Well, it would be good to let the witness

22  provide the foundation, too.  So you're objecting to this at

23  this time without a foundation?

24          MR. HEMANN:  It's just not within the -- it's not in

25  the same series of exhibits that I agreed to.

1      THE COURT:  All right.  Why don't you just get the

2   witness --

3      MR. HEMANN:  Well, let me just take a quick look,

4   Your Honor, and I'll -- I just haven't looked at the

5   attachments to it yet.  Would you just give me one moment?

6      THE COURT:  Sure.

7      MR. HEMANN:  Okay.  I'm fine with this, Your Honor.

8   I don't have any objection.  Sorry about that.

9      THE COURT:  Okay.  Go ahead.  Begin again.

10      MR. KIDNEY:  Thank you.  It happens.

11      (Document displayed)

12   BY MR. KIDNEY:

13   Q.   Can you identify this for the jury?

14   A.   It's a deposit slip.

15   Q.   Indicating what, the deposit of -- indicating what?

16   A.   The deposit of the check that I -- that I wrote to my

17   Bank of America account.

18   Q.   Okay.  If you would turn to the third page of the exhibit,

19   the next page in your book, can you tell us -- tell the jury

20   what that is.

21   A.   It was -- let's see.  It was a withdrawal of the account.

22   Q.   And the date on that is what?

23   A.   July 30th, '07.

24   Q.   Okay.  And so based on this exhibit, can you tell us what

25   you did with the money, the $14,000, I mean, what you did in

1   terms of banking it.

2   **A.**     Uhm, you're asking me if I can recall what I did with the

3   money?

4   **Q.**     Well, can you recall or are these records something you

5   feel you can adopt that tell you what you did with the money?

6   **A.**     Well, I mean, I recall that, you know, I wrote this check

7   in order to -- to get money out to pay off -- to pay towards

8   Mr. Zaman and Vinnie, I think, to -- towards the debt that I

9   had towards them.

10          And typically when I -- from my Schwab account, if I

11  wanted to cash it, I would have to take it to my

12  Bank of America account and cash it through there.  And I think

13  that it -- it just -- let's see.  Withdraw it on the 30th.

14  Uhm.  For some reason, we didn't do it right away, I guess.  We

15  didn't withdraw the money right away.  So I wrote the check and

16  then a week later, I guess, withdrawed it and then I must have

17  used the money to pay to Mr. Zaman.

18  **Q.**     You're basing this upon what you see in your own checking

19  records, correct?

20  **A.**     Yes.

21  **Q.**     And just to close the loop, we'll go to the last page of

22  the exhibit, which -- can you identify that, please.

23  **A.**     Yes.

24  **Q.**     What is it?

25  **A.**     It's my bank statement from Bank of America.

1        **MR. KIDNEY:**  If we could go down to the activity.

2        **THE WITNESS:**  Yes.

3    BY MR. KIDNEY:

4    Q.    That -- that confirms what we saw already, that you

5    deposited the check and a week later took out the cash,

6    correct?

7    A.    Correct.

8    Q.    I would like you to turn next to another check,

9    Plaintiff's Exhibit --

10       **MR. KIDNEY:**  Don't flash it yet, please.

11   BY MR. KIDNEY:

12   Q.    -- Plaintiff's Exhibit 1005.

13       **THE COURT:**  Any objection?

14       **MR. HEMANN:**  No objection, Your Honor.

15       **THE COURT:**  It's received.

16       (Document displayed)

17       (Plaintiff's Exhibit 1005 received in evidence.)

18   BY MR. KIDNEY:

19   Q.    Can you tell the jury what this -- there's a different

20   memo on this check.  Can you tell the jury about this check.

21   A.    This was a check written out to cash from my Schwab

22   account.

23   Q.    And it says -- what does it say on the memo line?

24   A.    Vin Dog.

25   Q.    Who was Vin Dog?

1  A.    Vinnie.

2  Q.    That was your nickname for him?

3  A.    That was typically his nickname, yes.

4  Q.    So why did you write this check for cash and note

5  "Vin Dog" on the memo line?

6  A.    Because I was going to give cash to Mr. -- to Vinnie.

7  Q.    To the defendant Mr. Gowrish?

8  A.    Yes.

9  Q.    Okay.  I note that this check is written on -- this check

10  is written on April 16th, right?

11  A.    Correct.

12  Q.    The testimony we took you through yesterday established

13  that you left for Asia on the 18th or 19th of April; is that

14  correct?

15  A.    Correct.

16  Q.    Why were you writing the check for cash to -- for

17  Mr. Gowrish just a couple of days before you were going to

18  Asia?

19  A.    Well, I was leaving to -- to move to Asia, so I wanted to

20  try -- or complete to pay off the debt that I owed to him,

21  which was far less than the debt that I owed to Mr. Zaman.

22  Q.    Do you recall actually paying Mr. Gowrish in that week

23  before you left?

24  A.    Yes.

25  Q.    Where was it?

1   A.   I went to his house or his condominium.

2   Q.   And did you pay him there?

3   A.   I gave him an envelope with the cash in the envelope.

4   Q.   Thank you.

5        Now, turn to Plaintiff Exhibit 1006, if you would,

6   please.

7        **MR. KIDNEY:**  We offer 1006, Your Honor.

8        **THE COURT:**  Any objection?

9        **MR. HEMANN:**  No objection, Your Honor.

10       **THE COURT:**  It's received.

11       (Plaintiff's Exhibit 1006 received in evidence.)

12       (Document displayed)

13  BY MR. KIDNEY:

14  Q.   Now, can you tell the jury what this check was for?

15  A.   Uhm, it was a check to -- for cash.  And from the memo,

16  the cash was for Adnan and Vinnie.

17  Q.   Now, did you deliver the cash to Adnan?  Was that Adnan

18  and Vinnie?

19  A.   Well, I mean, as far as the memo, the cash was for both of

20  them, but I don't recall if I gave it directly to Vinnie or if

21  I gave it directly to Adnan and Adnan was going to give Vinnie

22  his cut.

23  Q.   Did you sometimes give money to Mr. Zaman with an

24  instruction that part of it was for Mr. Gowrish?

25  A.   Yes.

1  Q.   Did Mr. Zaman ever tell you that he didn't deliver the

2  money to Mr. Gowrish?

3  A.   No.

4  Q.   Did Mr. Gowrish ever complain to you that he wasn't

5  getting any money from the tips?

6  A.   No.

7  Q.   I'll have you turn to Plaintiff's Exhibit 1004.

8          **MR. KIDNEY:**  We offer 1004, Your Honor.

9          **THE COURT:**  Thank you.  It's received.

10          (Plaintiff's Exhibit 1004 received in evidence.)

11          (Document displayed)

12  BY MR. KIDNEY:

13  Q.   Can you tell us -- this check has yet a different named

14  memo line.  Can you tell us what it is?

15  A.   It's a check written for cash.

16  Q.   What does it say in the memo line?

17  A.   "Rat #2."

18  Q.   Who is Rat #2?

19  A.   That could also be Vinnie.

20  Q.   Could?  Could it be somebody else?

21  A.   No.  I mean, it should -- it would be Vinnie.  Sorry.

22  Q.   So at this point you were calling him Rat #2 instead of

23  Vin Dog?

24  A.   Well, "Rat" was typically a name we kind of used with each

25  other.  They called me Rat.  I called them Rat.  But as far as

1  between the three of us, Vinnie was Vin Dog.  I would call

2  Adnan Rat.  He would call me Rat.  So it was just a nickname.

3          But, typically, Vinnie was Vin Dog.

4  Q.  But in this case you chose to call him something else?

5  A.  For some reason, I just wrote "Rat #2."

6  Q.  What did you do with the cash, if you recall?

7  A.  I mean, there was only two options.  Either I would give

8  the money directly to Vinnie or I would give it to Adnan to

9  give to Vinnie.

10 Q.  So you don't recall which --

11 A.  No.

12 Q.  -- of those happened here?

13 A.  No.

14 Q.  Are you confident you gave it to one or the other?

15 A.  Yes.

16 Q.  Now, did there come a time when you learned you were being

17 investigated by the Securities and Exchange Commission?

18 A.  Yes.

19 Q.  About when was that, if you recall?

20 A.  I don't remember the exact date.

21 Q.  Do you remember what year it was?

22 A.  It would have been 2008.

23 Q.  Speak up.

24 A.  Sorry.  I believe it might have started in 2008.

25 Q.  How did you learn about the investigation?

1  A.   Uhm, I received a phone call at my residence in

2  San Francisco on my home phone.  And the initial call, I

3  thought it was -- it was different than what -- what it was.   I

4  didn't -- I didn't -- at first, I didn't -- I didn't know it

5  was a call from the SEC.

6  Q.   Who did you think it was from?

7  A.   I thought it was one of those -- typically, you get those

8  calls, the class action calls or reports where I get them in

9  the mail concerning stocks that I've purchased where there's a

10 class action against them and they want me to fill out the

11 information as far as when I purchased the stock and how many

12 shares that -- I typically could receive money back or

13 something, or some kind of -- there was a case against the --

14 regarding the stock.

15 Q.   And do you recall what stock was mentioned by the SEC?

16 A.   WebMethods.

17 Q.   But you didn't realize at the time it was from the SEC,

18 the call?

19 A.   No, sir.

20 Q.   What did you do -- what happened after this call that you

21 mistook for a call from some class action law firm?

22 A.   Well, when -- when they first contact -- or when SEC first

23 contacted me, it was very early in the morning and calling on

24 my home phone.  So I -- I didn't -- you know, it took me a

25 second to, you know, try to figure out, you know, what this

1  call was about.  And I -- during that time with my account, I

2  had a financial person that took care of my accounts so I

3  had -- like I said, I had two accounts.  So I wanted to contact

4  him or -- to figure out what account this came from, either was

5  it the account that, you know, had Mr. Zaman used or was it the

6  other account.  And then I, you know --

7  **Q.**  Excuse me.  At this time when you contacted your advisor,

8  did you have -- were you still thinking this was a class action

9  inquiry?

10 **A.**  In the very beginning, I thought it was a class action

11 inquiry.  I wasn't sure.

12 **Q.**  Did something happen to cause you to realize it was an SEC

13 inquiry?

14 **A.**  Well, later on in the day at Vinnie's condominium, I was

15 there with my cousin, because my cousin was interested -- or

16 Vinnie was interested in taking over a lease from my cousin's

17 vehicle, and I was talking to Vinnie and my cousin about the

18 phone call.  And I was trying to figure out exactly what it

19 was.

20         And my cousin asked me, Well, what was the number?

21 And he called the number with his cell phone and then he -- he

22 was the one that confirmed that it was -- it was SEC, because

23 it was a voice message or a message machine saying, you know,

24 SEC or something like that.

25 **Q.**  And what did you do next?

1   A.   I mean, I -- you know, I was worried.  I don't know.  I

2   guess I figured that it must have had something to do with

3   the -- the tips that I received from Mr. Zaman and Vinnie.

4              And Vinnie was there when -- when I made that -- or

5   when my cousin made that call and, you know, he tried to

6   comfort me and tell me that, you know, not to worry about it.

7   Q.   Did you have further communication with Mr. Gowrish after

8   this session in his apartment when he was investigating taking

9   over the lease from your cousin?

10  A.   Yes.

11  Q.   What was the next conversation you had with him, if you

12  remember?

13  A.   I mean, we -- we hung out.  I mean, I was already at his

14  house when that -- when we made that call.  But he was just

15  trying to tell me, you know, it's probably nothing, not to

16  worry about it.

17  Q.   Now, subsequent to that, did you have further

18  communication with Mr. Gowrish?

19  A.   Yes.

20  Q.   Do you recall when, where, any details about it?

21  A.   I mean, within the next few days after, you know, we

22  realized what was going on and that, you know, it was something

23  serious, Mr. Zaman and Mr. Gowrish came to my house, came to my

24  condominium.

25  Q.   Came to your condominium?  And did they say what they were

1  there for?

2  **A.**    Well, we -- we were talking about, you know, the -- the --

3  the stocks that were in question from the SEC.

4  **Q.**    Did they ask you for anything?

5  **A.**    No.

6  **Q.**    What did you and Mr. Zaman and Mr. Gowrish conclude to do

7  next, if anything?

8  **A.**    Well, we needed the -- on the advice from my attorney at

9  that time -- or the question was that they needed the reasoning

10  for the purchase of the stocks that were in question.

11  **Q.**    Well, now, are you saying that within just a few days of

12  hearing from the SEC you retained a lawyer?

13  **A.**    Yes.

14  **Q.**    And within a few days of hearing from the SEC you and

15  Mr. Gowrish and Mr. Zaman concluded at a meeting that you

16  should do what?  I'm sorry, I don't think I quite understood.

17  **A.**    Well, right after the initial contact from the SEC and,

18  you know, figuring out, you know, that this was involving the

19  SEC and, you know, they were asking about stocks that were in

20  question, Mr. Zaman flew from New York to -- to come to

21  San Francisco pretty much immediately to try to figure out what

22  would be the next step, what to do.

23  **Q.**    At this time when you heard about the SEC, where was

24  Mr. Gowrish working, if you remember?

25  **A.**    He was -- he was still working for TPG.

1  Q.   In what city?

2  A.   They sent him to Minnesota.

3  Q.   Was he still working out of Minnesota?

4  A.   Yes.

5  Q.   Was his wife still in San Francisco?

6  A.   Yes.

7  Q.   So did he come out to -- in your experience, did he come

8  out to San Francisco very often?

9  A.   Uhm, I mean, I don't know what you consider "very often."

10  Q.   Well, how often did he come out that you know about?

11  A.   I mean, he was -- he was coming back and forth.  I mean,

12  typically, when he would come into town even before this SEC

13  thing happened, I would think he was in town once or twice a

14  month.

15  Q.   And where was Mr. Zaman working at the time you learned

16  about the SEC investigation?

17  A.   He was in New York.

18  Q.   If -- now, did Mr. Gowrish and Mr. Zaman -- or Mr. Zaman

19  help you out with your -- did they provide you anything to help

20  you out in talking to your lawyer?

21  A.   Did they help me out?

22  Q.   Yeah.  Did they help you out with any suggestions?

23  A.   Oh.  Well, I mean, I -- I didn't know anything about the

24  stocks that were in question because I would just, you know,

25  buy the stocks based on the information by them -- by Mr. Zaman

1  buying them, the stocks, or -- or passing me the stock

2  information through a yellow sticky.

3          So when -- when my attorney asked me for reasonings

4  why I purchased these stocks that were in question, I had no

5  idea of the reasoning.  So I had to contact Mr. Zaman for him

6  to come up with a reasoning for the stocks.  And I guess the

7  stocks that were tips from -- from Vinnie, he would have to

8  speak to Vinnie to get -- to correlate the rationale.

9  Q.   Did Mr. Zaman tell you he had spoken to Vinnie?

10 A.   Yeah.  Yes.  Sorry.

11 Q.   Can you please turn to -- let me help you with it.

12          MR. KIDNEY:  May I approach, Your Honor?

13          THE COURT:  You may.

14          THE WITNESS:  This one?

15 BY MR. KIDNEY:

16 Q.   Mr. Vaghar, we have placed in front of you what was

17 previously marked for identification as Plaintiff's Exhibit

18 1067.  Do you recognize that?

19 A.   Yes.

20 Q.   What is it?

21 A.   This is the list of the reasonings or -- the reasonings

22 why the stocks that were in question were purchased that we

23 came up with.  Or that Mr. Zaman and Vinnie came up with.

24          MR. KIDNEY:  Your Honor, we offer Plaintiff's Exhibit

25 1067.

1    MR. HEMANN:  No objection, Your Honor.  Thank you.

2    THE COURT:  Thank you.  It will be admitted.

3    (Plaintiff's Exhibit 1067 received in evidence.)

4    (Document displayed)

5  BY MR. KIDNEY:

6  Q.  Now, how did this come to be written up in the form we see

7  it now?  Do you remember?

8  A.    Mr. Zaman came to my apartment and we typed it up on my

9  computer.  So he brought it handwritten and typed it up on my

10  computer and printed it out and then saved it.  And I -- I gave

11  this to -- to my attorney.

12  Q.   At this time I don't want you to get into discussions with

13  your counsel --

14  A.   Okay.

15  Q.   -- but at this time were you cooperating with the FBI and

16  the SEC when this list was created?

17  A.   No.

18  Q.   What were you telling Mr. Gowrish and Mr. Zaman about the

19  investigation at this time -- or Mr. Zaman?  Let's limit it to

20  Mr. Zaman first.

21  A.   Okay.

22  Q.   What were you telling Mr. Zaman about the investigation,

23  about your role in the investigation?  Well, you're -- may I

24  rephrase it?

25        Did you tell Mr. Zaman what your plans were to do

1  with respect to the investigation about the time this document

2  was prepared?

3  **A.**    Uhm, I was hiring an attorney to -- to -- to help, I

4  guess, fight it.

5  **Q.**    Now, the jury can read these explanations for themselves.

6  I'm not going to take up their valuable time by having you do

7  so.   But are any of these reasons, if you look through them,

8  for these -- for buying these securities, are they true?   Did

9  it really happen?

10  **A.**    No.

11  **Q.**    Did there come a time when you decided to cooperate with

12  the SEC and the prosecutors?   Strike that.   Let me come back to

13  that later.

14        Did you receive any financial assistance from

15  Mr. Gowrish or Mr. Zaman to pay your lawyers?

16  **A.**    Yes.

17  **Q.**    Can you describe for us that situation?

18  **A.**    Well, at the time when -- when the whole SEC thing started

19  happening and I was seeking an attorney to -- to help me with

20  this case, you know, my -- my financial situation was not well

21  and, you know, the attorney wanted -- wanted money to -- you

22  know, for -- upfront and to pay to him and so on.

23        So I had told Mr. Zaman that, you know, I would need

24  help with paying the legal fees.

25  **Q.**    What did Mr. Zaman say when you told him that?

1  A.    That that was fine and that he would talk to -- talk to

2  Vinnie and get some money from him, too, to help.

3  Q.    Did you receive any money?

4  A.    Yes.

5  Q.    Can you tell the jury how many -- on how many occasions

6  did you receive money, that you remember?

7  A.    At least two occasions.

8  Q.    Do you recall -- what was -- do you recall how you

9  obtained the money?

10  A.    Uhm, since Adnan was still living in New York, he would

11  come into town once in a while or -- for, you know -- for this

12  or something like that, and if -- I think the times that he was

13  in town, I wasn't there or something like that.  So if he

14  couldn't give me the money directly, he -- he would leave the

15  money at Vinnie's apartment and I would go pick it up.

16  Q.    Did you do that?

17  A.    Yes.

18  Q.    Was Mr. Gowrish there when you did that?

19  A.    No.

20  Q.    Who was there?

21  A.    Chris Zand.

22  Q.    So he let you in?

23  A.    Yes.

24  Q.    And where did you find this money?

25  A.    One time I found it in the drawer of Vinnie's bedroom and

1    the other time it was like in a cigar box, humidifier.

2    Q.   A cigar box?

3    A.   Yeah.

4    Q.   And that was also in Vinnie's bedroom?

5    A.   Uhm, I don't remember what room in the house it was at.

6    Q.   It was in his apartment?

7    A.   Yes.

8    Q.   Did you tell Mr. Zand what you were there for?

9    A.   Uhm, no.  They -- Adnan told -- instructed me that he

10   didn't want Chris -- Chris Zand to know what was going on, so

11   to just go over there to hang out and then somehow go and get

12   the money.

13   Q.   Was all the money you expected always there?

14   A.   No.

15   Q.   Can you tell the jury what happened on that occasion?

16   A.   Uhm, on one occasion, I don't remember the exact figure,

17   but part of the money was supposed to come from Adnan and part

18   of the money was supposed to come from Vinnie.  And I -- I --

19   Vinnie, I guess, didn't get a chance -- or didn't put the full

20   amount or didn't -- wasn't able to put as much money as he was

21   supposed to, so it wasn't the amount of money that, I guess, we

22   agreed that was going to be there.

23   Q.   Did you eventually get that money?

24   A.   No.

25   Q.   Now, how much money are we talking about here?

1    A.    I think less than 10,000.

2    Q.    Total?

3    A.    Yes.

4    Q.    In a couple of different payments, right?

5    A.    Correct.

6    Q.    Now, did there come a time -- let me return to my earlier

7    question.  Did there come a time where you determined to

8    cooperate with the Securities and Exchange Commission and the

9    U.S. Attorney's Office?

10   A.    Yes.

11   Q.    What did you do?  I mean, to cooperate, what did you do?

12   A.    I decided to come clean and tell the truth.

13   Q.    Right.  How did you go about that?  I mean, how did you

14   tell them?

15   A.    Sorry.  It was kind of a broad question.

16   Q.    That's -- my apology.

17   A.    Yeah.  Where do you want me to start?

18   Q.    Well, let me just ask you, did you -- did you sit down

19   with them and tell them what happened?

20   A.    The SEC?

21   Q.    And the U.S. Attorney's Office.

22   A.    Yes.

23          MR. KIDNEY:  I believe Plaintiff's Exhibit -- I

24   believe Plaintiff's Exhibit 1000 is stipulated to be

25   admissible, correct?

1          MR. HEMANN:  I'm assuming, yes, but let me -- if it

2    is, go ahead, please.

3          MR. KIDNEY:  It's the proffer.

4          MR. HEMANN:  Yes.  Yes.

5          No objection, Your Honor.

6          MR. KIDNEY:  Plaintiff's Exhibit 1000, we offer that,

7    Your Honor.

8          THE COURT:  It's received.

9          (Plaintiff's Exhibit 1000 received in evidence.)

10         (Document displayed)

11         MR. KIDNEY:  May I approach, Your Honor?

12         THE COURT:  You may.

13   BY MR. KIDNEY:

14   Q.   Do you recognize Plaintiff's Exhibit 1000, which is a

15   three-page composite exhibit of three nearly identical

16   documents?

17   A.   Yes.

18   Q.   What are they?

19   A.   Proffer agreement.

20   Q.   Do you know what a proffer is now that you've been through

21   all this?

22   A.   Yes.

23   Q.   What is it?

24   A.   Uhm, let's see.

25         It's an agreement that I -- that I made with the U.S.

1  Attorney.

2  Q.   Okay.  Now, when you came forward to be interviewed by the

3  U.S. Attorney, were you promised, in any way, by the FBI that

4  if you cooperated at this time -- let's put this in a time

5  frame.

6          MR. KIDNEY:  Highlight the date of this, please, at

7  the bottom.

8          (Document displayed)

9  BY MR. KIDNEY:

10 Q.   It's dated February 13, 2009.  Is that when you came in to

11 talk to the FBI and SEC?

12 A.   Yes.

13 Q.   Okay.  Now, as of that time when you reached this

14 agreement, had you been told that you would receive a deferred

15 prosecution agreement if you cooperated?

16 A.   No.

17 Q.   Had you been made any promises that you would not be

18 prosecuted when you came in and signed this agreement?

19 A.   I was never promised I wouldn't be prosecuted.

20 Q.   Never?

21 A.   Never.

22          MR. KIDNEY:  If we could highlight the -- in

23 paragraph number 1, please, the part beginning, "Except a

24 prosecution."

25

1  BY MR. KIDNEY:

2  Q.    Now, preceding that is the phrase -- before this number

3  is -- if you look, it says, "The following understandings

4  exist," and it states that any statements that you made in the

5  proffer, if they were truthful, would not be used against you,

6  correct?

7  A.    Correct.

8  Q.    But that they could use against you any other information

9  they developed, independent of your particular statements,

10  correct?

11  A.    Correct.

12  Q.    Is there any other promise made to you other than that?

13  A.    No.

14  Q.    And if we could go to the last sentence of the document,

15  please.

16          MR. KIDNEY:   Highlight the last sentence, please.

17          (Document displayed)

18  BY MR. KIDNEY:

19  Q.    And it says, "No understandings, promises or agreements

20  have been entered into with respect to the meeting other than

21  those set forth in this agreement and none will be entered

22  unless memorialized in writing and signed by all parties."

23          Is that your understanding?

24  A.    Yes, sir.

25          MR. KIDNEY:   Turn to page 2 of the exhibit, please.

1   Oh, first, before you switch --

2   BY MR. KIDNEY:

3   Q.   You signed this agreement, right?

4   A.   Yes.

5   Q.   As well as the Assistant U.S. Attorney?

6   A.   Yes.

7   Q.   As well as the FBI agent?

8   A.   Yes.

9   Q.   As well as your own lawyer at the time, correct?

10  A.   Yes.

11  Q.   Okay.

12          MR. KIDNEY:   Turn to page 2, please.

13          (Document displayed)

14  BY MR. KIDNEY:

15  Q.   This is it.   Is this an identical agreement signed by all

16  those same people but dated April 1st, 2009?

17  A.   Yes.

18  Q.   And is that the date on which you came in for a second

19  interview with the FBI and the SEC?

20  A.   Yes.

21          MR. KIDNEY:   Turn to page 3, please.

22          (Document displayed)

23  BY MR. KIDNEY:

24  Q.   Those are the same promises and limitations on promises

25  signed in your first document, correct?

1  A.    For May 7, 2009?

2  Q.    For April that we just talked about.

3         **THE COURT:**  It says "May."

4         **MR. KIDNEY:**  We just threw up the next one.

5  BY MR. KIDNEY:

6  Q.    I'm sorry.  The April one we just talked -- were the

7  promises the same for all the times you were interviewed by the

8  FBI?

9  A.    Correct.

10 Q.    And the third time you were interviewed was May 7, 2009?

11 A.    Right.  Three times.

12 Q.    Three times.  Was that the last time you were interviewed

13 by them?

14 A.    Yes.

15 Q.    Okay.  Thank you.

16        Now, in fact, the SEC brought a lawsuit against you,

17 didn't they?

18 A.    Correct.

19 Q.    And you -- and you settled that with them, right?

20 A.    Correct.

21        **MR. KIDNEY:**  May I approach, Your Honor?

22        **THE COURT:**  You may.

23        **MR. KIDNEY:**  Your Honor, we move into evidence

24 Plaintiff's Exhibit 1123, which is stipulated to with the

25 defense.

1      THE COURT:  Any objection?

2      MR. HEMANN:  No, Your Honor.

3      THE COURT:  Thank you.  It will be received.

4      1123?

5      (Plaintiff's Exhibit 1123 received in evidence.)

6      MR. KIDNEY:  1123.  We put it in the witness

7   notebook.  I gave a copy --

8      THE CLERK:  I think it's back in your binder, but

9   it's not on the list.  That's why she's asking.

10     THE COURT:  Okay.

11     THE CLERK:  I don't need another copy of that.

12     MR. KIDNEY:  We added it.

13  BY MR. KIDNEY:

14  Q.   Can you identify Plaintiff's Exhibit 1123, Mr. Vaghar?

15  A.   Yes, sir.

16  Q.   What is it?

17  A.   It's the final judgment from the SEC.

18  Q.   And it contains -- also preceded by your consent to that

19  judgment, correct?

20  A.   Correct.

21  Q.   Did you pay the SEC any money?  Turn to --

22     MR. KIDNEY:  Can we go to page 7 of the exhibit,

23  Byron?

24  BY MR. KIDNEY:

25  Q.   This is actually your final judgment against you in the

1    case brought by the SEC, correct?

2    A.    Correct.

3    Q.    And your codefendants were Mr. Gowrish and Mr. Zaman and

4    Mr. Khoury, correct?

5    A.    Correct.

6    Q.    And was this for the conduct that you've testified about

7    in the last two days?

8    A.    Yes, sir.

9    Q.    Did you have -- have an obligation to pay the SEC?

10   A.    Yes.

11   Q.    How much did you have to pay them?

12   A.    $33,000.

13   Q.    Now, if we turn to -- that's not the amount that the SE --

14   that you -- that the final judgment found you were really

15   liable for, correct?

16   A.    No.

17   Q.    If you'd turn to page 10 of Plaintiff's Exhibit 1123.

18          MR. KIDNEY:    Highlight the -- blow up the first --

19   that's fine.

20          (Document displayed)

21   BY MR. KIDNEY:

22   Q.    In fact, the Court in its final judgment said you were

23   liable for disgorgement of $318,784, correct?

24   A.    Yes, sir.

25   Q.    Together with prejudgment interest of 47,217 on that

1  amount, correct?

2  A.    Correct.

3  Q.    However, it also states further that, based on your sworn

4  representations of your financial condition, most of that is

5  waived, and you were ordered to pay a civil penalty of -- of

6  $33,000, correct?

7  A.    Correct.

8         MR. HEMANN:  Your Honor, I'm going to just object on

9  leading grounds.

10        THE COURT:  Sustained.

11        Please don't do that any more.

12        MR. KIDNEY:  I'm sorry.  It just seems -- I was just

13 trying to speed things up a little.

14        THE COURT:  I know.  But it's important that you ask

15 direct questions.

16        MR. KIDNEY:  I know.  I apologize.

17 BY MR. KIDNEY:

18 Q.    Have you paid the SEC that amount of money?

19 A.    Partially.

20 Q.    How much have you paid them?

21 A.    I paid the first payment on time and there was a first

22 payment for half of it, which was 16,5, I think.  And the

23 second payment, we are working out a payment plan.  I'm working

24 on a payment plan with the SEC.

25 Q.    Who are you working on that with?

1   A.   Stacey Nahrwold.

2   Q.   You're not -- you and I have not discussed --

3   A.   No.

4   Q.   -- working on a payment plan?

5   A.   Not at all.

6   Q.   Nor have you discussed it with any other member of our

7   trial counsel, have you?

8   A.   No.  It's the plan -- the person that's taking care of my

9   payment as representative for the SEC.

10  Q.   Do you expect to complete the payment?

11  A.   Yes, sir.

12  Q.   How are you going to go about that?

13  A.   Payment plan.

14  Q.   What is your financial condition right now?

15  A.   Uhm, not -- not very well.

16  Q.   What's your income?

17  A.   Uhm, my income is from my medical disability.

18  Q.   How much is that a month?

19  A.   It comes up to be roughly 3600.

20  Q.   3600?

21  A.   (Nods head)

22  Q.   How much is your -- do you have a mortgage on where you

23  live?

24  A.   Yes.  I just recently got a temporary approval for a

25  modification on my -- on the property that I live in.  So

1  that's good because I thought I was going to lose the property.

2  And I pay that with my HOA, which is about $1,200 a month.  And

3  then my paying -- I'm paying the -- the fine that I -- that I

4  owe to the Department of Justice, a payment plan, which was

5  $5,000 initially from the DOJ.  And I've been paying that every

6  month, $200 a month, plus my monthly expenses, I don't know,

7  phone, electricity, everything like that.

8  Q.   Now, Plaintiff's Exhibit 1123, the final judgment, refers

9  to a sworn representation of your statement of financial

10 condition.  Did you submit such a thing to the Securities and

11 Exchange Commission?

12 A.   Yes.

13 Q.   Was it truthful?

14 A.   Yes.

15 Q.   In all respects?

16 A.   Yes.

17 Q.   You just mentioned a fine to the Department of Justice.

18 Did you enter into a deferred -- into some kind of agreement

19 with the Department of Justice?

20 A.   Yes, sir.

21 Q.   Turn to Exhibit 1017, please.  So it's in your other

22 binder.

23          MR. KIDNEY:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. KIDNEY:  I believe Plaintiff's Exhibit 1017 is

1  also subject to a stipulation.  Counsel?

2          **MR. HEMANN:**  Yes.  No objection, Your Honor.

3          **THE COURT:**  It's received.

4          (Plaintiff's Exhibit 1017 received in evidence.)

5          (Document displayed)

6  BY MR. KIDNEY:

7  Q.   Can you look at Plaintiff's Exhibit 1017 and identify it

8  for the jury, please.

9  A.   This is my pretrial deferred prosecution agreement.

10  Q.   Now, when did you actually receive a copy of this?

11  A.   I don't -- I don't know the date.

12  Q.   Is there a date on the cover letter?

13  A.   August 20, 2010.

14          **MR. KIDNEY:**  And if we could turn to page 6 of the

15  exhibit, please, the signature page.

16          (Document displayed)

17          **THE WITNESS:**  Okay.

18          **MR. KIDNEY:**  Exhibit page 6.  Exhibit page 6.

19  BY MR. KIDNEY:

20  Q.   Is that your signature on this agreement?

21  A.   Yes, sir.

22  Q.   And you signed the agreement in March of 2010 -- or when

23  did you sign the agreement?

24  A.   It says March 15, 2010.

25  Q.   And your counsel at the time, did he also sign the

1  agreement?

2  A.    Yes.

3  Q.    Now, I want to take you through some of the provisions in

4  this.

5         MR. KIDNEY:  And then, Your Honor, I think there will

6  be a couple more questions and then we will be through with the

7  witness.

8         THE COURT:  All right.

9         MR. KIDNEY:  On page 1 -- page 2 of the exhibit --

10  page 1 is the plea agreement -- I'm sorry.  Byron, page 2 of

11  the exhibit -- page 3.  I'm sorry.  Now -- here, if we could

12  blow up paragraph 1, please.

13         (Document displayed)

14  BY MR. KIDNEY:

15  Q.    Can you read that to the jury, the first part of that

16  sentence.

17  A.    (As read:)

18         "The United States is prepared to file an

19         Information against Vaghar in the

20         United States Court for the Northern District

21         of California charging the defendant with

22         one -- with one count of securities fraud

23         (insider trading)."

24  Q.    Okay.  Thank you.

25         Did you have any understanding whether the

1   United States was prepared to prosecute you?

2   **A.**    Yes.

3          **MR. KIDNEY:**    If we could go to exhibit -- page 4

4   [sic], please, paragraph 9 and 10.

5   **BY MR. KIDNEY:**

6   **Q.**    Can you read that to the jury, please.

7   **A.**    (As read:)

8          "Based on the defendant's willingness to come

9          forward to confess his wrongdoing, admit his

10         responsibility for the conduct giving rise to

11         the Information, and promise to cooperate in

12         good faith, the Office agrees ..."

13  **Q.**    Continue please.

14  **A.**    Oh.    (As read:)

15         "... not to file the Information against the

16         defendant subject to the agreements and

17         understandings set forth herein and not to

18         prosecute the defendant for any other conduct

19         arising out of the investigation that led to

20         the Information."

21  **Q.**    What does paragraph 10 say?

22  **A.**    (As read:)

23         "Other than those promises explicitly set

24         forth in paragraph 9, this Office does not

25         make any other promises to the defendant."

1    Q.   Did anyone at the department -- first of all, do you

2    understand that that has been, in fact, the case?

3    A.   Yes, sir.

4    Q.   Did anyone from the office of the United States Attorney

5    tell you that in order for you to receive benefit for your

6    cooperation it was insufficient for you to just talk about

7    Mr. Zaman, you had to bring somebody else into the scheme?

8    A.   No, sir.

9    Q.   Did anybody ever indicate to you that your cooperation had

10   to be better than what you were actually cooperating at the

11   time?

12   A.   No, sir.

13   Q.   Now, if we could turn to Exhibit A to this plea agreement,

14   which begins at page 8 of the exhibit.

15          MR. KIDNEY:   Exhibit A.  Next page, please.

16   BY MR. KIDNEY:

17   Q.   Do you see what that is?

18   A.   Yes.

19   Q.   What is it?

20   A.   Uhm, it says, "General allegations."

21   Q.   Okay.  It's Exhibit --

22          MR. KIDNEY:   Can we go back to page 3 of the exhibit.

23   Page 3 of the exhibit.

24          (Various documents displayed.)

25          MR. KIDNEY:   Sometimes computers are not all what

1    they are cracked up to be.

2               Page 3 of the exhibit.  Page 3.

3               **THE COURT:**  It's actually several exhibits, so you

4    better tell him exactly what you want.

5               **MR. KIDNEY:**  Yes.  PX1017, page 3.

6               **MR. KING:**  Okay.

7               **MR. KIDNEY:**  Okay.  Now we are there.  Highlight down

8    there the last sentence of the first numbered paragraph,

9    please.

10              (Document displayed)

11   **BY MR. KIDNEY:**

12   **Q.**   Can you read that to the jury, the last sentence there.

13   **A.**   (As read:)

14              "A copy of the Information is attached hereto

15              as Exhibit A, and incorporated by reference

16              herein."

17   **Q.**   Okay.  Now, if we can go back to -- is that what Exhibit A

18   was that you saw, that you were reading from a minute ago, a

19   copy of the Information?

20   **A.**   Correct.

21   **Q.**   Do you have any understanding as to whether that was the

22   Information that the U.S. Attorney's Office would file against

23   you if you violated the terms of your -- your -- the deferred

24   prosecution agreement?

25   **A.**   Correct.

1    **MR. KIDNEY:** Can we go to page 9 of the exhibit,

2    which is the next page after this.  I'm sorry, page 9 of the

3    exhibit.

4            (Document displayed)

5    **MR. KIDNEY:** Next page.  Can you bring up paragraphs

6    4 and 5.

7            (Document displayed)

8    BY MR. KIDNEY:

9    Q.  Can you read that to the jury, please.

10   A.  Number 5 or number 4 or both?

11   Q.  I'm sorry, 4 and 5.

12   A.  Okay.  (As read:)

13          "Person A, known to the United States

14          Attorney's Office, was a close friend of

15          Zaman's and was employed at a company -- at

16          Company A in San Francisco.  Company A's

17          business involved, among other things,

18          acquisition of publicly-traded companies.

19          "Person B, known in the United States

20          Attorney's Office, was a resident of

21          Emeryville, California, and was a friend of

22          Vaghar's and an acquaintance of Zaman during

23          the relevant time period."

24   Q.  Now, who was Person A in this Information?  Do you know

25   who that referred to?

1   A.    Person A would be -- would be Vinnie.

2   Q.    And who was Person B?

3   A.    Would be -- would be myself.

4   Q.    It says that Person B was a friend of Vaghar's.

5   A.    Oh, wait.  It says, "Person B was a resident of

6   Emeryville, California."  It's confusing.

7   Q.    Do you know who Person B was?

8   A.    Well, from what I'm reading from number 5, it says,

9   "Person B, known to the United States Attorney's Office, was a

10  resident of Emeryville, California."  I'm the only person that

11  lived in Emeryville.

12  Q.    Are you sure?

13  A.    Oh, sorry.  Okay.  So Person B would be Sameer Khoury.

14  Q.    Okay.  Thank you.

15          **MR. KIDNEY:**  And then if we could move to the next

16  page, please, paragraph 10.

17          (Document displayed)

18  **BY MR. KIDNEY:**

19  Q.    Can you read that to the jury, please, except for the box.

20  A.    (As read:)

21          "During the period of late 2006 to May 2007,

22          Zaman learned that Person A -- that

23          Person A -- that Company A was engaged in

24          certain confidential transactions involving

25          the acquisition or potential acquisition of

1              certain publicly-traded companies.  These

2              transactions included the transactions

3              identified in the following table."

4  Q.   Okay.  Then we have the table, and can you read the

5  remainder of the paragraph after the table.

6  A.   (As read:)

7              "Zaman knew that prior to the public

8              announcement dates, the existence of the

9              transactions summarized above (the Company A

10             transactions) were material, nonpublic

11             information.  He also knew that due to Person

12             A's employment at Company A, Person A had

13             access to and was aware of the material

14             non-public information (the Company A inside

15             information)."

16  Q.   Again, who was Person A?

17  A.   Mr. Zaman.

18  Q.   Mr. Zaman?

19  A.   Who is this -- this talking -- it says Zaman -- oh, I see

20  it.  Mr. A would be -- would be Vinnie.

21  Q.   Okay.  Thank you.

22  A.   Sorry about that.  It's confusing.

23         MR. KIDNEY:  Now go to the next page, please,

24  paragraph 12.

25         (Document displayed)

1  BY MR. KIDNEY:

2  Q.    By the way, are any of the statements made that you've

3  read from out of this Information -- proposed possible

4  Information -- has anything that you have read been untruthful?

5  A.    No.

6  Q.    Uhm, please read to the jury paragraph 12.

7  A.    (As read:)

8              "Person A passed to Zaman material,

9              non-public information that Person A knew

10             about the Company A transactions in violation

11             of fiduciary and other duties of trust,

12             confidence and confidentiality that Person A

13             owed to Company A.

14             "Zaman then passed Company A inside

15             information to Vaghar and Person B, or to

16             Vaghar with knowledge that he would pass

17             information to Person B.  Vaghar and Person B

18             knew that the source of the Company A inside

19             information owed, and had been breached,

20             duties of trust, confidence and

21             confidentiality with respect to Company A

22             inside information.

23             "Vaghar and Person B traded in the securities

24             of Sabre Holdings, TXU, and Alliance Data and

25             shared some of the profits with Zaman by

1          paying him cash and providing other financial

2          benefits."

3  Q.    To your knowledge, is any part of that statement not true?

4  A.    No, sir.

5  Q.    Now, did you also provide the U.S. Attorney's Office a

6  personal statement that also is accompanying your deferred

7  prosecution agreement?

8  A.    Personal statement?

9  Q.    Personal statement.

10 A.    I believe so.

11 Q.    Do you remember?

12 A.    Uhm, a personal statement coming from myself?

13 Q.    Yes.

14 A.    I believe so.

15 Q.    Okay.  Let's turn to Exhibit B, at page 14 [sic] of the

16 exhibit.

17        (Document displayed)

18        **MR. KIDNEY:**  Highlight the beginning of the third

19 paragraph, please.

20 BY MR. KIDNEY:

21 Q.    First of all, is this part of your personal statement that

22 you provided?

23 A.    Correct.

24 Q.    Is this something that you wrote up with your attorney?

25 A.    I believe so.

1  Q.   Can you read the first sentence to the jury, please, in

2  the paragraph that we've blown up, paragraph 3.

3  A.   (As read:)

4          "Although I'm unable to recall the specifics

5          of each insider trading transaction, I know

6          the general method by which I obtained inside

7          information from Zaman, executed the trades

8          and shared the profits."

9  Q.   So did you acknowledge that you couldn't recall the

10 specifics about every occasion?

11 A.   Correct.

12        MR. KIDNEY:   Let's go to the sentence starting at the

13 end of the paragraph, as far as we can see, starting, "Zaman

14 communicated."

15        (Document displayed)

16 BY MR. KIDNEY:

17 Q.   Can you read that, please.

18 A.   (As read:)

19          "Zaman communicated the inside information to

20          me in person and often handed to me a Post-It

21          note with the trading symbol of the target

22          company and price and call option contract

23          expiration date."

24 Q.   So is that true?

25 A.   Yes.

1    Q.    Now, let's go to the next page of the exhibit, please.    We

2    are almost through with it.

3              (Document displayed)

4    BY MR. KIDNEY:

5    Q.    And the last paragraph, please, can you read that to the

6    jury, please.

7    A.    (As read:)

8              "I believe that Zaman obtained inside

9              information for the trades in Sabre Holdings,

10             TXU, and Alliance Data Systems from Person A.

11             I understand that Person A, like Zaman,

12             worked in the financial industry and had

13             access to insider information about

14             pending -- pending acquisitions, transactions

15             between publicly-traded companies.    On three

16             occasions, I delivered cash to or for" --

17             (Reporter interrupts)

18             MR. KIDNEY:    "To or for."

19   BY MR. KIDNEY:

20   Q.    And then continue reading on the next page.

21   A.    (As read:)

22             "... the benefit of Person A in exchange for

23             the inside information he provided through

24             Zaman."

25   Q.    Keep reading.

1  A.    (As read:)

2             "The first time -- the first time I gave cash

3         to Zaman with the understanding that Zaman

4         would pass the cash to Person A; I did not

5         confirm whether Zaman actually delivered the

6         cash to Person A."

7  Q.    Keep reading.

8  A.    (As read:)

9             "On two other occasions, I paid Person A

10        directly.  I do not recall the precise amount

11        of each payment I delivered to or for the

12        benefit of Person A; my best estimate is that

13        each payment totaled approximately 2 to

14        $5,000."

15 Q.    Is there anything in that whole paragraph that, as you sit

16 here today, you believe to be untrue?

17 A.    No.

18             MR. KIDNEY:  Now, if we could return to the first

19 page of this exhibit, the cover letter.  Highlight the middle

20 of it, please, the numbered paragraphs.  You don't have to

21 highlight it.

22             (Document displayed)

23 BY MR. KIDNEY:

24 Q.    Now, the U.S. Attorney's Office, in this cover letter,

25 does it highlight for you your obligations under this deferred

1  prosecution agreement?

2  A.   Yes.

3  Q.   Can you read those to the jury, please.

4  A.   Where do you want me to start from?

5  Q.   Number 1.

6  A.   (As read:)

7          "You shall not violate any federal, state or

8          local law.  You should -- you shall contact

9          PTSA immediately -- immediately if you are

10         arrested or questioned by any law enforcement

11         officer."

12  Q.   Have you complied with that provision?

13  A.   Yes.

14  Q.   And I'll note "PTSA" is shown as the Pretrial Services

15  Agency.

16         What's the second provision?

17  A.   "You shall report to PSTT" -- excuse me -- "PTSA as

18  directed."

19  Q.   You have to report to PTSA?

20  A.   Yes.

21  Q.   How often?

22  A.   Uhm, I report on the 1st of every month in person, and

23  then on the 15th of every month, I -- I shoot -- I send my

24  point of contact an e-mail just stating, you know, how things

25  are going.  And I send them a scanned copy of the check that

1   I've sent to the DOJ for that month as my payment plan.

2   Q.   Read number three 3, please.

3   A.   (As read:)

4          "You should not -- you shall not change

5          residence without prior approval of PTSA."

6   Q.   Have you changed residence?

7   A.   No, sir, thankfully.

8   Q.   Please read to the jury the final provision.

9   A.   (As read:)

10         "Persistent [sic] to the deferred prosecution

11         agreement between yourself and the

12         United States Attorney" --

13         (Reporter interrupts)

14  BY MR. KIDNEY:

15  Q.   You've got to slow down.

16  A.   I'm sorry.

17  Q.   The court reporter tries to take down every word.  It's

18  very difficult.

19  A.   Where do you want me to start at?

20  Q.   Why don't you just begin again to read the paragraph.

21  A.   Okay.  (As read:)

22         "Persistent [sic] to the deferred prosecution

23         agreement between yourself and the

24         United States Attorney's Office for the

25         Northern District of California (the DPA) a

1           copy of which is attached hereto as Exhibit A

2           [sic], you shall participate in 192 hours of

3           community service and pay a fine of $5,000 in

4           increments deemed appropriate by PTSA."

5  **Q.**   Now, are you performing that 192 hours of community

6  service?

7  **A.**   Yes.

8  **Q.**   Is that the mentoring program that you are involved in?

9  **A.**   City of Dreams, yes.

10 **Q.**   Are you paid for that?

11 **A.**   No.

12 **Q.**   How much more time do you have to perform?

13 **A.**   I've completed about a hundred -- a little more than a

14 hundred of my hours, so I still have another 90 hours.  But I'm

15 going to continue even when I finish.

16        **MR. KIDNEY:**  I have just a couple of follow-up

17 questions and then I'll be able to pass the witness, Your

18 Honor.

19        **THE COURT:**  All right.

20 **BY MR. KIDNEY:**

21 **Q.**   A couple of things I just meant to ask you yesterday and

22 did not.

23        When you engaged in social events with Mr. Zaman, did

24 his wife -- well, first of all, was Mr. Zaman married at this

25 time?

1   A.   At the time, yes.

2   Q.   And did his wife typically accompany him on the social

3   events that -- that -- after work that you attended with

4   Mr. Zaman and Mr. Gowrish?

5   A.   Sometimes.

6   Q.   Sometimes yes and sometimes not?

7   A.   Yes.

8   Q.   Was it more frequent that the wife was in attendance or

9   not?

10  A.   I mean, I guess I could say 50/50.  She had her own -- she

11  had a job and sometimes she wouldn't want to go out with us.

12  Q.   Okay.  Was Mr. Gowrish married at the time?

13  A.   Yes.

14  Q.   Did his wife accompany you -- the three of you on outings

15  to bars and so forth?

16  A.   A few times.

17  Q.   What was she doing, if you know?

18  A.   She was a medical student.

19  Q.   In San Francisco?

20  A.   In Vallejo.

21  Q.   Vallejo.

22       Now, I asked you yesterday about what you knew about

23  TXU, and how you knew it.

24  A.   Correct.

25  Q.   Did you ever attend a party at which you heard a rumor

1  A.    Yes.

2           MR. HEMANN:  Move admission of that document, Your

3  Honor.

4           THE COURT:  Just the one page?

5           MR. HEMANN:  Yes, please.

6           THE COURT:  Any objection?

7           MR. KIDNEY:  No objection.

8           THE COURT:  All right.  It will be received.  So

9  that's page 83.

10          MR. HEMANN:  2089.0083, please.

11          (Defendant's Exhibit 2089.0083 received in evidence.)

12          (Document displayed)

13 BY MR. HEMANN:

14 Q.    So this is April 14, 2008, correct?

15 A.    Yes.

16 Q.    This is approximately two and a half months after your

17 initial conversation with the SEC?

18 A.    Okay.

19 Q.    You spoke to the U.S. Attorney's Office for the first time

20 and Mr. Kelly and Ms. Riewe in February -- on February 13,

21 2009, correct?

22 A.    In '09?  Okay.

23 Q.    Do you remember that?

24 A.    I remember speaking to them.  I don't remember the dates.

25 Q.    Would it refresh your recollection about the dates to look

1  at the report of your interview with the U.S. Attorney's

2  Office?

3  A.    Do you want me to look at the report?

4  Q.    Would it help you remember the date?

5  A.    Correct.

6  Q.    Look at the white binder in front of you and look at the

7  tab at the back, the first tab at the back.

8  A.    Which one?

9  Q.    The first tab at the back.

10  A.    Okay.

11  Q.    At the back (indicating).  Do you see that, Mr. Vaghar?

12        MR. KIDNEY:  Can we have a page number?

13        MR. HEMANN:  It's the first page of the first --

14  BY MR. HEMANN:

15  Q.    If you can look at the date at the bottom of that

16  document.  No, no, the report there.

17  A.    What?

18  Q.    Look at the date at the bottom.

19  A.    February 13th.

20  Q.    Don't -- don't read it.

21  A.    Sorry.  It's difficult.  Okay.

22  Q.    Does that refresh your recollection as to when you spoke

23  with the FBI and the SEC?

24  A.    I guess so, yes.

25  Q.    So you retained Mr. Ehrlich about two and a half months

1  after you first spoke to the U.S. Attorney's Office and the

2  SEC, correct?  I mean, sorry.  I'm sorry.  I got them reversed.

3          You spoke to the U.S. Attorney's Office and the SEC

4  about ten months after you hired Mr. Ehrlich, correct?

5  A.   So this -- this transcript is the date, the first date

6  that what?  I'm sorry.

7  Q.   I need to ask the questions.

8  A.   Okay.  Well, I mean, I don't -- I don't know what this --

9  Q.   You testified a moment ago that you met with -- you met

10  with the SEC and the FBI in your first proffer session in

11  February of 2009, correct?

12  A.   Okay.  Yes.

13  Q.   Okay.  And you hired Mr. Ehrlich in April of 2008,

14  correct?

15  A.   Uhm, yes.  I mean, this says legal deposit, so I'm

16  assuming that it's the first check, but I could have met with

17  him earlier.  I don't know the exact date.

18  Q.   Was that approximately the time that you met with him --

19  A.   I assume so.

20  Q.   -- the first time?

21          So you didn't decide to come clean for ten months

22  after you hired Mr. Ehrlich, correct?

23  A.   No.

24  Q.   You didn't actually come clean for ten months after you

25  hired Mr. Ehrlich, correct?

1  A.   No.  I think the whole process just took that long.  But,

2  I mean, initially from the get-go, you know, like I said, as

3  soon as Mr. Ehrlich recommended or -- we spoke and I went over

4  with -- you know, my side of the story, he -- you know, and he

5  knew that -- you know, that the best -- I guess the best

6  possibility or we both came up with the best possibility was to

7  come clean and go from there.

8  Q.   The best possibility for what?

9  A.   I mean, my best -- the best possibility for me -- what's

10 best for me to do.

11 Q.   The best possibility for what?

12 A.   As far as how to handle -- handle my case.

13 Q.   The best possibility to get out of jail, right,

14 Mr. Vaghar?

15 A.   No.

16 Q.   Did you need a lawyer, Mr. Vaghar, to tell you that the

17 morally right thing to do was to cooperate?

18 A.   No, I needed a lawyer to speak on my behalf.

19 Q.   And to keep you out of jail, correct?

20 A.   No.

21 Q.   You wanted to go to jail?

22 A.   No.

23 Q.   You didn't want to go to jail?

24 A.   Of course not.

25 Q.   Okay.  So you hired a lawyer and you talked to the lawyer

1   and through the process of cooperation over a ten-month period

2   of time you decided that the best way to stay out of jail was

3   to cooperate, correct?

4   A.   No.

5   Q.   So you decided to cooperate --

6   A.   Yes.

7   Q.   -- to cleanse your soul?

8   A.   Well, I decided to cooperate, like I said, from the

9   beginning, and there was nothing ever promised to me about what

10  would happen, I would or would not go to jail.  I was never

11  under the impression that I wouldn't go to jail.  I didn't know

12  what was going to happen.

13  Q.   You just said you decided to cooperate from the beginning.

14  A.   From the -- like I said, you know, I spoke to my attorney

15  and we went over what was -- you know, what I should do, and

16  that's what we came up with.

17  Q.   So shortly after April 14th, 2008, you decided to

18  cooperate?

19  A.   Shortly, yes.

20  Q.   When?

21  A.   I didn't know the exact date.

22  Q.   You just testified that you went through a process and you

23  gave your side of the story and you thought about it.

24  A.   Well, like I said, I went through a process.  I spoke with

25  the attorney, initially met up with him.  We went over all the

1  circumstances and, you know, I said that, you know, whatever,

2  let's go clean with this and move forward.

3  **Q.**   And how long after you made that decision did you make a

4  proffer to the U.S. Attorney's Office?

5  **A.**   From this -- this date here?

6  **Q.**   How long after you made the decision to cooperate did you

7  make a proffer to the U.S. Attorney's Office?

8  **A.**   Well, the proffer was completed?  I mean, this whole

9  process took months.

10 **Q.**   You met with the U.S. Attorney's Office and the SEC for

11 the first time on February the 13th, 2009, correct?

12 **A.**   Correct.

13 **Q.**   How long after you decide -- when did you decide to

14 cooperate?  Was it on -- around April 14th?

15 **A.**   No.  Of course -- I mean, it wasn't the first day because

16 I -- I didn't -- you know, I was speaking with the lawyer.

17 **Q.**   How long after that?

18 **A.**   Pretty soon after.

19 **Q.**   How long?  What's pretty soon?

20 **A.**   Within a month.

21 **Q.**   Within a month.

22          So by May 14th, 2008, you decided to cooperate,

23 correct?

24 **A.**   I mean, I believe I was already cooperating.

25 **Q.**   How long after that before you went and made your first

1    proffer to the U.S. Attorney's Office?  Nine months, right?

2    A.    I mean, I guess if that's the date that you have that I

3    first met with them.

4    Q.    So did you anticipate, Mr. Vaghar, that you would have to

5    pay some money back once you decided that you were going to

6    come clean?

7    A.    I didn't anticipate anything.  I mean, I -- I knew the

8    possibilities were a fine and, of course, possibility of jail.

9    Q.    Did you understand that there was a possibility that you

10   would have to pay money back?

11   A.    Yes.

12   Q.    And how much money did you think it was possible you would

13   have to pay back?

14   A.    No idea.

15   Q.    How much money did you gain through your trading?

16   A.    Well, the total amount that the SEC came back and stated?

17   Q.    How much money do you think you obtained through your

18   trading?

19   A.    I didn't have a figure in my head.

20   Q.    Do you have a figure in your head right now?

21   A.    Well, I have the figure that was stated from the SEC in

22   the --

23   Q.    So the SEC has told you what the figure is?

24   A.    Correct.

25   Q.    How much do you think that you got wrongfully?

1  A.   I believe it's the same amount that the SEC came up with

2  because they -- they did the investigation.

3  Q.   So over $300,000?

4  A.   Correct.

5  Q.   Okay.  So you believe that you wrongfully obtained over

6  $300,000, correct?

7  A.   Correct.

8  Q.   Okay.  And you understood at -- sometime within the month

9  after this (indicating) that you would have to pay some of that

10  money back, correct?

11  A.   Some or all.

12  Q.   Some or all.

13       In June of 2008, you made a wire transfer of $84,000

14  to somebody by the name of Freddie Mitchell, correct?

15  A.   Correct.

16  Q.   And what was that money for?

17  A.   It was a personal loan.

18  Q.   Who's Freddie Mitchell?

19  A.   He is a family friend.

20  Q.   And that $84,000 was money that could have been used to

21  repay the debt that you owed from your crime, correct?

22  A.   Correct.

23  Q.   Instead, you sent it to your family friend Mr. Mitchell,

24  correct?

25  A.   It was supposed to be a short-term loan.

1  Q.   Was it a short-term loan?

2  A.   I haven't been paid back yet and I'm actually in civil

3  litigation with him.

4  Q.   Eventually, you did sign a deferred prosecution agreement,

5  correct, Mr. Vaghar?

6  A.   Yes.

7  Q.   I want to talk about the deferred prosecution agreement

8  and the --

9          MR. HEMANN:   This document is already in evidence as

10  a plaintiff exhibit, Your Honor.   We have it as a defense

11  exhibit on our electronics.

12          Is there any objection to just using our 2117?

13          MR. KIDNEY:   No objection.

14          MR. HEMANN:   Thank you.

15          THE COURT:   Let's refer to it by whatever the

16  plaintiff's number is.   1017?

17          MR. KIDNEY:   1017, Your Honor.

18          THE COURT:   All right.

19          MR. KELLY:   1017, Your Honor.

20          THE COURT:   Great.   Thank you.

21          MR. KELLY:   You're welcome.

22  BY MR. HEMANN:

23  Q.   Now, if you could turn --

24          MR. HEMANN:   Page 6.

25

1  BY MR. HEMANN:

2  Q.   You reviewed some of this with Mr. Kidney earlier.  I'm

3  not going to review all of it.  If you could look at page 9 --

4  or, I'm sorry, paragraph 9 in the deferred prosecution

5  agreement.

6            MR. HEMANN:   Highlight that, please.

7            (Document displayed)

8  BY MR. HEMANN:

9  Q.   Through this, through your cooperation, the

10  U.S. Attorney's Office, which are the criminal prosecutors,

11  agreed not to file the information that you reviewed with

12  Mr. Kidney, correct?

13  A.   Correct.

14  Q.   And not to file any other criminal charges against you,

15  correct?

16  A.   Correct.

17  Q.   So the upshot of this is you didn't get prosecuted for a

18  crime, right?

19  A.   Right.

20  Q.   And what consequences -- you avoided some bad stuff by not

21  being prosecuted for a crime, correct?

22  A.   Correct.

23  Q.   You avoided going to prison, right?

24  A.   Correct.

25  Q.   How much prison time did Mr. Zaman receive; do you know?

1   A.   I believe 24 months.

2   Q.   You avoided a large criminal fine, correct?

3   A.   Criminal fine?

4   Q.   You avoided a large criminal fine, correct?

5   A.   From the SEC?

6   Q.   No, from the U.S. Attorney's Office.

7   A.   Correct.

8   Q.   You could have been fined up to $250,000 for this,

9   correct?

10  A.   Correct, I assume.  I mean, I don't know the exact figure.

11  Sorry.

12  Q.   Let's look at it real quick.  We'll go back to that.

13       If you had been convicted of a felony, you would have

14  lost your VA benefits, wouldn't you have?

15  A.   I don't know.

16  Q.   You don't know?  If you had been --

17       MR. KIDNEY:  Excuse me.  Don't you want an oral

18  answer to that?

19       MR. HEMANN:  He said, "I don't know."

20       MR. KIDNEY:  Never mind.

21  BY MR. HEMANN:

22  Q.   If you had been convicted of a felony, you would have lost

23  your Social Security benefits, correct?

24  A.   I don't know the rules of the VA or Social Security.

25  Q.   Those aren't things you thought about when you were

1  deciding whether to cooperate?

2  A.    No.

3  Q.    What other income do you have other than your VA and your

4  Social Security benefits?

5  A.    That's it.

6  Q.    The date of this agreement --

7          MR. HEMANN:  If you can go to the next page, page

8  8 -- I'm sorry, Mr. Allen.

9  BY MR. HEMANN:

10 Q.    Look at the signatures at the bottom.

11         MR. HEMANN:  Go -- do the signature above, too,

12 Mr. Stevens' signature.

13         (Document displayed)

14 BY MR. HEMANN:

15 Q.    You signed this agreement on March the 15th, correct?

16 A.    Correct.

17 Q.    And Mr. Stevens and Mr. Ehrlich signed the agreement on

18 March the 26th, correct?

19 A.    Correct.

20 Q.    The date that you signed it is the same date that you

21 signed the personal statements, your statements, which we

22 looked at earlier, Exhibit B, correct?

23 A.    Correct.

24 Q.    Now, you testified on direct examination that you and your

25 lawyer prepared this statement; is that correct?

1   A.   Today, you're talking about, in examination?

2   Q.   You testified earlier today --

3   A.   Okay.

4   Q.   If I say "direct examination," I mean when Mr. Kidney was

5   questioning you.

6   A.   Okay.

7   Q.   -- that you and your lawyer prepared this statement; is

8   that correct?

9   A.   I assume.

10  Q.   Why do you assume that?

11  A.   Well, he was speaking of it before I even looked at it.

12  Q.   Who was speaking of it?

13  A.   The other attorney.

14  Q.   Mr. Kidney was speaking of it?

15  A.   I mean, it wasn't in front of me.

16  Q.   I mean, will you look at it now?

17  A.   Okay.   That's fine.

18  Q.   All right.   Look in our binder.   It's 2117.

19          **MR. HEMANN:**   May I approach, Your Honor?

20          **THE COURT:**   You may.

21          **MR. HEMANN:**   Should I ask, or is it okay if I come

22  and go with it?

23          **THE COURT:**   It's okay if you come and go.

24          **MR. HEMANN:**   2117.   And it will be page 16 of that

25  document.

1          **THE WITNESS:**  Okay.

2          **THE COURT:**  So is this what we had otherwise called

3    1017?

4          **MR. HEMANN:**  Yes, Your Honor.

5          **THE WITNESS:**  Okay.  So 1117.

6          **MR. HEMANN:**  And it starts on page 16.  It's what we

7    were talking about is the personal statement.

8          **THE WITNESS:**  I don't know where -- I don't see a

9    page 16.  Oh, okay.

10   **BY MR. HEMANN:**

11   **Q.**   Okay.  Who prepared this document, Mr. Zaman [sic]?

12   **A.**   Vaghar.

13   **Q.**   I'm sorry.  Mr. Vaghar.

14   **A.**   So you're asking me who prepared this document?

15   **Q.**   Yes.

16   **A.**   My attorney.

17   **Q.**   And who -- Mr. --

18   **A.**   Sorry.  Miles Ehrlich.

19   **Q.**   Mr. Ehrlich prepared this document?

20   **A.**   Well, we prepared it together.

21   **Q.**   You sat down with him and prepared the document?

22   **A.**   Yes.

23   **Q.**   Where were you sitting when you prepared the document with

24   him?

25   **A.**   I don't remember.

1  Q.   Do you remember actually sitting and preparing the

2  document with him?

3  A.   I mean, yes.

4  Q.   Where were you?

5  A.   It would had to have been at his office.

6  Q.   And was it -- you see at the bottom the document is signed

7  on -- by whom, by just you?

8  A.   By myself.

9  Q.   On what date?

10  A.   March 15th.

11  Q.   It's not signed by Mr. Ehrlich, is it?

12  A.   No.

13  Q.   Okay.  If you look at the first -- the third sentence of

14  Exhibit B, which is on page 16, the third sentence at the

15  beginning.

16         (Document displayed)

17  Q.   Can you read the third sentence there, starting with the

18  word "in."

19  A.   (As read:)

20         "In early 2007, I met Person A, who I

21         understood to be a friend of Zaman's from

22         college."

23  Q.   And Person A is Mr. Gowrish, correct?

24  A.   Correct.

25  Q.   When did you meet Mr. Gowrish?

1  A.    I assume -- I mean, I don't -- I assume 2007, I guess, if

2  I wrote that or stated that.

3  Q.    So you met Mr. Gowrish in early 2007?

4  A.    I believe I might have met him earlier than that.

5  Q.    Well, there's a picture that Mr. Kidney showed you --

6  A.    Right.

7  Q.    -- within the first three minutes of you testifying, that

8  has a July 2006 date stamp on it, correct?

9  A.    Correct.

10 Q.    Isn't it true that you testify in your deposition that you

11 met him in 2000 -- shortly after college, in 2001, when you got

12 back from Japan --

13 A.    Correct.

14 Q.    -- I'm sorry, 2002 when you got back from Japan?

15 A.    So 2007 could be an off date.

16 Q.    So you didn't meet Mr. Gowrish, Person A, in early 2007?

17 A.    The initial first time?

18 Q.    "I met Person A."

19 A.    Right.

20 Q.    Did you meet Person A in 2007?

21 A.    It must have been sooner, earlier than that.

22 Q.    Okay.  Did you write -- so you and Mr. Ehrlich sat in his

23 office and you wrote that you met Mr. Gowrish in early 2007?

24 A.    Right.  So I must have been wrong.

25        THE CLERK:  Hold on.  She needs to get a phone.

1          (Juror's cell phone ringing.)

2          **THE WITNESS:**  When I wrote this statement, I must

3  have put the wrong date.

4          **THE CLERK:**  Hold on.

5          **THE WITNESS:**  I'm sorry.

6  BY MR. HEMANN:

7  Q.    So, Mr. Vaghar, a lot of this exhibit, a lot of this

8  statement concerns Person A, Mr. Gowrish, correct?

9  A.    Correct.

10  Q.    Okay.  Did Mr. Gowrish have any obligations that were

11  relevant to the conduct that you described here?

12  A.    I don't know what you mean.

13  Q.    Uhm, you don't know what I mean by obligations?

14  A.    Obligations to what?

15  Q.    Okay.  You have no idea what I'm talking about when I say

16  "obligations"?

17  A.    I know what obligation means, but you're just saying

18  obligations.  I don't know -- I don't know what you're speaking

19  of.

20  Q.    Let me ask it again.  Did Mr. Gowrish have any obligations

21  that were relevant to the conduct that you were describing in

22  your statement here?

23  A.    You're asking me if -- if Mr. -- if Vinnie was involved in

24  the trading of securities?

25  Q.    No, I'm asking if he had any obligations relevant to the

1  conduct that you're describing here.

2          MR. KIDNEY:  Your Honor, I think this question is

3  pretty vague.

4          THE COURT:  Sustained.

5          MR. HEMANN:  Okay.

6  BY MR. HEMANN:

7  Q.   Can you read the last sentence of the first paragraph.

8  Read it out loud.

9  A.   Can you highlight it?

10         (Document displayed)

11         THE WITNESS:  Uhm (as read):

12         "I also knew that in providing inside

13         information, Zaman, Person A, breached an

14         obligation to the sources of that information

15         not to share in the manner that they did."

16         Okay.

17  BY MR. HEMANN:

18  Q.   What obligations did he have?

19  A.   They had obligations to the companies that they worked

20  for.

21  Q.   Okay.  And who were the sources of information?

22  A.   From Mr. Zaman and from Vinnie --

23  Q.   And you -- yes.

24  A.   Correct?

25  Q.   Yes.

1  A.    The information that was used to trade was from them, too.

2  Q.    And when did you know that?

3  A.    When did I know that the information was coming from --

4  from who?

5  Q.    When did you know that Mr. Gowrish breached an obligation

6  to the sources of information?

7  A.    Because after the first initial tip that came from -- from

8  Vinnie through Adnan, and we made a trade on it, I was aware

9  that the tip came from Vinnie because we had to divvy up the --

10  the profits.  And I contacted him after that initial trade.

11  Q.    So -- and we'll get to that.  At that point in time, you

12  understood that he had breached an obligation to a source of

13  information?

14  A.    I mean, I knew the information came from Vinnie.

15  Q.    Did you understand at the time that Mr. Gowrish had

16  breached an obligation to his source of information?

17  A.    That the information was insider trading?

18  Q.    At the time --

19  A.    At what time, though?

20  Q.    The time that you just described.

21        -- did you understand that Mr. Gowrish had breached

22  an obligation to his source of information?

23        **MR. KIDNEY:**  Your Honor, I believe that the question

24  asks for a legal conclusion.  It goes beyond --

25        **THE COURT:**  He's asking for his belief.

1          You may answer the question.

2          **THE WITNESS:**  Okay.

3          So at the time that I realized that the information

4   came from Vinnie, you're asking me if I knew that he broke his

5   obligation to his company that he worked for?

6   **BY MR. HEMANN:**

7   Q.    Yes.

8   A.    Yes.

9   Q.    What information did Mr. Gowrish provide to Mr. Zaman?

10  A.    He provided him with -- with information, I guess, in

11  regards to his company.

12  Q.    What information did Mr. Gowrish provide to Mr. Zaman?

13  What did he say to Mr. Zaman?

14  A.    I don't know.  I wasn't there.

15          **MR. KIDNEY:**  Objection.  Calls for hearsay.

16          **THE COURT:**  It calls for something he doesn't know.

17  So --

18          **MR. HEMANN:**  It's not offered for the truth, Your

19  Honor.  It's offered to determine whether this witness knows

20  what information he is talking about in this document.

21          **THE COURT:**  Well, the answer is -- he says he didn't

22  know because he wasn't there.

23  **BY MR. HEMANN:**

24  Q.    You don't know what information Mr. Gowrish provided to

25  Mr. Zaman, do you?

1   A.    No.

2   Q.    Further along here, Mr. Vaghar, if you can look at page 17

3   at the bottom, look at the first paragraph that starts with, "I

4   believe."  Do you see that?

5   A.    Correct.

6   Q.    Can you read that out loud.

7   A.    (As read:)

8            "I believe that Zaman obtained the inside

9            information for the trades in Sabre Holdings,

10           TXU, and ADS from Person A."

11           (Reporter interrupts)

12  BY MR. HEMANN:

13  Q.    Can you read it again more slowly, Mr. Vaghar.

14  A.    (As read:)

15           "I believe that Zaman obtained the inside

16           information for trades in Sabre, TXU, and

17           ADS" -- or Alliance Data Systems -- "from

18           Person A."

19  Q.    Okay.  Three companies, correct?

20  A.    Correct.

21  Q.    Okay.  You testified differently to that in your

22  deposition; did you not?

23  A.    I don't remember.

24  Q.    Could you please grab the white binder there and turn to

25  page 262 of your deposition.  White binder, page 262.

1  A.    Where are the page numbers?

2  Q.    They're on the bottom.

3  A.    Okay.

4  Q.    Look at lines 15 through 20 of page 262.

5  A.    Start with number 15?

6  Q.    I'll read it.  I'm just going to ask you if this is what

7  you testified to:

8            "QUESTION:  When -- how many stocks did you

9            trade based on information Mr. Zaman said

10           came from Mr. Gowrish?

11           "ANSWER:  Two.

12           "Do you remember which stocks?

13           "ANSWER:  I don't remember."

14           Was that your testimony in your deposition,

15  Mr. Vaghar?

16  A.    Yes.

17  Q.    And your deposition was taken on what date?  I'll give it

18  to you.  It was taken on August 25, 2010, correct?

19  A.    March -- was that March 15th?

20  Q.    No, your deposition, the white binder in your right hand.

21  A.    This?  Okay.

22  Q.    Yes.  August of 2010, correct?

23  A.    Okay.

24  Q.    So when you testified in your deposition, you testified

25  differently than what's written in Exhibit B, your statement to

1    the U.S. Attorney's Office, correct?

2    A.    Okay.  Yes.

3    Q.    Yes.  If you look at the next -- just -- not the next

4    sentence, two sentences down, not in the deposition but in

5    Exhibit B, your statement again -- your statement.

6    A.    Okay.  Which part?

7    Q.    The last sentence at the bottom of that page that starts

8    with, "On three occasions."

9    A.    Right.

10   Q.    Okay?

11   A.    Okay.

12   Q.    Can you read that sentence and the -- read that sentence

13   and -- actually, I'm sorry.  Let me cut it shorter.

14          Turn to the next page, page 18.

15   A.    Do you want me to read that?

16   Q.    Yes.

17   A.    (As read:)

18          "I believe that Zaman obtained inside

19          information for the trade" --

20   Q.    No, no.  I'm sorry.  I'm sorry.  Do you have page 18

21   there?

22   A.    Am I reading it from the monitor or from the book?

23   Q.    It's not -- let me show you.  The exhibit in the black

24   book --

25   A.    Okay.

1   Q.   -- Exhibit 2117, page 18 there.

2         If you could read the sentence on page 18 that starts

3   with, "On two later occasions."

4   A.   Okay.  (As read:)

5         "On two later occasions I paid Person A

6         directly.  I don't -- I do not recall the

7         precise amount of each payment delivered

8         to" --

9   Q.   No, just -- just the one sentence (as read):

10         "On two later occasions I paid Person A

11         directly."

12   A.   (As read:)

13         "On two later occasions I paid Person A

14         directly."

15   Q.   So your statement to the U.S. Attorney's Office, as part

16   of your deferred prosecution agreement, was that you paid

17   Mr. Gowrish directly two times, correct?

18   A.   Yes.

19   Q.   You testified differently in your deposition, correct?

20   A.   Where does it say it in the deposition?

21   Q.   Do you remember testifying differently in your deposition?

22   A.   I don't remember.

23   Q.   Okay.  If you look at page 263 of your deposition, lines 8

24   through 23.

25         Look at the deposition, the white book.

1    A.    This book?

2    Q.    Yeah.

3    A.    Okay.

4    Q.    Page 263.

5    A.    Okay.

6    Q.    Line 8.  I'm going to read your testimony.

7              "QUESTION:  You mentioned the one meeting

8         where you remember paying Mr. Gowrish at his

9         apartment before going to Kokkari.  Were

10        there other occasions in which you gave

11        Mr. Gowrish money?"

12        Mr. Kidney said:

13        "Directly, you mean?"

14        And I said:

15             "QUESTION:  Directly or indirectly."

16   A.    Right.

17   Q.    (As read:)

18             "ANSWER:  I don't remember.

19             "QUESTION:  Were there other occasions where

20        you gave him money directly?

21             "ANSWER:  I don't remember.

22             "QUESTION:  Other than the one occasion that

23        you described in detail, do you remember any

24        occasions on which you gave -- you handed

25        cash to Mr. Gowrish?

1           "No, I don't remember."

2           Was that your deposition testimony?

3    A.   Yes.

4    Q.   And that is different, is it not, from the statement you

5    made to the U.S. Attorney's Office regarding paying Mr. Gowrish

6    directly?

7    A.   Correct.

8    Q.   Correct?

9    A.   That they're different, yeah.  That they're different,

10   correct?

11   Q.   Correct.

12   A.   Right.

13   Q.   And we'll talk more about this later on.  You testify in

14   your deposition that you paid Mr. Gowrish at his apartment

15   before going to Kokkari, correct?

16   A.   Correct.

17   Q.   The payment that you described when you were talking to

18   Mr. Kidney earlier today, after you paid Mr. Gowrish in April

19   of 2007, did you go to Kokkari?

20   A.   I don't remember which instance it was that we went to

21   Kokkari.

22   Q.   So the document that you sat down and wrote with

23   Mr. Ehrlich --

24   A.   Okay.

25   Q.   -- had some errors in it; didn't it?

1   A.    Well, it could be vice versa.  It could be the errors

2   could be in this -- in the statement.

3   Q.    So your sworn testimony --

4   A.    What I'm saying is that it could have been in the -- in

5   the statement of the sworn testimony.  I could have said

6   something, could have made an error.  I'm not saying which one

7   could have an error.

8   Q.    So you don't know which one is true?

9   A.    No, no, no.  I'm reading both of them.  I'm looking at

10  both of them.  I can answer everything for you.

11  Q.    Which one is true?

12  A.    I'm not saying that one is true and one is untrue.  I'm

13  just saying at the time of both statements, there could be an

14  error because I forgot something or I missed a number or

15  something like that.  But like certain circumstances, as far as

16  going to Kokkari, I remember distinctively.

17  Q.    Okay.

18  A.    So I'm not going to say which one is true and which one is

19  untrue.

20  Q.    Are you able to say which one is correct and which one is

21  incorrect?

22  A.    As far as what?  Which issue?

23  Q.    As far as the truth, Mr. Vaghar.

24  A.    Yeah.  I mean, I can tell you the truth, but I can't tell

25  you -- if I forget something, it doesn't mean it's untrue.

1   It's just that I forget.

2   Q.   Now, as you sit here today, is your statement to the

3   U.S. Attorney's Office true or is your statement in your sworn

4   testimony true?

5   A.   Both of them are true.

6   Q.   Even though they are different?

7   A.   Well, I mean, there could be -- there are different dates,

8   there are different times.  I forget information or the

9   information could be -- you know, I don't remember everything

10  exactly.

11  Q.   So you forget how many times you paid Mr. Gowrish?

12  A.   No.  I mean, I -- like I said, I had an estimate.  It

13  could have been two times, could have been three times.

14  Q.   Did you pay him one time or two times?

15  A.   I know I paid him at least once.

16  Q.   Did you pay him two, like you told the U.S. Attorney's

17  Office?

18  A.   Yes.

19  Q.   So you paid him two times and one time?

20  A.   No.  I said that I remember -- remembered distinctively

21  about the Kokkari incident, but I had an idea that there was

22  another time.

23  Q.   Is that what your statement says, that you had an idea

24  that there might have been another time?

25  A.   No, I guess not.

1  Q.    Uhm, as part of your cooperation, Mr. Vaghar, you met with

2  the -- with the FBI agents, correct?

3  A.    Yes.

4  Q.    And one of the things that you did in meeting with FBI

5  agents was to go through a series of credit card -- a series of

6  credit card statements?

7  A.    Yes.

8  Q.    Do you remember why you went through those credit card

9  statements?

10  A.    Uhm, Mr. Zaman at certain times either charged things

11  online with my credit card or he had my credit card in his

12  possession, which he made charges to -- to offset the amount

13  that I owed him for this.

14  Q.    And you went through the exercise with Mr. -- with the FBI

15  of trying to identify the charges that Mr. Zaman was

16  responsible for and the charges that he was not responsible

17  for, correct?

18  A.    From what I could remember.

19  Q.    Okay.  And the purpose of that was to assess how much

20  Mr. Zaman benefited from this scheme?

21  A.    I assume.

22  Q.    Okay.  And it was determined that Mr. Zaman benefited to

23  the tune of about 60 -- $68,000, correct?

24  A.    I believe so.

25  Q.    Okay.  And that was, in part, due to the charges that you

1   identified in these credit card statements, correct?

2   **A.**    Charges, cash.  I mean, I might not have got it all, but,

3   I mean, it was what I could help them with.

4   **Q.**   So it could have been even more?

5   **A.**    Yes.

6   **Q.**    Could you please look at Defense Exhibit 2100.  I'm sorry.

7   I'm sorry.  I'm sorry.  2108.

8          **MR. HEMANN:**  Oh, do you not have a copy of this?  I'm

9   sorry, Jim.  It's my mistake.

10          **THE WITNESS:**  Okay.

11  BY MR. HEMANN:

12  **Q.**    So just to set the stage a little bit, Mr. Vaghar, you

13  went over to the FBI office -- you went to the FBI office in

14  this building, right?

15  **A.**    I believe so.

16  **Q.**    And you met with two agents, right, with your attorney,

17  correct?

18  **A.**    Correct.

19  **Q.**    And that was on April 7th, 2009, right -- I'm sorry,

20  May 7th, 2009?

21  **A.**    Should be correct.

22  **Q.**    Is that an approximate -- early summer 2009?

23  **A.**    Like I said, I don't know any of the dates off the top of

24  my head, so if you have paperwork that shows that I was there

25  that date, then, I mean, there's no reason to doubt your --

1  Q.   But you remember the meeting?

2  A.   Okay.  Yes.

3  Q.   Yes?

4       And they handed you a stack of credit card receipts

5  and they said, Please go through this and annotate them as to

6  the ones that are attributable to Mr. Zaman?

7  A.   Okay.  Yes.

8  Q.   Yes?

9       And you did so?

10 A.   Yes.

11 Q.   If you could look at page 2 -- or page 009 -- oh,

12 anyway --

13          MR. HEMANN:  We move this admission, Your Honor.

14          THE COURT:  The whole thing?

15          MR. HEMANN:  Yes.

16          THE COURT:  Any objection?

17          MR. KIDNEY:  No, Your Honor.

18          THE COURT:  All right.  Thank you.  It will be

19 received.

20          (Defendant's Exhibit 2108 received in evidence.)

21          THE CLERK:  Two zero --

22          MR. HEMANN:  2108.

23          THE CLERK:  Oh, okay.

24          MR. HEMANN:  If you could put page 97 up and

25 highlight around in that area, Mr. Allen.

1          (Document displayed)

2          (Cell phone ringing.)

3          **THE WITNESS:**  Sorry.  I thought I turned the phone

4    off.  Sorry about that.

5    **BY MR. HEMANN:**

6    Q.    Do you see a charge on 8/15, August 15, 2007?

7    A.    Correct.

8    Q.    And what's the charge -- what's the amount of the charge

9    there?

10   A.    $4,645.

11   Q.    And the "A" next to that signifies a charge for Adnan

12   Zaman; does it not?

13   A.    Correct.

14   Q.    So by this, you were telling the FBI that Adnan Zaman had

15   incurred a $4,645 charge on your credit card as compensation

16   for the insider trading scheme, correct?

17   A.    Correct.

18   Q.    And this is for a purchase at the San Francisco Duty Free

19   Shop, correct?

20   A.    Correct.

21   Q.    And, in fact, that purchase was for a watch, correct?

22   A.    After the fact?

23   Q.    Is it true that that purchase was for a watch?

24   A.    Well, when I went over this initially, I thought it was a

25   charge that Mr. Zaman could have purchased because he had my

1  credit card when he was traveling, and I saw "Duty Free," but

2  after going over it, I realized that I made a mistake and it

3  was a charge that I did.  So it was a mistake.

4  Q.  So this is your charge?

5  A.  Yes.

6  Q.  Okay.  Now, you said "after going over it."

7      Did you ever tell the FBI that you wrongly attributed

8  this to Mr. Zaman?

9  A.  No.  I mean, now that I looked at it again, that I -- I

10 mean, when -- I looked at it again when I went to Mr. Kidney's,

11 when he went over things with me, and he asked me about it.  I

12 realized that it was a mistake, that it was something I

13 realized was a charge that I made.  But at the time, I thought

14 it was a charge that was for Mr. Zaman.

15 Q.  Okay.  It's for San Francisco Duty Free, correct?

16 A.  Right.

17 Q.  And it's the airport in San Francisco, in August of '07?

18 A.  Correct.

19 Q.  And you were in the airport in San Francisco in August of

20 '07?

21 A.  Yes.

22 Q.  And you were going to Mexico, were you not?

23 A.  Yes.

24 Q.  Okay.  And you bought a Cartier watch for yourself,

25 correct?

1  A.    Correct.

2  Q.    And when you sat down, you skimmed through this and you

3  attributed it to Mr. Zaman?

4  A.    At that time, like I said, because I thought it -- when I

5  was going through all those charges, the list of all the

6  charges, you know, I had to go through a long list, you know,

7  going through them and off the head when I first initially

8  marked it, I thought it was -- I didn't remember the -- that I

9  purchased that watch, and I thought it was a Duty Free charge,

10 which I think there are other Duty Free charges on my account

11 that he possibly made.

12 Q.    But when you went over these with Mr. Kidney, it was

13 corrected?

14 A.    Well, I -- yeah.  I mean, when I went over it with

15 Mr. Kidney, I realized the mistake.  He asked me about it and I

16 told him it was a mistake.

17 Q.    And that was after your deposition when I asked you about

18 it, correct?

19         MR. KIDNEY:  I'm going to object.

20         THE WITNESS:  I don't know.

21         MR. KIDNEY:  I believe that -- after the deposition?

22         THE WITNESS:  I think at the deposition you asked me

23 if it was a charge that I made.  And I already realized that it

24 was a mistake and it was a charge that I made.

25

1   BY MR. HEMANN:

2   Q.   That was based on your conversation with Mr. Kidney?

3   A.   No.   I mean, he just brought it back up again.   But I

4   realized it was already a mistake.   I thought it was already

5   clear.

6   Q.   Okay.   It's the single largest charge on this bill, isn't

7   it?

8   A.   I don't know.   On this -- on this page?

9   Q.   Well, it's the single largest charge that is attributed

10  to -- I mean, it's the single largest credit card charge in

11  this entire document, is it not?

12  A.   I guess so.

13  Q.   There's another charge that I would like to ask you about.

14  If you look at page 91, 0091, there's a charge for Harlot's; do

15  you see that --

16  A.   Correct.

17  Q.   -- on July the 15th, 2007?

18  A.   Correct.

19  Q.   And you and Mr. Zaman were together on that occasion; is

20  that correct?

21  A.   Correct.

22  Q.   Both of you went to Harlot's, which is a club in

23  San Francisco, correct?

24  A.   Correct.

25  Q.   And you, together, incurred the $651 charge, correct?

1  A.    Well, uhm, Mr. Zaman had my credit card at that time and I

2  think at that instance is when I received my credit card back

3  or somewhere around there.  And the -- the reasoning for the --

4  for the charge -- I don't know.  We didn't know who actually

5  had the credit card at that time.

6  Q.    One of you did it, and you were there together?

7  A.    Right.

8  Q.    You didn't explain that to the FBI when you met with them,

9  did you?

10  A.    About the credit card?

11  Q.    You just said it was Mr. Zaman, correct?

12  A.    I mean, I believe it was him because he had my credit

13  card.

14  Q.    But you were there with him, correct?

15  A.    Well, I showed up.

16  Q.    And you remember this, correct?

17  A.    Yes.

18  Q.    You were there at Harlot's, correct?

19  A.    I mean, he was there with his friends.  He had the table

20  and I showed up.

21  Q.    Could you go two pages before this to page 89.

22         MR. HEMANN:  Can you blow up that middle section

23  there.

24         (Document displayed)

25

BY MR. HEMANN:

Q.   Three days after the charge at Harlot's, you make a fraud claim, correct?

A.   Correct.

Q.   You were there with Mr. Zaman?

A.   Well, the reason that I made the claim was because we thought we were charged twice.  So Mr. Zaman asked me to contact the credit card company.

Q.   Are there two charges?

A.   No.  I -- I guess he wasn't aware if he got charged somewhere else on his credit card, or something like that.  I think we paid twice for it.

Q.   And you received credit for the full amount, correct?

A.   Correct.

Q.   The full amount that you attributed to Mr. Zaman, correct?

A.   Because Mr. Zaman had my card in his possession.  I think at that time or around that time was when I received it back, but there was some kind of issue with the charge where, I guess, Harlot's charged us twice or he thought they charged us twice.  So he asked me to dispute the charge.

Q.   And you did dispute the charge?

A.   Correct.

Q.   And you got a credit for it, correct?

A.   Correct.

Q.   So it turned out that you weren't entitled to the credit,

1    correct?

2    A.    I don't think -- I don't remember.  You can ask Mr. Zaman.

3    Q.    But you were at Harlot's?

4    A.    Excuse me?

5          MR. KIDNEY:    What was that last --

6    BY MR. HEMANN:

7    Q.    I said, "But you were at Harlot's."

8          Correct?

9    A.    Right.  I showed up at Harlot's.  That -- but it was

10   Mr. Zaman with my credit card that was charging the table or

11   whatever service he was getting.  So he might have put his

12   credit card down, too, or something like that.  I don't

13   remember the exact issue.  But there was something about he

14   believed that we were charged twice, so he told me to call and

15   dispute the charge.

16   Q.    And you have a very clear recollection of this, correct?

17   Can you look at your deposition, the white book over your right

18   shoulder.

19   A.    Okay.

20   Q.    And if you can look at page 144.

21   A.    Okay.

22   Q.    And you testified in your deposition that you couldn't

23   remember the exact reasoning for why there was the fraud

24   charge, correct?

25   A.    Well, I mean, I think it's what I stated in here, that --

 1   that I believed that we were charged twice.

 2   Q.    (As read:)

 3              "Something paid twice or something, I don't

 4              remember what the exact" --

 5              This is at line 21 through 24.

 6              "Something paid twice or something.  I don't

 7              remember what the exact issue was, but there

 8              was an issue.  The card either got lost or

 9              they charged me, but I think there was an

10              issue."

11              Correct?

12   A.    Right.

13   Q.    But you now remember the exact issue, correct?

14   A.    No.  I mean, it was the same thing I just stated.  There

15   was something about that it was charged twice or something like

16   that and potentially could have been charged on Mr. Zaman's

17   card or something like that.  I don't remember the exact issue,

18   but it had something to do with possibly being charged twice.

19   Q.    On direct examination, Mr. Vaghar, Mr. Kidney asked you

20   about your disabilities.  Do you remember that?

21   A.    Yes.

22   Q.    And Mr. Kidney asked you (as read):

23              "Do these disabilities interfere with your

24              ability to earn a living?"

25              And you said, "Yes."

1              Do you remember that?

2  A.    Yes.

3  Q.    And Mr. Kidney asked you (as read):

4              "How do the disabilities interfere with that?"

5              Do you remember that?

6              And you said:

7              "Well, my injury is to my right frontal lobe,

8              which I have headaches often.  I have tried

9              to return to the workforce previously, but I

10             had issues with my headaches which made it

11             hard for me to keep a job."

12             Is that correct?

13 A.    Correct.

14 Q.    When did you return from the United States after teaching

15 in Japan?

16 A.    Uhm, 2002.

17 Q.    And your testimony is that since that time your headaches

18 have kept you from keeping a job, correct?

19 A.    Correct.

20         **MR. HEMANN:**  I'd like to play an excerpt from

21 Mr. Vaghar's deposition.  It's at page 11, line 23, through

22 page 13, line 16.

23             (Videotaped deposition was played in open court, and

24             was not reported by the court reporter.)

25         **MR. KIDNEY:**  Your Honor, may I ask that the defense

1   counsel give us an opportunity, before playing from the

2   deposition, for the plaintiff's counsel to read the part they

3   are going to play?  Because I don't believe this was

4   impeachment.  He wasn't asked any question to which this

5   differs.  I think we should have an opportunity --

6          **THE COURT:**  He said here that he had a job.  He said

7   on the stand he didn't.

8          **MR. KIDNEY:**  I don't believe that's what he said.

9   But, in any event --

10          **THE COURT:**  I take your point, and I agree with you.

11          And would you please do so.

12          **MR. HEMANN:**  I gave the lines.  I didn't give enough

13   time to play it, though.  I apologize for that.

14   **BY MR. HEMANN:**

15   **Q.**   But let me address Mr. Kidney's point.  You testified

16   yesterday how -- Mr. Kidney said:

17          "Do these disabilities interfere with your

18          ability to earn a living?"

19          And you said:

20          "Yes, because I have headaches."

21          Correct?

22   **A.**   Correct.

23   **Q.**   You didn't quit that job because you had headaches; did

24   you?

25   **A.**   Well, it was too overwhelming, the position.  I mean,

1    the -- the things that I -- I went through the training and

2    then the things that they wanted me to do was just too

3    overwhelming for me.

4    Q.   That's not what you said in your deposition, is it?

5    A.   No.

6    Q.   And you haven't had any job since then, or other than that

7    job, correct?

8    A.   Correct.

9    Q.   So you said the headaches interfere with your job.  Do the

10   headaches interfere with your traveling?

11   A.   Uhm, I mean, my -- my -- my injury affects, you know, like

12   interaction with other people and, you know, with the job and

13   stuff like that.  Sometimes things are too fast pace or moving,

14   you know, I can't keep up with it.

15            So I haven't found something that, you know, is worth

16   my speed.

17   Q.   Okay.  But the headaches don't interfere with your -- your

18   disability doesn't interfere with your traveling, does it?

19   A.   I mean, I've had headaches when I'm traveling.  Headaches

20   are a constant part of my life.

21   Q.   They don't keep you from traveling, though, correct?

22   A.   No.

23   Q.   You have been to Jamaica, Japan.  You have been many

24   places in Asia, correct?

25   A.   I travel -- mostly I travel on the military flights, which

1   are free because I'm a retired veteran.

2   Q.   But you're able to do it, correct?

3   A.   I'm able to travel.

4   Q.   Are you able to go to clubs and bars?

5   A.   I'm able to hang out socially with my friends.

6   Q.   And you're able to interact with them at clubs and bars?

7   A.   To a point.

8   Q.   To a point?

9   A.   Right.

10  Q.   Are you able to go to concerts?

11  A.   Yes.

12  Q.   Sporting events?

13  A.   Yes.

14  Q.   You're a Warriors fan and a Sharks fan and a Giants fan?

15  A.   I like sports.

16  Q.   And your headaches -- your headaches don't interfere with

17  your ability to do any of those things, correct?

18  A.   To a point.

19  Q.   To a point?

20  A.   I mean, I can't overexert myself.

21  Q.   Do you wake-board?

22  A.   I have done wake-boarding before.

23  Q.   That's post disability?

24  A.   Yes.

25  Q.   You went wake-boarding in August of 2008, correct?

1  A.   Correct.

2  Q.   You swim frequently, correct?

3  A.   Yes.

4  Q.   When you went to Singapore or Thailand, you rented a

5  scooter and toured around the island, correct?

6  A.   Correct.

7  Q.   You go to the gym frequently?

8  A.   To swim.

9  Q.   Okay.  You lift weights, too, correct?

10 A.   I have, but not -- mainly it's for cardio.

11 Q.   But your disability doesn't prevent you from lifting

12 weights, correct?

13 A.   No.

14 Q.   You play racquetball, correct?

15 A.   Yes.

16 Q.   In fact, in December 2009, you were obsessed with

17 racquetball, correct?

18 A.   I still enjoy racquetball.

19 Q.   You were obsessed with it in December of '09, correct?

20 A.   I don't know about obsessed, but I enjoy it.

21 Q.   And then we talked a little bit about your Jamaica trip

22 and you could have gone horseback riding but you didn't,

23 correct?

24 A.   We didn't go and I've never been horseback riding, but I

25 think I would have tried it if I had the opportunity.

1  Q.    You receive, as part of your -- you receive, as part of

2  your disability or because of your disability, approximately

3  how much a month?

4  A.    From the VA?

5  Q.    Uh-huh.

6  A.    2600.

7  Q.    And you also receive Social Security disability, correct?

8  A.    Correct.

9  Q.    And you even, Mr. Vaghar, have a handicap placard for your

10  car; don't you?

11  A.    No.

12  Q.    No?

13  A.    No.

14  Q.    Does your disability limit you at all in terms of your

15  stock trading activity?

16  A.    Stock trading ability?

17  Q.    Stock trading ability.

18  A.    No.

19  Q.    So, certainly, there are jobs that you could do that would

20  allow -- that are sedentary jobs, correct, where you just sit

21  and do something like stock trade, correct?

22  A.    Yes.

23  Q.    But you haven't done any of those jobs, correct?

24  A.    No.

25  Q.    But, yet, every month you collect your disability check

1    from the United States government?

2    A.    Yes.

3    Q.    When you were negotiating with the Securities and Exchange

4    Commission, you took the position with the Securities and

5    Exchange Commission that you were unable to pay the full fine

6    that was appropriate for a case like this, right?

7    A.    Correct.

8    Q.    And that was, in part, because of your disability,

9    correct?

10   A.    I mean, as part of my financial situation.

11   Q.    In fact, you sent to the Securities and Exchange

12   Commission your Veterans Administration disability

13   determination in support of your request to pay less?

14   A.    Yes.

15   Q.    And that disability determination by the Veterans

16   Administration is that you are -- you have a 50 percent

17   cognitive mental disability, correct?

18   A.    Yes.

19   Q.    And you have a 50 percent physical disability, correct?

20   A.    I mean, I don't have the exact numbers in front of me.

21   Q.    Would it refresh your recollection to look at the exact

22   numbers?

23   A.    Yes.

24          MR. KIDNEY:   Your Honor, may we approach?

25          THE COURT:   Sure.

1          How much more do you have, Mr. Hemann?

2          **MR. HEMANN:**  I probably just have a couple of

3   minutes, and I'm not going to offer this.  I'm just going to

4   ask him to refresh his recollection, if that changes your

5   opinion.

6          **MR. KIDNEY:**  Well, I think I'd like to have a little

7   conference.

8          **THE COURT:**  All right.

9          (The following proceedings were held at sidebar.)

10          **MR. KIDNEY:**  I'd like to know more about where

11  Mr. Hemann is going with this because, as you know, it was an

12  issue of in limine motions and rulings.

13          I know Your Honor said he couldn't use documents.

14          How far are you going to go into this?  Because, the

15  point is, I believe you are getting into matters which are

16  collateral to this case or you're going to ask him leading

17  questions based on your interpretation of those documents.

18          **MR. HEMANN:**  All I'm going to ask him is whether he's

19  got back problems and physical problems and 50 percent disabled

20  and cognitive problems that rendered him 50 percent disabled

21  and whether these back problems are now preventing him from

22  working.

23          I'm going to ask him whether he has reported to the

24  VA that he's unable to do things like wait tables, and then

25  I'll probably leave it at that, depending on his answers

1  obviously.  But I'm not going to go much further than that.

2           **MR. KIDNEY:**  Okay.

3           **THE COURT:**  Thank you.

4           **MR. HEMANN:**  Thank you, Your Honor.  And then it

5  would probably be a good time after that.

6           **THE COURT:**  For lunch?

7           **MR. HEMANN:**  If that's okay with Your Honor.

8           **THE COURT:**  Yeah.

9           (Sidebar concluded.)

10  BY MR. HEMANN:

11  Q.  So you recall that you provided some -- oh, let me go

12  back.  I think I remember the exact question that was asked.

13           Could you look at Exhibit 2103.  It's going to be one

14  of the dark books.  Let me give it to you, the special box

15  here.

16  A.  Okay.

17  Q.  Okay.  If you can just look at the reports from the VA

18  just to refresh your recollection.  I think I asked you before

19  we broke for a moment --

20           (Counsel confer off the record.)

21  BY MR. HEMANN:

22  Q.  Does this refresh your recollection as to your percentage

23  of disability, 50 percent mental and 50 percent physical?

24  A.  I see a total of 70 percent, but I don't see -- I see the

25  50 for the cognitive disorder, and then 10 percent for scar,

1   scalp and forehead.

2   Q.    Okay.

3   A.    So are we looking at somewhere else?

4   Q.    Well, you reported to the FBI when you were talking to

5   them that you had been found 100 percent disabled; is that

6   correct?

7   A.    Well, a hundred percent service connected disabled.

8   Q.    Okay.

9   A.    It doesn't mean the exact ratings.  The rates add up to a

10  hundred percent.

11          MR. HEMANN:  Mr. Kidney suggested that this is long

12  enough that he may want to look at this.  And I now agree

13  because it is going to require some math.

14          THE COURT:  So is your point that you would like to

15  have lunch?  Is that what you mean?

16          MR. HEMANN:  It's up to Your Honor.  I can walk him

17  through this pretty quickly or we could have him look at it.

18          MR. KIDNEY:  I just think that this is complicated.

19  It may not be to him.  It might be good to give him a chance to

20  look at it over lunch.

21          THE COURT:  All right.  We will take our lunch break

22  now then.

23          Ladies and gentlemen, we will have our lunch recess.

24  If you would be ready to come back, please, at 25 minutes 'til

25  1:00.  In the meantime, please do not speak with each other or

1   Q.    -- what did you say to him?

2   A.    I mean, I don't remember the exact conversation but pretty

3   much in short I was just thanking him for, you know, the tip.

4   And I can't remember what he said on his side.  And, you know,

5   it was short and then he got off the phone.  And then shortly

6   after, like I said, Mr. Zaman contacted me, and I don't know if

7   it was the same day or a couple of days after, but shortly

8   after he contacted me and told me never to contact Vinnie again

9   about this -- about what we're doing, about the insider

10  trading.

11  Q.    Like the day after he called you and told you that?

12  A.    I don't remember the exact time frame of how far after but

13  it was soon after.

14  Q.    And you said thanks for the tip, and that's the only thing

15  you remember from the phone call?

16  A.    Yeah.  I mean, I remember it was just a short conversation

17  like -- you know, we were already friends.  So I called him and

18  that was the -- I guess, the meat of the conversation, but I

19  don't know what else we spoke about.

20  Q.    Did you elaborate?

21  A.    I mean, we spoke about it.  We talked directly about

22  the -- you know, I said, "I thank you for the tip."  I don't

23  know -- I don't remember the conversation exactly.

24  Q.    What did he say?

25  A.    I don't remember.

1  Q.   About how long did the conversation last?

2  A.   Pretty short.

3  Q.   Like how long?

4  A.   A minute.

5  Q.   Okay.  And all you remember from this conversation was you

6  saying, "Thanks for the tip"?

7  A.   You know, speaking, saying, "Thanks for the tip."  He said

8  "okay" or "bye" or whatever.  And we talked, and that was the

9  end of it.

10         And then I remember shortly after, Mr. Zaman calling

11  me -- it could be the day, a few days, whatever -- telling me,

12  you know, Vinnie is flipping out.  Why did you call him about

13  this -- you know, about the tip?  You know, he doesn't want

14  to -- you know, you to call him about any of that stuff.  That

15  was it.

16  Q.   So then how long after that did you see Mr. Vaghar -- or

17  Mr. Gowrish?

18  A.   I don't know.

19  Q.   Do you recall going out with he and Mr. Zaman that

20  weekend, the weekend after that phone call?

21  A.   No.

22  Q.   Could you have gone out with him the weekend after that

23  phone call?

24  A.   Yeah.  I mean, I hung out with Adnan all the time, and

25  Vinnie was usually there sometimes or once in a while.

1  Q.   And in the phone call itself, did you talk about your

2  plans for that weekend?

3  A.   Like I said, I don't even remember the phone -- if there

4  was a phone call.  Are you talking about the phone call to

5  Vinnie to thank him?

6  Q.   Yeah.  Yeah.

7  A.   Could have.

8  Q.   Don't remember?

9  A.   Don't remember.

10        MR. HEMANN:  I don't know what the Court has in mind.

11  I've got a while to go.

12        THE COURT:  All right.  Then we'll take our afternoon

13  recess.

14        Ladies and gentlemen, if you would be ready to come

15  back, please, at 25 minutes after 2:00.  In the meantime, do

16  not speak with each other or anyone else about the case.  Don't

17  make up your mind.  You have not heard all the evidence yet.

18        (Jury out at 2:12 p.m.)

19        THE COURT:  Do you expect that we will finish this

20  witness today?

21        MR. HEMANN:  I expect we will, Your Honor, yes.

22        THE COURT:  Well, I guess I mean both of you.  Do you

23  think you'll both finish?

24        MR. KIDNEY:  Well, he's not through yet.  I do have

25  some redirect.  I don't expect it to take very long.

1          THE COURT:  You can step down, sir.

2          MR. HEMANN:  Thank you, Your Honor.

3          THE WITNESS:  Thank you.

4          (Recess taken from 2:13 to 2:32 p.m.)

5          THE COURT:  Are we ready?

6          MR. HEMANN:  Yes, Your Honor.

7          MR. KIDNEY:  Yes, Your Honor.

8          (Jury enters at 2:32 p.m.)

9          THE COURT:  Welcome back, ladies and gentlemen.  You

10    may all be seated.

11          You are still under oath, sir.

12          MR. HEMANN:  May I go ahead, Your Honor?

13          THE COURT:  Yes, you may.

14    BY MR. HEMANN:

15    Q.   Mr. Vaghar, earlier this morning, when Mr. Kidney was

16    doing his direct examination, you talked to him about a check

17    register that you produced to the FBI.  Do you remember that?

18    A.   Yes.

19    Q.   Okay.  And I want to turn your attention to a copy of the

20    check in that check register that we discussed.  If you could

21    look at Exhibit 2088.

22          MR. HEMANN:  This may not be as good a copy as --

23          MR. KIDNEY:  PX1007.

24          MR. HEMANN:  Thank you.

25          THE COURT:  Is it the same thing?

1          **MR. HEMANN:**  It actually is the same thing, Your

2   Honor, so we can use this if you prefer.

3          **THE COURT:**  I'd rather we use the exhibit number

4   from --

5          **MR. HEMANN:**  All right.  So I'm going to give, if

6   it's all right, Mr. Vaghar PX1007 from the SEC's binder.

7          **THE COURT:**  That's fine.  If you are going to display

8   it, we could certainly ask the plaintiff to put it up.

9          **MR. KIDNEY:**  Be happy to, Your Honor.

10         **THE COURT:**  Why don't you do that.

11         Tracy, would you switch over to plaintiff.

12         (Document displayed)

13         **MR. HEMANN:**  Of course, this isn't that much of a

14  better copy, but we'll use it anyway.  It's about the same.

15         **THE COURT:**  Well, the plaintiff put it up.

16         **MR. HEMANN:**  Could you put the check up that has --

17         **MR. KIDNEY:**  What page is it on there?

18         **MR. HEMANN:**  Well, I don't really know which page it

19  is.  It's the 3/15 check.

20         **MR. KIDNEY:**  The page is (inaudible).

21         **MR. HEMANN:**  One moment, please.

22         It looks like it's page 18.

23  BY MR. HEMANN:

24  Q.   Okay.  Remember we looked at this this morning,

25  Mr. Vaghar?

1   A.   Okay.

2   Q.   And this corresponds to an original check that is -- that

3   you deposited or cashed at Charles Schwab that just says "Rat

4   2" on it, correct?

5   A.   Okay.

6   Q.   Do you remember that check?

7   A.   Yes.

8   Q.   And your testimony was that after you deposited the check

9   at Charles Schwab, it had the "Rat 2" designation on it, you

10  then changed the carbon copy that we're looking at here to

11  write "Vin Dog" on it, correct?

12        MR. KIDNEY:  Objection, Your Honor.  I don't believe

13  we addressed that in direct this morning.

14        MR. HEMANN:  Well, I can address it then.

15        THE COURT:  So withdraw the question, please, and

16  just ask another one.

17  BY MR. HEMANN:

18  Q.   Isn't it a fact, Mr. Vaghar, that you initially wrote a

19  check to Charles Schwab that said "Rat 2" on it?

20        MR. KIDNEY:  Do you want us to show the check to him?

21        MR. HEMANN:  No, I'll do that.  I'll just hand it to

22  him.

23  BY MR. HEMANN:

24  Q.   Do you remember that, Mr. Vaghar?

25  A.   Writing "Rat 2" on what, the carbon or on the actual

1  check?

2  Q.  On the actual check.

3  A.  No.  Can you show me the check?

4  Q.  Please look at Exhibit 2089 in the black binders.

5          THE CLERK:  So did we move in 2088?

6          MR. HEMANN:  No, Your Honor.

7          No, Tracy.

8          THE COURT:  You got that right.

9          THE WITNESS:  2089.

10         MR. HEMANN:  Tracy, can you switch back to our side

11 real quick?

12         MR. KIDNEY:  I believe it's Plaintiff's Exhibit --

13 the check itself is Plaintiff's Exhibit 1004.

14         THE COURT:  Can you bring that up, please.

15         (Document displayed)

16 BY MR. HEMANN:

17 Q.  This, Mr. Vaghar, is the original check that you wrote,

18 correct?

19 A.  Okay.

20 Q.  Correct?

21 A.  Correct.

22 Q.  And it's dated March 13 -- or March 15, 2007, correct?

23 A.  Correct.

24 Q.  And the "for" line is "Rat #2," correct?

25 A.  Correct.

1  Q.   You testified this morning that by "Rat #2," you were

2  meaning to identify Mr. Gowrish, correct?

3  A.   Correct.

4  Q.   Can you identify any other occasion in which you

5  identify -- in which you called or wrote "Rat #2" in relation

6  to Mr. Gowrish?

7  A.   No.

8  Q.   So is this the one and only time in history that you

9  called him Rat #2?

10 A.   Correct.

11 Q.   At some point after this, after you wrote this check and

12 deposited it at Charles Schwab, you went back and you wrote

13 something on the carbon check register that corresponds to this

14 check, correct?

15 A.   Correct.

16       MR. HEMANN:   Could you switch back to the other

17 exhibit, please.   Thank you.

18       (Document displayed)

19 BY MR. HEMANN:

20 Q.   And you went back and you wrote "Vin Dog" over "Rat #2."

21 A.   Correct.

22 Q.   Is that right?

23 A.   Yes.

24 Q.   And you did that in the check register that you kept at

25 home until you started cooperating with the FBI, correct?

1   A.    Correct.

2   Q.    And when you started cooperating with the FBI, you took

3   the check register that you had written the word "Vin Dog" on

4   and you brought it and you gave it to the FBI, right?

5   A.    Whatever was written on the original registry, I brought

6   it over to the FBI, yes, correct.

7   Q.    And the FBI made a copy of it, correct?

8   A.    I believe so.

9   Q.    And the FBI gave you back the original check register,

10  correct?

11  A.    Correct.

12  Q.    Uhm, and what did you do, Mr. Vaghar, with the original

13  check register?

14  A.    I had it in my car for a little bit after I received it

15  back from the FBI, because when the FBI agent that gave it back

16  to me -- gave it back to me, I put it in my car.  And then, I

17  guess, when I cleaned out my car at a carwash, I threw it away.

18  Q.    You took the original check register that you had written

19  over "Vin Dog" on, and you threw that in the garbage?

20  A.    Well, I threw it away because I figured we were done with

21  it.  I mean, I didn't think about it because the FBI already

22  took all the copies and gave it back to me.  So there was no

23  reason for me to keep it.

24  Q.    When did you do that?

25  A.    Soon after it was returned to me.

1  Q.   And that was the document that had the original writing on

2  it, "Vin Dog," over the carbon "Rat 2"?

3  A.   I mean, it was the carbon copies from the original checks,

4  correct.

5  Q.   And when did you get it back from the FBI?

6  A.   When they were done with it.

7  Q.   When was that?

8  A.   I don't know the date.

9  Q.   And how long after they gave it back to you did you throw

10  it away?

11  A.   Like I said, I put it in my car, and then after the next

12  time I washed my car, I must have threw it away.  That was it,

13  because I think I was asked if I had the original again later

14  on, and I said I didn't have it, I threw it away.

15  Q.   Do you have any idea when that occurred?

16  A.   No.

17  Q.   Do you have any idea what year that occurred in?

18  A.   I mean, it would have happened soon -- or after I received

19  the -- my bank -- or the copies back, because I typically wash

20  my car once every two weeks, three weeks, something like that.

21  So it had to happen the next time I washed my car probably.

22  Q.   So when did you get it back from the FBI?

23  A.   I don't know the date.  I had to sign something that I got

24  it back -- that they gave it back to me.  So you should be able

25  to locate the date.

1  Q.   Do you remember what year that was in?

2  A.   It would have been in 2010 or 2009.

3  Q.   But you don't know?

4  A.   No.

5  Q.   You received a subpoena in this case to produce documents

6  in connection with your deposition, correct?

7  A.   Correct.

8  Q.   You didn't produce the original check register?

9  A.   I didn't have it anymore.

10 Q.   You had thrown it away by then?

11 A.   Correct.

12      MR. HEMANN:   Could you put up -- I hate to do this,

13 but could you put up Plaintiff's 1012, please.

14      (Document displayed)

15      MR. HEMANN:   I'm sorry, I must have written down the

16 wrong one.   Is this 1012?   Oh, the next page.   I'm sorry.

17      MR. KIDNEY:   The registry page?

18      MR. HEMANN:   The registry page.

19      (Document displayed)

20 BY MR. HEMANN:

21 Q.   Do you remember looking at this this morning, Mr. Vaghar?

22 A.   Yes.

23      MR. HEMANN:   Actually, could you go back to the

24 previous page.

25      (Document displayed)

BY MR. HEMANN:

Q.    So the previous page you see, Mr. Vaghar, says pay to the order of cash, correct?

A.    Correct.

Q.    It doesn't refer to Rat at all, does it?

A.    No.

Q.    And the "for" line has nothing on it, correct?

A.    Correct.

Q.    Okay.

        MR. HEMANN:   Now can you go to the next page, please.

        (Document displayed)

BY MR. HEMANN:

Q.    Now, here you see "For Rat" written on the pay line, correct?

A.    Correct.

Q.    And you see the word "Rat" written on the "for" line, correct?

A.    Correct.

Q.    And these were both written on the check register that you threw away, correct?

A.    Correct.

Q.    Uhm, do you see any -- and it's hard to read down here. That is the word "Rat," though, down in the left-hand corner, correct?

A.    I believe so.

1  Q.   It appears that the typeface, the printing, is different

2  for the two of them.   One is much bolder and thicker, correct?

3  A.   Correct.

4  Q.   Why is that?

5  A.   I mean, one of them could have been the carbon from the

6  previous written down because, I mean, it's carbon copies on

7  top of carbon copies.

8        But, typically, especially in the beginning, I

9  wouldn't write anything on there.   I would just put "for cash"

10 because everybody was so cautious about a paper trail.

11       But for my own records, after I would write the

12 check, I would write "Rat" or "Vinnie" or something on the

13 carbon copy for my own record, knowing that I gave them money,

14 that I gave Adnan money.

15 Q.   So you are speculating as to why the type is different,

16 the printing is different?

17 A.   No.   Well, I mean, so, like if the "cash" and "for Rat"

18 is --

19       (Reporter interrupts)

20 Q.   So you're speculating as to why one is darker and thicker

21 than the other one?

22 A.   No.   Actually, I think the one that's darker is because I

23 have handwritten it onto the carbon copy.   And then the one

24 that's like a carbon copy, it's like a carbon copy.   It's

25 probably written from a different one that I wrote "Rat" or

1  something like that on another copy and it went through on the

2  other carbon copy.

3  **Q.**   So the one that would have been immediately before this,

4  correct?

5  **A.**   No.  I'm not saying where it would be.  But I'm saying you

6  could tell the type of writing is different.

7  **Q.**   It's different.

8          And if we had the original, we would probably be able

9  to answer the question that you're asking right now, correct?

10 **A.**   Yes.

11 **Q.**   On the subject of "Rat," isn't it true that you called

12 lots of people Rat?

13 **A.**   Like I said, it was a nickname for -- that we called each

14 other.

15 **Q.**   But not just Mr. Zaman.  You called many people Rat,

16 correct?

17 **A.**   Correct.

18 **Q.**   And many people called you Rat, correct?

19 **A.**   Correct.

20 **Q.**   You testified that -- on Mr. -- Mr. Kidney's questions

21 earlier today that you wrote a check on April 16th, 2007 for

22 $5,000 to -- with the memo line "Vin Dog."  Do you remember

23 that?

24          **MR. HEMANN:**  And this would be -- if we could

25 continue to do this with the plaintiff's exhibits.  That would,

1  I think, be Plaintiff's 1005.

2              (Document displayed)

3              **THE WITNESS:**  Correct.

4  **BY MR. HEMANN:**

5  **Q.**   And shortly after this check was written, you went to

6  Japan, correct?

7  **A.**   Correct.

8  **Q.**   In fact, you were at least on your way to Japan on

9  April 19th when you e-mailed from Alaska; is that right?

10  **A.**   Correct.

11  **Q.**   And you testified this morning that you gave this money to

12  Mr. Gowrish before you left for Alaska, correct?

13  **A.**   The check would be for money for Vinnie before I left.

14  **Q.**   Did you give money to Mr. Gowrish before you left for

15  Alaska -- for Japan?

16  **A.**   Directly?

17  **Q.**   Directly.

18  **A.**   Could have.

19  **Q.**   Could have?

20              Do you remember giving him money directly?

21  **A.**   I remember giving him money directly and I told you the

22  circumstances I remember for sure.  And, like I said, it could

23  have been more than one time and this could have been one of

24  the times.

25  **Q.**   This morning you testified -- I'm sorry.  Yesterday you

1  testified (as read):

2          "Did you owe Mr. Gowrish money as a result of

3          this insider trading arrangement that you had

4          before you left for Japan?

5          **"ANSWER:** Yes."

6  A.    Right.

7  Q.    (As read:)

8          "Did you pay him before you left?

9          **"ANSWER:** Yes.

10         "You paid him all what you owed him?

11         **"ANSWER:** I believe so."

12         Is that correct?

13 A.    Correct.

14 Q.    Did you pay him this money before you left to go to Japan?

15 A.    I believe so.

16 Q.    And you testified that you remember that you went to

17 Kokkari after paying him the money, correct?

18 A.    One of the times that I paid him the money.

19 Q.    You also testified that you only remember paying him money

20 one time; isn't that correct?

21 A.    Well, one for sure that I remember giving to him directly.

22 Q.    Okay.  On the time for sure, did you go to Kokkari after

23 paying him?

24 A.    Yes.

25 Q.    And you remember for sure that you paid him this money

1  before you went to Japan, correct?

2  A.    Correct.

3  Q.    So isn't it true that you would have gone to Kokkari after

4  paying him this money before going to Japan?

5  A.    It could have been that date or it could have been another

6  date.

7  Q.    It could have been another date that you don't remember at

8  all?

9  A.    Well, I mean, this could have been a date that I just give

10 the money to him or I gave the money to Adnan to give to him.

11 I don't know.

12 Q.    So you don't know whether you went to Kokkari --

13 A.    No, I know I went to Kokkari, but I don't remember the

14 date.

15 Q.    But you know this was the date you gave him the money,

16 correct?

17 A.    This is the date that I did give him some money.

18 Q.    Okay.  But you don't remember any other date that you gave

19 him money?

20 A.    No.

21       MR. HEMANN:  Your Honor, we would like to play a clip

22 here.  It will be -- and we provided these to the SEC -- page

23 304, line 14, through 306, line 19.

24       (Videotaped deposition was played in open court, and

25       was not reported by the court reporter.)

1      **MR. HEMANN:**  Thank you, Tracy.

2      **THE CLERK:**  Hold on.

3  **BY MR. HEMANN:**

4  **Q.**  So yesterday when you told Mr. Kidney that you gave him

5  all that you owed him, Mr. Gowrish, before you left to Japan,

6  that wasn't accurate, was it?

7  **A.**  I mean, I would think that whatever the potential amount

8  that I owed him I would have paid him before I left because I

9  wasn't sure how long I would be gone for.  And, you know, our

10  relationship wasn't as good a relationship as between Adnan and

11  I and the amount of money I still owed Adnan was a lot more.

12  So --

13  **Q.**  You would think?

14  **A.**  I mean, that's what I'm assuming, I guess.

15  **Q.**  You're assuming that?  You don't remember, Mr. Vaghar,

16  anything about the payment of money from this check, do you?

17  **A.**  I remember.

18  **Q.**  What do you remember?

19  **A.**  I mean, I remember writing the check and cashing it.

20  **Q.**  Was Mr. Gowrish there when you wrote the check?

21  **A.**  No.

22  **Q.**  Was Mr. Gowrish there when you cashed the check?

23  **A.**  No.

24  **Q.**  What else do you remember?

25  **A.**  That's it.

1    Q.    Mr. Gowrish never actually gave you any information

2    directly, did he?

3    A.    No.   Insider information?

4    Q.    Correct.

5    A.    No.

6    Q.    And Mr. Zaman did not specifically tell you what

7    information Mr. Gowrish had provided to him, did he?

8    A.    Well, he told me, but I don't remember.

9    Q.    He told you specifically what Mr. Gowrish had told him?

10   A.    Well, at the time of the stocks that were purchased, he

11   would have told me, you know, these ones came from Vinnie.  So

12   at that time I would know which one it was.

13   Q.    He would identify stock, but would he tell you what

14   Mr. Gowrish said to him?

15   A.    No.

16   Q.    No?

17   A.    What he -- I mean, he would tell me that the -- the stock

18   that we were purchasing, whatever symbol it was, was a tip that

19   came from Vinnie or from Vinnie's office because we would have

20   to split the profits between the three of us.  So as far as

21   that, I would have known at that time.

22   Q.    But did he tell you specifically what Mr. Gowrish had told

23   him?

24   A.    No.

25   Q.    Now, you said that you, on one occasion, gave Mr. Zaman

1  money to give to Mr. Gowrish, correct?

2  A.    Correct.

3  Q.    No more than one occasion, correct?

4  A.    I mean, one occasion that I remember.

5        **MR. HEMANN:**  Jason, could you play the clip, please.

6  This is the second one.

7        Mr. Kidney, 264/16 through 265/15.

8        Thank you, Tracy.

9        (Videotaped deposition was played in open court, and

10       was not reported by the court reporter.)

11 **BY MR. HEMANN:**

12 Q.    Mr. Kidney asked you today about the payment of attorneys'

13 fees, correct?  Remember you received some money for payment of

14 attorneys' fees?

15 A.    Correct.

16 Q.    And it's true that you picked up that money from

17 Mr. Gowrish's apartment, correct?

18 A.    Correct.

19 Q.    And Mr. Zaman stayed frequently in Mr. Gowrish's

20 apartment, correct?

21 A.    Correct.

22 Q.    You never actually spoke to Mr. Gowrish about that money,

23 did you?

24 A.    Uhm, I contacted him one time.

25 Q.    And you didn't talk to him, though, did you?

1  A.    I spoke to him briefly.

2  Q.    Isn't it true that you called him and you said something

3  and he hung up the phone?

4  A.    I don't remember the conversation.

5  Q.    Do you remember what you said?

6  A.    No.

7  Q.    Do you remember what he said?

8  A.    No.

9  Q.    So other than that conversation, did you ever talk to

10 Mr. Gowrish about the attorneys' fees?

11 A.    No.

12 Q.    When did you get that -- those -- Mr. Gowrish was living

13 in Minnesota at the time, correct?

14 A.    Correct.

15 Q.    When did you actually get those attorneys' fees, those --

16 that money?

17 A.    I mean, I don't know the dates.  It was after I was

18 starting to hire Mr. -- my attorney, the previous attorney, to

19 help me out with my case.

20 Q.    Who was that?

21 A.    Felecia Gross, and -- Miles.

22 Q.    Was it after you hired them?

23 A.    Right, because I paid the initial deposit myself.

24 Q.    And how much money did you receive from Mr. Zaman for

25 attorneys' fees to pay to Mr. Ehrlich and Ms. Ram --

1   A.   Ramsey.

2   Q.   -- Ms. Gross?

3   A.   I don't remember the exact amount.

4   Q.   What was the approximate amount?

5   A.   At least 5,000.

6   Q.   And after your initial deposit, how much money did you pay

7   to Mr. Ehrlich?

8   A.   I think I paid a total of 15 or 20.  I don't remember the

9   exact amount.

10  Q.   Did you pay all of the money to Mr. Ehrlich by check?

11  A.   I believe so.

12  Q.   And that would have been on your Schwab account?

13  A.   Schwab or Navy Federal.  Those are the only two choices.

14  Q.   You testified in the course of yesterday and today that

15  Mr. Zaman told you not to talk about what you were doing, the

16  insider trading, with Mr. Gowrish, correct?

17  A.   After the initial call where I thanked him for the tip?

18  Q.   Correct.

19  A.   Correct.

20  Q.   Mr. Zaman also told you at one point not to talk to

21  Mr. Khoury, correct?

22  A.   About the tips?

23  Q.   Correct.

24  A.   Correct.

25  Q.   And Mr. Zaman also told you not to talk to Christopher

1  Zand about the tips, correct?

2  **A.**    Yes, correct.

3  **Q.**    Mr. Kidney showed you some bank records regarding a

4  July 23rd check for $14,000 that says "Rat" on it.  Do you

5  remember that?

6  **A.**    Okay.  Yes.

7  **Q.**    You do remember it?  And we maybe can get away without

8  putting them up on the screen.  But you deposited that check in

9  your Bank of America account; is that correct?

10 **A.**    Right.  That's typically how I would cash the checks.

11 **Q.**    And then you withdrew it from the same account on July the

12 30th, 2007, correct?

13 **A.**    Correct.

14 **Q.**    And you testified that you paid that money to Mr. Zaman,

15 correct?

16 **A.**    Part of it.

17 **Q.**    Okay.

18 **A.**    Correct.

19 **Q.**    But Mr. Zaman, at this point in time, lived in New York,

20 correct?

21 **A.**    I believe so.

22 **Q.**    Isn't it true, Mr. Vaghar, that the week after you

23 withdrew the money on the 30th, you went to Las Vegas?

24 **A.**    With them?

25 **Q.**    No.  Alone.

1   A.   Oh.

2   Q.   Or not -- not with Mr. Gowrish, Mr. Zaman.

3   A.   With Mr. Zaman?

4   Q.   Not with Mr. Gowrish or Mr. Zaman.

5   A.   Oh, could be.

6   Q.   Could be?  Do you remember?

7   A.   I mean, I've been to Vegas before.  I don't know the

8   dates.

9   Q.   Where did you pay a portion of that money to Mr. Zaman?

10  Where were you when you paid that money to Mr. Zaman?

11  A.   Well, I mean, I don't -- I don't know if the money was

12  ever given to him or not.  I just know that the check was

13  written in order to give the money to them.  So maybe I'm

14  thinking something could have happened, maybe he was supposed

15  to come and he didn't come or something happened.

16  Q.   So writing the word "Rat" on the check doesn't necessarily

17  mean that any of the money was paid to Adnan Zaman?

18  A.   No, the check was supposed to be for Adnan Zaman or

19  payments to -- to whoever, but I'm saying it's for that time

20  lapse that happened with it, I think -- you know, that I recall

21  is that maybe we were supposed to see -- I was supposed to see

22  Adnan, and for some reason, maybe he couldn't come to town or

23  something happened like that.

24  Q.   You went to Puerto Vallarta later in August with

25  Mr. Gowrish, correct?

1  A.    Correct.

2  Q.    And that was -- you were on your way to Puerto Vallarta

3  with Mr. Gowrish when you bought the Cartier watch at the Duty

4  Free place at the airport, correct?

5  A.    Correct.

6  Q.    How many days were you in Mexico with Mr. Gowrish?

7  A.    A few days.  I don't remember how many days it was.

8  Q.    Where did you stay?

9  A.    I stayed with them at the Sheraton Hotel.

10  Q.    And who was with you there?

11  A.    A few of Vinnie's friends.

12  Q.    When was the last time before that that you had traded

13  based on information provided -- you say came from Mr. Gowrish?

14  A.    I -- the last time that information that I know came from

15  him?

16  Q.    Yeah.  When was the last time before August of '07, did

17  you trade on information that you believed was coming from

18  Mr. Gowrish?

19  A.    I don't remember.

20  Q.    Had it been many months?

21  A.    No idea.

22  Q.    No idea?

23  A.    I mean, I don't know when the last trade was.

24  Q.    Nevertheless -- and you had been hanging out with

25  Mr. Gowrish a lot in August, correct?

1   A.   I guess so.  I don't know.

2   Q.   And yet you said you thanked him once you got to Mexico,

3   correct?

4   A.   While we were in Mexico, we had a chance to talk, just the

5   two of us.

6   Q.   And you said you thanked him?

7   A.   I thanked him.

8   Q.   And you said that he said that, "Maybe next year we'll do

9   better," correct?

10  A.   He said next year that he would help me make more money.

11  Q.   In the whole period of time, whatever it was, from when

12  you last received information until the time you got to Mexico

13  with Mr. Gowrish in August, had you done any trading at all on

14  information provided by Mr. Gowrish?

15  A.   Could have.

16  Q.   Could have?

17  A.   I mean, I don't know -- I don't remember the dates.

18  Q.   So --

19  A.   From when?

20  Q.   What's that?

21  A.   What were the dates again?

22  Q.   You remember doing the TXU trade based on information you

23  think came from Mr. Gowrish, correct?

24  A.   Right.

25  Q.   That was in February, right?

1  A.    I don't have the papers -- my Schwab statement in front of

2  me to look at the dates.

3  Q.    Well, you testified it was in February, yesterday, when

4  you were reviewing records with Mr. Kidney on the screen.  Do

5  you remember that?

6  A.    Right.  So I had the dates in front of me.

7  Q.    Okay.

8  A.    Okay.

9  Q.    You testified yesterday that you did not remember that any

10  ADS information came from Mr. Gowrish.  Remember that?

11  A.    Okay.

12  Q.    So between February and August, you didn't get any

13  information from Mr. Gowrish, correct?

14  A.    I mean, if there was never -- none of the trades that were

15  in question on those dates, I guess not.

16  Q.    Mr. Zaman left to move to New York in June, correct?

17  A.    Okay.  I don't know the date that he moved.

18  Q.    After Mr. Zaman left, you and Mr. Gowrish started spending

19  time together more frequently, correct?

20  A.    Correct.

21  Q.    And you would talk to each over on the phone, get together

22  socially, without Mr. Zaman, correct?

23  A.    Correct.

24  Q.    That would have been July and August, right?

25  A.    Correct.

1   Q.   And Mr. Gowrish was still a TPG employee in July, correct?

2   A.   I believe so.

3   Q.   And he still had access to material nonpublic information

4   about acquisitions then, correct?

5   A.   I believe so.

6   Q.   Did he get -- which stocks did he tip you on?

7   A.   You're asking me what stocks he tipped on?

8   Q.   Yeah, when you and he were talking to each other.

9   A.   He never tipped me directly on any stocks.

10  Q.   He said, though, "Maybe we'll do better next year," right?

11  A.   Right.

12  Q.   So did you believe when he said that that next year he was

13  going to tell Adnan Zaman some information and Adnan would tell

14  you?  Is that what you thought was going to happen?

15  A.   I mean, that -- it changed because, I mean, it was -- our

16  communication was through Adnan and then we became closer

17  friends.

18        So on the trip to Mexico, he -- he confined [sic] in

19  me that -- you know, I was thanking him.  You know, we were

20  hanging out.  We got a little closer.  We spent a little

21  vacation together.

22        I was, you know, appreciating what -- you know, what

23  he did, and I was -- you know, what's happened.  And he just

24  said, you know, "Stick with me, and next year we'll do better."

25  Q.   But in the meanwhile --

1  A.    He didn't say it was going to be through Adnan or was

2  going to be directly through him or he was going to give me

3  insider tips.  It didn't mean anything.  He just said that he

4  was going to help me out to do better next year.

5  Q.    So when you said that about the conversation in Mexico, it

6  didn't have anything to do with insider information.  He was

7  just going to help you out in general?

8  A.    I mean, he was just saying that he was going to help me do

9  better next year.  I mean, I was thanking him for the tips.

10 Q.    So did you understand what he said to mean that he was

11 going to give you inside information to help you do better over

12 the next year?

13 A.    I mean, he didn't say directly, "I'm going to give you

14 insider information to help you do better this year."  He just

15 said, you know, "Stick with me.  I'll help you do better --

16 we'll do better next year."  So it could be insider.  Could

17 not.  I'm not saying anything.

18 Q.    Okay.  But after Adnan Zaman moved to New York, he didn't

19 give you any insider tips, did he, when you were hanging out

20 directly?

21 A.    I didn't ask him for insider tips.

22 Q.    And he didn't offer any?

23 A.    No.

24 Q.    He was between jobs when you were in Mexico, correct?

25         THE COURT:   "He" who?

BY MR. HEMANN:

Q.   Oh, I'm sorry.  Mr. Gowrish was between jobs, correct?

A.   Not that I remember.

Q.   Do you remember him moving from TPG Capital, which is a

mergers and acquisitions private equity group, to TPG Credit?

Do you remember that?

A.   I mean, he never discussed with me exactly what position

he was doing while he was at TPG, from here to there.  I just

know that he went to Minnesota because it was going to help him

with his career.

Q.   Did you talk about the fact that the Minnesota job was

managing private investment portfolios, not mergers and

acquisitions?

A.   No.

Q.   You testified, Mr. Zaman, about a series of conversations

or two conversations, I believe, that you had after the SEC

called you, with Mr. Gowrish.  Do you remember that?

A.   I mean, I was over at his house when -- when we figured

out that it was the SEC that called.

Q.   And he was there when it happened, correct, when your

cousin called the guy back at the SEC, correct?

A.   Called the number, yes.

Q.   And did you speak about it with him?

A.   With Vinnie?

Q.   Yes.

1  A.    Yes.

2  Q.    And what did you say to him?

3  A.    I mean, I don't remember exactly a conversation.

4  Q.    What did he say to you?

5  A.    I mean, he was just saying to me that it's probably

6  nothing, don't worry about it.

7  Q.    Can you please look at page 270 of your -- the white

8  binder, please.

9  A.    This one?

10 Q.    The white one, yes.  270 of your deposition.  270, page

11 [sic] 20, through 271, page [sic] 7.  Do you see that,

12 Mr. Vaghar?

13 A.    This one, right?

14 Q.    Yes, please.  Page 270.

15 A.    Page 270, okay.

16 Q.    Line 20.  I want to start reading.  (As read:)

17        "QUESTION:  What did you say -- what did he

18        say to you?

19        "ANSWER:  I don't remember what he said."

20 A.    Who said?

21 Q.    Are you talking about your conversation with Mr. Gowrish

22 here?  Look up on page -- on line 12.

23 A.    Okay.

24 Q.    This is a conversation with Mr. Gowrish, correct?

25 A.    Yes.

1    Q.    Okay.   Starting at line 20 (as read):

2          "What did he say to you?

3          "ANSWER:   I don't remember what he said.

4          "QUESTION:  Did you talk about the SEC?

5          "ANSWER:  Yes."

6          There is an objection.

7          "QUESTION:  Do you remember anything

8          Mr. Gowrish said during that conversation?

9          "ANSWER:  No, not exactly.

10         "QUESTION:  After that -- well, generally, do

11         you remember anything he said?

12         "ANSWER:  No."

13         Do you remember giving that testimony?

14   A.    Yes.

15   Q.    So when you testified today that he said everything would

16   be okay, there's no problem, that's not what you remembered

17   when you gave your sworn testimony in the deposition, correct?

18   A.    Right.

19   Q.    So when was the next time you spoke to Mr. Gowrish about

20   this -- the SEC investigation?

21   A.    I mean, after that we figured out that this was an SEC

22   investigation, I contacted Adnan and then Adnan was contacting

23   Vinnie.  So, I mean, I don't -- I don't know the exact next

24   time we spoke.

25   Q.    Who was with -- was somebody with Mr. Gowrish when you had

1   that conversation?

2   A.    Where, at his house?

3   Q.    The next time you spoke to him after the SEC called that

4   day, was somebody with him when you had that conversation?

5   A.    Not that I remember.

6   Q.    At some point in time -- and what did you talk about when

7   you talked with him the next time?

8   A.    I mean, I believe I was talking about the SEC calling and

9   what we were going to do.

10  Q.    And what did you say?

11  A.    Nothing.  I -- I think he was still talking -- you know,

12  saying that, you know, it's probably nothing because, you know,

13  it was the initial stages that SEC was asking why -- what was

14  the reasoning why I bought the stocks or my attorney asked me

15  to, you know, tell him why, what was the reasoning behind

16  buying, purchasing the stocks.

17  Q.    Did you tell him anything about the trading activity that

18  you and Mr. Zaman had been engaged in?

19  A.    No.

20  Q.    Did you tell him anything about the profits that you and

21  Mr. Zaman had obtained from the trading activity?

22  A.    No.

23  Q.    When was the next time you spoke to Mr. Gowrish about the

24  SEC investigation?

25  A.    I don't remember.

1  Q.   You don't remember.  Mr. Kidney asked you about an

2  occasion in which Mr. Zaman and Mr. Gowrish came over to your

3  house.  Do you remember that?

4  A.   Right.

5  Q.   Was that the next time?

6  A.   Could have been.

7  Q.   Okay.  When was that?  How long after the initial call

8  from the SEC was that?

9  A.   I mean, Adnan, you know, flew into town and so there

10 was -- it was soon -- soon after everything started.  So, I

11 mean, all of it is kind of like jumbled together as far as

12 everything happening.

13 Q.   And when -- and did they come over to your house?

14 A.   Yes.

15 Q.   What did they tell you?

16 A.   Nothing.  I mean, I don't -- I don't remember the exact

17 conversation.

18 Q.   Do you remember anything that Mr. Zaman said during the

19 conversation?

20 A.   No.

21 Q.   Do you remember anything that Mr. Gowrish said during the

22 conversation?

23 A.   No.

24 Q.   Do you remember anything at all that happened during that

25 conversation?

1   A.    No.

2   Q.    After that conversation, do you ever remember having

3   another conversation with Mr. Gowrish?

4   A.    Uhm, no.

5   Q.    Mr. Kidney showed you a document.  The document starts

6   with Myogen, and talks about the trade reasons -- the reasons

7   that you might have bought the series of stocks.

8   A.    Right.

9   Q.    Do you remember that?

10  A.    Yes.

11  Q.    Do you remember meeting with the FBI and looking at that

12  document?

13  A.    After the document was made?

14  Q.    Yes.

15  A.    Yes.

16  Q.    Do you remember telling -- showing the FBI the document

17  was created on March 1st, 2008?

18  A.    I mean, I don't remember the date that it was created.

19  Q.    Do you remember showing the FBI on your computer that it

20  was modified on March 3rd, 2008?

21  A.    No.

22  Q.    Was Mr. Gowrish present at all during either the creation

23  or the modification of that document?

24  A.    The creation of the document?

25  Q.    Was he there during the creation of the document on

1  March 1st?

2  **A.**  Adnan created the document.

3  **Q.**  It was on your computer, though, correct?

4  **A.**  He came over to my house.

5  **Q.**  How many times did you and Adnan work together on that

6  document?

7  **A.**  I think I remember one time.

8  **Q.**  Okay.  Didn't you show the FBI that it was created on

9  March the 1st and modified two days later on March the 3rd?

10  **A.**  Not that I remember.

11  **Q.**  Was Mr. Zaman there twice?

12  **A.**  He could have been there twice.  I just remember him

13  coming to create the document.

14  **Q.**  Mr. Gowrish was never there in connection with the

15  creation of the document, was he?

16  **A.**  They met in New York to create their rationale for the

17  stocks.

18  **Q.**  They met in New York prior to March 1st and March 3rd to

19  talk about it?

20  **A.**  Or they were supposed to.  I was waiting for Adnan to get

21  the information.  He said that Vinnie was supposed to be in

22  New York or -- I'm not sure if he ever did, but he was supposed

23  to come to New York and they were going to meet up and come up

24  with some rationale.  It could have been the second time.  I

25  don't remember.

1  Q.  But you don't know whether Mr. Gowrish ever went to

2  New York, right?

3  A.  No.

4  Q.  And Mr. Gowrish wasn't present during the creation of the

5  document, was he?

6  A.  No.

7          **MR. HEMANN:**  I think that's all I have, Your Honor.

8          **THE COURT:**  Thank you.

9          Mr. Kidney.

10                    **REDIRECT EXAMINATION**

11  BY MR. KIDNEY:

12  Q.  Starting with one of the more recent comments/questions by

13  Mr. Hemann, on this $14,000 check that we've established was

14  deposited in the Bank of America for a week and then the end of

15  July was cashed, you -- is it possible that this Kokkari thing

16  that Mr. Hemann brought up occurred at that time?

17  A.  Possible.

18  Q.  So if Mr. -- if Mr. Zaman was in New York after you cashed

19  that check, but you were going to see Mr. Gowrish shortly after

20  cashing it, is it possible that you paid Mr. Gowrish some of

21  that money?

22          **MR. HEMANN:**  Objection, Your Honor.  Calls for

23  speculation as to what's possible.

24          **THE COURT:**  Sustained.

25

1  BY MR. KIDNEY:

2  Q.   Do you have -- can you say that you didn't pay Mr. Gowrish

3  some of that money?

4           MR. HEMANN:   Objection, Your Honor.   Calls for

5  speculation.

6           THE COURT:   Sustained.

7  BY MR. KIDNEY:

8  Q.   Do you have a recollection whether you paid Mr. Gowrish

9  some of that money?

10  A.   It could have been.

11  Q.   You have a recollection that when you paid Mr. Gowrish --

12  what did Kokkari have to do with that and the time you

13  recollect paying?

14  A.   Well, the Kokkari, I mean, that's -- since I remember

15  distinctively because I went to his house and then gave him

16  some cash.   I don't remember the amount.   And then him and I

17  proceeded to dinner to Kokkari, which he paid with the money

18  that I gave him.

19  Q.   On this conversation which you addressed when I was

20  questioning you and again when Mr. Hemann was questioning you

21  about thanking Mr. Gowrish for the tip on Sabre, you've

22  testified both in response to my questions and Mr. Hemann's

23  about talking about some sort of SEC investigation that

24  Mr. Zaman said Mr. Gowrish was worried about.   Was that in the

25  same conversation that Mr. Zaman called to say, "Don't call