PAMELA L. JOHNSTON CA Bar No. 132558
    pjohnston@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:    213.972.4500
Facsimile:      213.486.0065

JASON B. ALLEN, CA CA BAR NO. 251759
    Jason.allen@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
ONE MARKET, SPEAR STREET TOWER
SAN FRANCISCO, CA 94105-1126
TELEPHONE:    415.442.1000
FACSIMILE:    415.442.1001

Attorneys for Defendant VINAYAK S. GOWRISH

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> VINAYAK S. GOWRISH, ADNAN S. ZAMAN, PASCAL S. VAGHAR and SAMEER S. KHOURY, <br><br> Defendant. | Case No: 3:09-cv-05883-SI <br><br> **DEFENDANT VINAYAK S. GOWRISH'S UNSEALED APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANT VINAYAK S. GOWRISH'S OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT** <br><br> VOLUME II (PAGES 221-343) <br><br> Date: June 10, 2011 <br> Time: 9:00 a.m. <br> Location: Courtroom 10, 19th Floor <br> 450 Golden Gate Avenue <br> San Francisco, CA 94102 <br><br> Judge: Hon. Susan Illston <br><br> Date Complaint Filed: 12/16/2009 |

VOLUME II GOWRISH'S UNSEALED APPENDIX OF EVIDENCE ISO OPPOSITION TO MOTION FOR
ENTRY OF FINAL JUDGMENT
CASE NO. 3:09-CV-05883-SI

LACA_2915852.1

Defendant Vinayak Gowrish respectfully submits this Volume II Unsealed Appendix of Evidence in Support of the Opposition to Plaintiff's Motion for Entry of Final Judgment, which attaches the documents set forth in the index below.

| Ex | Title | Pages |
|----|-------|-------|
| 13 | Adnan Zaman Trial Testimony Excerpts (Pages 454-705 with gaps) | 221-308 |
| 14 | Vinayak Gowrish Trial Testimony Excerpts (Pages 753-839 with gaps) | 309-319 |
| 15 | Special Agent Fuelling Trial Testimony Excerpts (Pages 896-896) | 320-322 |
| 16 | Jury Instructions Trial Transcript Excerpts (Pages 968-977 with gaps) | 323-331 |
| 17 | SEC Counsel James Kidney Closing Argument Trial Transcript Excerpts (Pages 980-996 with gaps) | 332-338 |
| 18 | Jury Verdict (CR 133) | 339-343 |

Dated: May 6, 2011         **FOLEY & LARDNER LLP**
PAMELA L. JOHNSTON

By: _____/s/ Pamela L. Johnston_
PAMELA L. JOHNSTON
Attorneys for Defendant VINAYAK S. GOWRISH

1

VOLUME II GOWRISH'S UNSEALED APPENDIX OF EVIDENCE ISO OPPOSITION TO MOTION FOR
ENTRY OF FINAL JUDGMENT
CASE NO. 3:09-CV-05883-SI

LACA_2915852.1

**PROOF OF SERVICE Electronic Filing with Mail Service**

I HEREBY CERTIFY that on **May 6, 2011**, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Anthony S. Kelly ,
Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549
202-551-4545
Email: KellyA@sec.gov

James Andrew Kidney
Securities and Exchange
Commission
100 F St., NE
Stop 4010
Washington, DC 20549-4010
202-551-4441
Fax: 202-772-9246
Email: kidneyj@sec.gov

Julie M. Riewe ,
Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549
202-551-4546
Email: riewej@sec.gov

Scott W. Friestad
Securities And Exchange
Commission
100 F Street, NE
Washington, DC 20549-4010-A
(202) 551-4431
Email: friestads@sec.gov

Jason Bruce Allen
Morgan, Lewis & Bockius
LLP
One Market
Spear Street Tower
San Francisco, CA 94105
415-442-1288
Fax: 415-442-1001
jason.allen@morganlewis.com

John Henry Hemann
Morgan Lewis & Bockius
One Market
Spear Street Tower
San Francisco, CA 94115
415-442-1355
Fax: 415-442-1001
jhemann@morganlewis.com

Thomas Edward Stevens
United States Attorney's Office
450 Golden Gate Avenue
P.O. Box 36055
San Francisco, CA 94102-3495
415 436-6559
Fax: 415 436-7234
Thomas.Stevens@usdoj.gov

/s/ Bill J. Symes
**Bill J. Symes**

LACA_2915852.1

# Exhibit 13

1. will just say for the jury's benefit we're alleging involved

2. the defendant, Sabre, TXU, and ADS, would he be telling the

3. truth?

4. A.    Yes.

5. Q.    If Pascal Vaghar testified that he paid you for these

6. tips, would that be truthful also?

7. A.    Yes.

8. Q.    If Pascal Vaghar gave -- or testified that he gave you

9. money with instructions to pay some of it to Mr. Gowrish as his

10. share of tipping proceeds, would that be true also?

11. A.    Yes.

12. Q.    If Pascal Vaghar also testified that he paid money

13. directly to the defendant, would you have any way of knowing,

14. other than from Mr. Gowrish, whether that was true or not?

15. A.    No.

16. Q.    What was the first company that you tipped Mr. Vaghar to

17. trading in?

18. A.    I believe it was the acquisition of Myogen by Gilead.

19. Q.    And that was a Lazard deal, not a TPG deal, correct?

20. A.    Right.

21. Q.    Why did you tell Mr. Vaghar about that deal?

22. A.    For over a year he had been asking me for stock tips and I

23. had given him some stock tips in the past that weren't based on

24. inside information and had a lapse in judgment and thought that

25. I can help out a friend in a wrong way.

1    Q.   Did you tell him you wanted to share the profits with him?

2    A.   No.

3    Q.   Did there come a time when you gave him a second tip?

4    A.   Yes.

5    Q.   What was that company?

6    A.   Sabre.

7    Q.   Did you share in the profits of that one?

8    A.   I did.

9    Q.   How did that arrangement come to be?

10   A.   After Myogen, Pascal proposed that if I gave him any other

11   tips, he would give me 30 percent of the profits.  And I told

12   him that I couldn't do it anymore because I was worried that I

13   would lose my job at Lazard and I had no intention of giving

14   him any other tips, except when I learned about the potential

15   acquisition of Sabre, I thought maybe I could pass it on to

16   Pascal because it was not connected to Lazard.

17   Q.   Now, where did you get the information that Sabre Holdings

18   was to be acquired?

19   A.   I remember when Vinnie came back from his honeymoon around

20   Thanksgiving of '06, and when he called me, I was surprised he

21   was back because I didn't think he was supposed to be back at

22   that time.  And he said that his honeymoon got cut short

23   because of a deal he was working on.  And he mentioned that he

24   was on the phone the entire time and on the whole trip back.

25         And then I don't know if it was that conversation or

1  a later conversation where he mentioned that they were working

2  on an acquisition of a travel and reservation network or GDS.

3  And I mentioned that I had worked on some things related to

4  Amadeus, which was a competitor of Sabre, and when he heard

5  about the fact that I worked on Amadeus, he wanted to talk to

6  me more about it and wanted to kind of data dump about what I

7  knew of the industry.

8          And then he went into talking a little bit about the

9  potential acquisition that they were looking at.  And from that

10  conversation, I was able to figure out that it was likely that

11  he was working on an acquisition of Sabre.

12  Q.   What information caused you to, under your story, deduce

13  that it was Sabre?

14  A.   There really weren't any -- Travelport had been acquired

15  by Blackstone and Amadeus had been bought out as well.  I think

16  Sabre was the only kind of large remaining public GDS out

17  there.  And I knew enough about the space that -- that I was

18  able to figure it out pretty easily.

19  Q.   So Mr. -- Mr. Gowrish gave you enough information -- now,

20  first of all, he knew that you worked on Amadeus, correct?

21  A.   I believe I mentioned that.

22  Q.   And he was analyzing the acquisition of Sabre, correct?

23  A.   Right.

24  Q.   And according to you, there was only one other public

25  company that did what Sabre did, right?

1  A.   There might -- I'm not sure if Expedia also did something

2  similar, but Sabre was the primary competitor to Amadeus and

3  Travelport.

4  Q.   So now you're saying that maybe Expedia could have been

5  what he was working on?

6  A.   No, because if -- if you worked for months in the space,

7  you'd be able to figure out that it was not Expedia and it was

8  Sabre.

9  Q.   So he gave you enough information to know that it was

10 Sabre, under your own story, correct?

11 A.   Right.

12 Q.   Now, did he tell you it was Sabre?

13 A.   I don't think so.

14 Q.   What do you mean you don't think so?

15 A.   It was a conversation we had in the end of '06 and it's

16 now 2011.  I don't think that he told me the name.

17 Q.   Do you remember being interviewed --

18 A.   We never -- we never used names.  So that's why I'm saying

19 I don't think so.

20 Q.   But he gave you pretty much everything but the name if

21 there was only one public company that did what -- what Sabre

22 did?

23 A.   Well, in the course of talking about it, I was able to

24 glean that it was probably Sabre.

25 Q.   Well, as an analyst to Sabre, didn't he know if there

1    was -- if what you say is true, that there was only one other

2    public company in the business?

3            MR. HEMANN:  Objection, Your Honor.  The question is

4    as to what Mr. Gowrish knew.

5            THE COURT:  Sustained.

6    BY MR. KIDNEY:

7    Q.   Did you discuss how there was only one company left in the

8    business?

9    A.   I don't remember.

10   Q.   Do you remember being interviewed by the FBI about this

11   matter in March of 2009?

12   A.   Yes.

13   Q.   Do you remember telling the FBI, Gowrish may have been --

14   Gowrish -- something to the effect that Gowrish may have told

15   you that the travel reservation company was Sabre?

16           THE WITNESS:  I thought 302s were confidential.

17           THE COURT:  Actually, he gets to ask you the

18   questions and you get to answer them.  And if there are issues,

19   some lawyer will object and raise them.  So unless you hear

20   something like that, just answer his question, please.

21           THE WITNESS:  Can you repeat it, please.

22   BY MR. KIDNEY:

23   Q.   First of all, you have a copy or had a copy before you

24   went to prison of your FBI --

25   A.   I did, yes.

1  Q.   -- 302?

2  A.   Right.

3  Q.   And you read it, right?

4  A.   Yes.

5  Q.   When was the last time you read it?

6  A.   I believe right before my deposition.

7  Q.   Right before your deposition?  Okay.  We'll come back to

8  that.

9          My question was, do you remember telling the FBI that

10 Mr. Gowrish may have told you that the travel reservation

11 company was Sabre?

12 A.   I did say that I wasn't sure if he told me the name or

13 not.

14 Q.   You said, according to the notes by the FBI, Gowrish may

15 have told you?

16          MR. HEMANN:  Objection, Your Honor.  Hearsay.

17 BY MR. KIDNEY:

18 Q.   So you do have a recollection --

19          THE COURT:  Sustained.

20          MR. KIDNEY:  I'll withdraw the question.

21 BY MR. KIDNEY:

22 Q.   So you do have a recollection of telling the FBI that he

23 may have told you it was Sabre?

24 A.   I have a recollection of saying I wasn't sure if he told

25 me the name or not.

1  Q.   And your interview with the FBI was on March 19, 2009.

2  Was that closer to the events than today?

3  A.   Yes.

4  Q.   And do you remember at your deposition that you said you'd

5  thought about the conversation and had decided for your

6  deposition that he didn't tell you it was Sabre?  Do you

7  remember testifying to that effect?

8  A.   I don't know if I said I thought about it and decided.

9  That sounds like I made a conscious decision to change my mind.

10  I don't believe I said that.

11  Q.   Do you have a notebook in front of you with your

12  deposition?

13          (Handing binder to witness.)

14          MR. KIDNEY:  Page 232, Counsel.  I'm sorry, 239,

15  starting at line 9.

16          This deposition was not videotaped, Your Honor.

17          THE COURT:  Where are you going to read to?

18          MR. KIDNEY:  To line 19.

19  BY MR. KIDNEY:

20  Q.   Now, can you read to the jury -- well, it was introduced

21  with reading you a sentence from your FBI proffer in which

22  you -- it recounts that you said the -- he may have told you

23  that the FBI -- that he may have -- Mr. Gowrish may have told

24  you that it was Sabre.  The question, can you read that?  I'll

25  read it.  (As read):

1        "QUESTION:  Do you remember telling that to

2        the FBI?"

3  A.    I do.  This sounds much more like what I said here.

4  Q.    Do you want to read it?  I'll do the questions and answers

5  and then we'll ask you if that's your testimony.

6  A.    Sure.

7  Q.   (As read:)

8        "QUESTION:  Do you, as you sit here today,

9        recall Mr. Gowrish saying that the company

10       was Sabre?"

11  A.   (As read:)

12       "I don't think he mentioned the company by

13       name."

14  Q.    No, I'll read the questions and the answers.

15  A.    Oh, okay.  Sorry.

16  Q.    Thanks for helping.  (As read:)

17       "ANSWER:  I don't think he mentioned the

18       company by name.

19       "QUESTION:  So why did you say he may have to

20       the FBI?

21       "ANSWER:  Well, at the time I thought he may

22       have.  But, also, I guess I had a year and a

23       half to kind of think about it and review and

24       re-review things in my head over, you know,

25       the course of this time."

1          Was that your statement at your deposition?

2   A.   Yes, it was.

3   Q.   And your deposition was taken on June 30, 2010, correct?

4   A.   Yes.

5   Q.   And you talked to the FBI in March of 2009, correct?

6   A.   Right.

7   Q.   And again in July -- and again in July of 2009, correct?

8   A.   Yes.

9   Q.   Didn't you say the same thing to the FBI then, that he may

10  have told you it was Sabre?

11  A.   I don't recall -- in July?

12  Q.   In July.

13  A.   I don't recall.

14  Q.   I'm going to show you a copy of the FBI 302 notes of your

15  interview from July 15, 2009 and point you -- I put an arrow

16  there to a sentence that you should read to yourself.

17  A.   (Witness reading.)   Okay.

18  Q.   Does that refresh your recollection that you told the FBI

19  also in July that Mr. Gowrish may or may not have mentioned

20  Sabre?

21  A.   It says "may or may not."

22  Q.   Correct.

23  A.   Correct.

24  Q.   Now, in your deposition you conclude that he probably --

25  that he did not tell you it was Sabre, correct?

1   A.   Correct.

2   Q.   And the deposition was nearly a year after your second

3   interview with the FBI and well over a year after your first

4   interview with the FBI, correct?

5   A.   Correct.

6   Q.   How many times did you meet with Mr. Gowrish since your

7   first interview with the FBI?

8   A.   Uhm, I think I only met him those two times.

9   Q.   Pardon me?

10  A.   I think I only met him those two times.

11  Q.   You didn't see him at all after your first interview with

12  the FBI?

13  A.   I don't think so.

14  Q.   Did you talk to him?

15  A.   I might have run into him once at a friend's birthday

16  party, but he left as soon as he saw me, pretty much.

17  Q.   Did you talk to him?

18  A.   No.

19  Q.   You never talked to him between -- between your first

20  interview with the FBI --

21  A.   I really don't think so.

22  Q.   -- and your deposition, other than what you've described?

23  A.   Right.

24  Q.   Now, how is it that your memory about a conversation that

25  took place in 2006 that you told the FBI you may or may not

1  have included the name Sabre, how did your memory improve by

2  2010 to conclude it didn't include Sabre?

3  A.   Well, I mean, I just had a lot more time to think about

4  everything calmly.  When I was taken in in March to be -- for

5  questioning, you know, it was only a couple of weeks after I

6  found out that I was being investigated.  I just had my

7  passport taken away.  I was going through two different lawyer

8  changes trying to get out of my place in New York.  My whole

9  life had just been turned upside-down and I didn't really have

10  any time to think about anything.  I just went in and, you

11  know, you guys asked me questions for ten hours and I answered

12  them without having any time to really think about them.

13  Q.   Well, you actually learned about the investigation itself

14  in February of 2008; didn't you?

15  A.   February 27th, I believe, was when Myogen counsel told me

16  that there was an investigation.

17  Q.   February 27th of 2009?

18  A.   And '9, yes.

19  Q.   But you learned about the SEC investigation of Mr. Vaghar

20  in February of 2008, correct?

21  A.   Yes, but I didn't do anything.

22  Q.   You went to Mr. Vaghar's house to look for his trading

23  records, didn't you?

24  A.   Yes.

25  Q.   You flew out to San Francisco from New York the very

1  A.   Oh.

2  Q.   -- Mr. Gowrish about Sabre.

3  A.   I think it was just maybe twice.

4  Q.   Okay.  Now, do you remember specifically what was said or

5  have you exhausted your recollection on that subject?

6  A.   I don't remember specifically, no.

7  Q.   Is it possible you had more than two conversations?

8  A.   It's possible.

9  Q.   Can you tell us again what it was that Mr. Gowrish told

10  you that led you to so narrowly identify the company by its

11  line of work?

12  A.   To be honest, I don't even remember much about Amadeus,

13  which is the deal that I worked on.  So I don't remember what

14  it was, but, you know, when you're working on a deal, you --

15  you have to kind of study the industry inside out, and

16  that's -- that's why I was able to figure it out.

17  Q.   Well, the fact that -- Sabre had several areas of travel

18  reservations, didn't it?  Several kinds of businesses?

19  A.   Uh-huh, yes.

20  Q.   And it has competitors in some of those, doesn't it?

21  A.   Yes.

22       MR. KIDNEY:  We're going to put on the board -- Your

23  Honor, I believe this comes in under 803(8) -- give a copy to

24  the defense first -- Plaintiff's Exhibit 1095.

25       MR. HEMANN:  I have no objection to this, Your Honor.

1  lot to do with --

2  Q.   So based on what Mr. Gowrish told you, you could make

3  these distinctions --

4  A.   Yes.

5  Q.   -- and conclude that it was only Sabre; is that right?

6  A.   I guess I should have thought that there is a chance it

7  could be Expedia, but I thought it was only Sabre, yes.

8  Q.   But isn't it also just a fact that Mr. Gowrish told you it

9  was Sabre?

10  A.   No, I don't think I said that.

11  Q.   I didn't ask whether you said that.  I asked whether

12  Mr. Gowrish said that.

13  A.   I don't think so.

14  Q.   How much money did you get for tipping Mr. Vaghar about

15  Sabre?

16  A.   I think maybe about 5-, $6,000.

17  Q.   Did you keep track of the tips you gave to Mr. Vaghar and

18  how much you made?

19  A.   I did.

20  Q.   How did you do that?

21  A.   In a little black notebook.

22  Q.   Pardon me?

23  A.   In a little black notebook.

24  Q.   Where is that now?

25  A.   I threw it away before I went to New York, back in May or

1   Q.   Why was that?

2   A.   Because the potential for profit was greater.

3   Q.   Did you ever have any -- express any concerns to

4   Mr. Vaghar about not overbuying in a security?

5   A.   Yes.

6   Q.   Can you tell us what you specifically told Mr. Vaghar?

7   A.   I told him not to buy too much. You know, he always

8   wanted to make as much money as possible. And I told him that

9   he shouldn't be greedy and buy too much because if he bought

10  too much, it was more likely that we'd get caught.

11  Q.   Did you ever, in fact, sell securities that were in his

12  account because you were afraid of that?

13  A.   Yes.

14  Q.   Do you remember which issuer that was?

15  A.   For TXU.

16  Q.   So you were -- saw how much he bought of TXU --

17  A.   There might have been other instances, too, but I remember

18  TXU.

19  Q.   And you were afraid it might cause attention so you sold

20  some before the announcement?

21  A.   That and he also had just bought -- he just kept buying

22  more and more every day. And I told him -- especially on TXU,

23  I told him I wasn't even a hundred percent sure about the deal.

24  So in either case, if it happened, I thought he had too much

25  and we'd get in trouble. And if it didn't happen, then he

1  would lose a bunch of money.

2  Q.    Did you also receive compensation from Mr. Khoury for the

3  Sabre transaction?

4  A.    No, I did not.

5  Q.    Did you tip Mr. Khoury to it?

6  A.    I did not.

7  Q.    Did you tell Mr. Vaghar to tip him?

8  A.    I did not tell him to tip him, but he did tip him.

9  Q.    Did you tell Mr. Vaghar that the information about Sabre

10  came from Mr. Gowrish?

11  A.    I did.

12  Q.    Why?

13  A.    Because he -- I had told him that I wasn't going to

14  provide him any inside information and I told him that -- and I

15  told him that I wouldn't provide him any inside information

16  because I was worried about losing my job at Lazard if I got in

17  trouble for it.  And that's why I told him that I found out

18  through Vinnie about Sabre.

19  Q.    In your dealings with Mr. Vaghar, do you have any belief

20  as to whether he cared whether the information came from Lazard

21  or TPG Capital?

22  A.    He probably didn't care.  We were very open.  I wasn't

23  trying to hide it from him at the time.  I just told him -- it

24  wasn't something I planned.  I just told him, you know.

25  Q.    Now, when you were talking to Mr. Gowrish about Sabre, did

1   he still seem kind of peeved about how his honeymoon had been

2   interrupted?

3   A.   Yes.

4   Q.   So he was a little upset with TPG for calling him in?

5   A.   Yes.

6   Q.   Did Mr. Gowrish feel that he was under -- underrated at

7   TPG?

8   A.   I don't know.  I don't think so.

9   Q.   Did he -- did he ever express any discontent with his

10  position at TPG?

11  A.   No.  I mean -- no, not really.

12  Q.   Did Mr. Vaghar have any reaction that you could discern

13  after you told him that the information about Sabre came from

14  Mr. Gowrish?

15  A.   I think he was just excited to have another potential

16  trade.

17  Q.   Did Mr. Vaghar give you any money with an instruction to

18  give it to Mr. Gowrish after Sabre?

19  A.   No.

20          MR. HEMANN:  I'm sorry, I didn't hear the answer.

21          THE WITNESS:  No.

22          MR. HEMANN:  Thank you.  I'm sorry.

23          MR. KIDNEY:  One moment, Your Honor, please.

24  BY MR. KIDNEY:

25  Q.   Do you remember telling the FBI that after the acquisition

1  of Sabre, Mr. Vaghar gave you $5,000 to give to Mr. Gowrish?

2  A.    I believe in July I told them that I was wrong about my

3  timing of a number of those events.

4  Q.    So you don't deny telling that to the FBI, but you later

5  told them you were wrong; is that right?

6  A.    I told them that in March.  And then in July I told them

7  that I was wrong about the timing.  As I had kind of played

8  everything in my head again, I realized that I was off by a few

9  months in all those things.

10 Q.    Did you give the same detailed instructions as to what

11 securities to buy when you tipped Mr. Khoury directly --

12 A.    No.

13 Q.    -- that you gave to Mr. Vaghar?

14 A.    No.

15 Q.    Why not?

16 A.    He was more experienced and I think he had already done

17 options on his own before.  And I didn't tell him anything

18 other than the potential targets.

19 Q.    Did you have access to his trading account?

20 A.    I did not.

21        THE COURT:  When you reach a point where you are

22 changing topics, let me know and we'll take a break.

23        MR. KIDNEY:  That's a very timely request, Your

24 Honor.

25        THE COURT:  All right.

1          **MR. KIDNEY:**  I just have one question -- that's it.

2   I think we can take a break.

3          **THE COURT:**  All right.  Ladies and gentlemen, we'll

4   take our morning recess.  If you would be ready to come back,

5   please, at 10:15.  In the meantime, please do not speak with

6   each other or anyone else about this case.  Don't make up your

7   minds.  You haven't heard all the evidence yet.

8          (Jury exits at 10:02 a.m.)

9          (The following proceedings were held in open court,

10         outside the presence of the jury.)

11         **MR. HEMANN:**  Your Honor, may I say something briefly?

12         **THE COURT:**  Sure.

13         **MR. HEMANN:**  These exhibits are fine.  They are SEC

14   filings.  They're a little dense; clearly hard for me to read

15   them on the fly.  I assume they are admissible, but I don't

16   think they are impeachment or rebuttal.  This is their direct,

17   their witness.  I don't think they impeach anything that he's

18   said.  They are facts of public record that I didn't hear him

19   disagree with.  I don't think they go to his honesty or

20   credibility.

21         And I'm just -- I guess my request is, if there is

22   anything else like these I could take a quick look at, because

23   I feel a little silly standing here --

24         **THE COURT:**  Are these not on the exhibit list?

25         **MR. HEMANN:**  They are designated as impeachment

1          You are still under oath.

2          You may proceed, Mr. Kidney.

3   BY MR. KIDNEY:

4   Q.   Mr. Adnan -- Mr. Zaman -- I'm sorry -- what was the next

5   tip that you conveyed to Mr. Vaghar after Sabre?

6   A.   It was TXU.

7   Q.   Did you also tip Mr. Khoury?

8   A.   Yes, I did.

9   Q.   Can you please tell the jury -- well, first, do you have

10  any recollection as to when the TXU tip happened?

11  A.   It was probably sometime in early February.

12  Q.   2007?

13  A.   Yes.

14  Q.   Can you please tell the jury your story as to how you

15  claim you learned about TXU.

16  A.   So the first time I heard anything about anything related

17  to TXU, I was at a party, I think, sometime in January, and I

18  believe that Pascal was there with me.  And there was some

19  people talking about how they were working on one of the

20  largest buyouts ever, some huge energy buyout, but it wasn't

21  anything much beyond that.  And everyone was pretty inebriated,

22  as well, and didn't make much of it at the time.

23          And then a couple of weeks later, I was at Vinnie's

24  office, either waiting to go to lunch with him or waiting maybe

25  to borrow his car in the late afternoon or evening, I don't

1  remember exactly why I was at his office, but I remember I was
2  at his office and I was waiting for him to finish up something
3  that he was doing.  And there was someone in the next office
4  talking quite loudly about some energy buyout.  And that's when
5  I asked Vinnie if they were working on a big energy deal.
6  Q.  What did Mr. Gowrish say to you, according to this story?
7  A.  He acknowledged that they were working on a big energy
8  deal.  And then even though he wasn't working on it, apparently
9  he read a lot about it because he was preparing for his -- I
10 don't know if it was for his interview or he had already gotten
11 the job at TPG Credit in Minneapolis, but that was one of the
12 things, I guess, that he had reviewed in preparation for that
13 job.
14        And he started kind of almost educating me on the
15 marginal cost of producing electricity and different types of
16 electricity and so on and so forth.  And it seemed like he was
17 pretty excited about both the energy industry as well as the
18 deal itself.
19 Q.  What did he tell you about the deal as opposed to the
20 energy --
21 A.  The things that I remember him saying about the deal was
22 that it was going to be like Texas Genco, only bigger.  It was
23 going to be tens of billions or -- I don't know if he said tens
24 of billions, or 20 or 30 billion.  Something really large.  And
25 he said it was mired in regulatory issues.

1   Q.   Can you remember whether he told you anything else?

2   A.   I can't remember anything else.  Those are the things that

3   kind of stood out.

4   Q.   When he -- when, according to you, he said it would be

5   just like the Texas Genco deal, did you have any

6   understanding -- what was your understanding of what that

7   meant?

8   A.   I didn't know a lot about Texas Genco, other than I

9   remember it was a home run for -- I think, TPG, Goldman Sachs,

10  and, I think, maybe KKR were the ones who bought it.  And I had

11  read an article on my own, before, about how it was a huge home

12  run and all the firms made billions of dollars in it.

13  Q.   Okay.  So continue with your story as to how you came

14  to -- you know, what you did next.

15  A.   So that night when I went home, I started researching

16  Texas Genco more and found that Texas Genco was later acquired

17  by NRG.  And then I pulled a lot of research reports on NRG.

18        And one of the reports, or at least a few of the

19  reports, had comparable companies in them.  And when I looked

20  at the comparable companies, one of the -- one of the larger --

21  I think -- I think it was the largest comp was TXU.  I think I

22  pulled research reports for a few different companies but I

23  don't think there was any other companies in Texas that were

24  that big.

25        And when I looked up some TXU research reports, I

1  think I even read a research report where it mentioned that TXU

2  was a potential acquisition candidate.   And then I read a lot

3  of reports about how there are all these regulatory issues with

4  TXU.   And that's why I thought TXU was -- was probably what

5  they were working on.

6  Q.   Now -- and then what did you do, under your story?

7  A.   The next time I saw Pascal, which was soon thereafter,

8  because I used to see Pascal probably several times a week, I

9  told Pascal that I thought that TXU was going to get acquired

10  and we can buy some -- initially, I told him just to buy some

11  call options because I wasn't even really sure.   I don't know

12  how much I told him to buy, but maybe like 20 or something like

13  that, which he did.

14        And then he just started buying more and more every

15  day, without me ever telling him to buy any more.

16  Q.   And that caused you to go into his account and sell some?

17  A.   Yes.

18  Q.   And TXU, of course, subsequently was acquired, and money

19  was made in the account, correct?

20  A.   Yes.

21  Q.   Did Mr. Vaghar share some of that money with you?

22  A.   He did.

23  Q.   Did there come a time when Mr. Vaghar gave you money to

24  give to Mr. Gowrish?

25  A.   It was sometime after TXU.

1  Q.   And did you give it to Mr. Gowrish?

2  A.   I did not.

3  Q.   Why did you tell Mr. Vaghar that -- well, strike that.

4       Did you tell Mr. Vaghar that the information about

5  TXU came from TPG through Vinnie?

6  A.   I think I described generally what I just described to

7  you, to Pascal, that I figured it out by talking to Vinnie.

8  Q.   So Mr. Vaghar said, "Here's some money, please give this

9  to Vinnie," some of it?

10  A.   It wasn't exactly like that.

11  Q.   How it was?

12  A.   It was -- after TXU, he -- he said, uhm -- he said that --

13  he basically wanted to involve Vinnie because now we had gotten

14  Sabre and TXU through Vinnie, so he -- and he knew that I

15  didn't want to do any deals using Lazard information.  So he

16  was like, "Why don't we bring Vinnie in, and we can share the

17  profits with Vinnie and split the profits three ways."

18  Q.   What did you say in response?

19  A.   I said I didn't -- "I don't think Vinnie would -- would

20  want to do this."  Plus, Pascal was like, "We can tell him, you

21  know, that we traded on TXU."  And I think he said something

22  like, you know, "Tell him we made 20- or 30,000 and" -- in the

23  same way that Myogen -- without me having asked him to give me

24  money for Myogen, he was like, "Why don't we give some money to

25  Vinnie and then, you know, tell him that we can kind of bring

1  him into the fold going forward."

2       And I was like, "I don't think Vinnie is going to do

3  it.  First of all, he is way too straight an arrow, and it's

4  not worth the risk."

5       That's when I started thinking, "I don't even know

6  why I'm doing this," because both Vinnie and I were making lots

7  of money, several times more than what I got from this, from

8  our day jobs.  And I was like, "Look, I really don't think he

9  is going to do this."  And then I was like, "Let me -- let me

10 think about it."  And that's how I left it.

11      And then a couple of weeks later, he kind of showed

12 up with the cash and he's like -- I don't know if it was a

13 misunderstanding or he thought that I was okay with it or what,

14 but he was like, you know, "Let's -- let's kind of bring Vinnie

15 into this."

16      And with the cash in my hand, I thought about saying,

17 "No, you know, he's not going to be okay with this."  And then

18 I was like -- I took the cash and I said, "All right.  Let

19 me -- let me talk to Vinnie.  You don't talk to Vinnie.  I'll

20 deal with him and see what I can get out of him."

21 Q.   And then did you leave it with Mr. Vaghar -- did you ever

22 tell Mr. Vaghar that Mr. Gowrish wasn't going to be involved

23 and don't give you any money for that?

24 A.   I didn't tell Pascal that I didn't give any of the money

25 until February of '09.

1  call or anything like that.

2  A.    Right.  I didn't say that.

3  Q.    Why not?

4  A.    I didn't remember it at the time.  The -- the truth is

5  that I learned about -- you know, all I heard on the phone call

6  was someone talking about something related to energy, and I

7  didn't hear any details about anything from a phone call.

8          And I learned about the transaction by talking to

9  Vinnie, not by, you know, overhearing any other conversations.

10  Q.    And Mr. Gowrish, according to you, told you that it was

11  like the Texas Genco deal?

12  A.    Right.

13  Q.    That it was going to be a many-billion-dollar transaction,

14  correct?

15  A.    Right.

16  Q.    That there were energy regulatory problems, correct?

17  A.    Yes.

18  Q.    What else did he tell you?

19  A.    Those are the things that stood out.  I don't -- I don't

20  remember what else he said.  Was there something else in here?

21  Q.    So the differences between what you told the FBI on that

22  day in March in 2009 were no overheard telephone call and no

23  request for Mr. Vaghar to ask Vinnie to check out the rumor,

24  right?

25  A.    Correct.

1   Q.   And who was at this party where the energy rumor was
2   overheard, besides Mr. Vaghar?
3   A.   We didn't know any of the other people.  There were a
4   bunch of people.  The party that I'm thinking about was at the
5   Clift Hotel in San Francisco, but I can't even say for sure if
6   it was that party.
7   Q.   So you don't have any idea who it was that was talking
8   about this energy rumor?
9   A.   I didn't know the people.
10  Q.   And then it's your testimony that that -- how long after
11  this party were you in Mr. Gowrish's office and overheard this
12  conversation?
13  A.   Maybe a couple of weeks, something like that.
14  Q.   So it's your testimony that you heard something anonymous
15  about a rumor at a party, and then were in Mr. Gowrish's office
16  and overheard a conversation or part of a conversation about an
17  energy deal and talked to Mr. Gowrish about it, and then he
18  gave you enough money [sic] to go out and do a bunch of
19  research and figure out that it had to be TXU; is that right?
20  A.   Right.  Overhearing the conversation sparked the
21  conversation between me and Vinnie.
22  Q.   Now, one of the -- part of the research you did was to
23  find out that there were no other Texas energy companies of an
24  equivalent size, I believe you said, correct?
25  A.   I don't think so.  I mean, I -- I think that's correct.

1  Q.   Let me take the FBI report back.

2        Did Mr. Vaghar ever tell you that he had shared some

3  of the TXU profits with Mr. Gowrish?

4  A.   Directly?

5  Q.   That he told you he had shared it with Mr. Gowrish.

6  A.   Yes, yes.

7  Q.   Yes.

8        And did Mr. Vaghar -- did you overhear Mr. Vaghar

9  talking about making money on TXU in the presence of both you

10 and Mr. Gowrish?

11 A.   I don't believe he said he made money on TXU in the

12 presence of me and Mr. Gowrish.

13 Q.   Well, isn't that what you not only told the FBI but you

14 then confirmed in your deposition?

15 A.   I didn't say it was on TXU, I don't believe. Is there a

16 page I should be looking at?

17 Q.   I'll show you.  Let me first look myself.

18        MR. KIDNEY:  Page 53, Counsel, the first real

19 paragraph.

20        Your Honor, I'm showing the witness his FBI proffer

21 report, page -- the report on his proffer at page 53, his

22 proffer on March 19, 2009, the first full -- second full

23 paragraph.

24 BY MR. KIDNEY:

25 Q.   Does that refresh your recollection as to what you told

1 the FBI?

2 A.    Yes, but I don't believe I said it -- I found things in

3 the 302 reports, because they are not quoting me exactly, that

4 aren't written the way I said them.   And I don't believe that

5 that's exactly what I said.

6              MR. KIDNEY:   One moment, Your Honor.

7              THE COURT:   All right.

8 BY MR. KIDNEY:

9 Q.    Now, if you turn to page 238 --

10 A.    Of?

11 Q.    -- of your deposition.  I'd asked you about the paragraph

12 I directed your attention to.

13              Isn't it the case that in your deposition you adopt

14 all but the last sentence?

15 A.    Correct.

16 Q.    So do you sit here today and still adopt all but the last

17 sentence?

18 A.    Can I say what I believe I said?

19 Q.    I'm asking you what you said in your deposition.

20 A.    I said that I believe -- I said everything but the last

21 sentence.

22 Q.    Correct.

23              And so at your deposition, you adopted --

24              MR. KIDNEY:   Your Honor, I believe I can read this

25 statement because it was adopted in his deposition.

1   A.   I mean, he could call him to congratulate him on deals,

2   but he didn't even work on this deal, and I told him not to

3   talk about anything that we're doing with Vinnie.

4   Q.   Did Mr. Gowrish tell you why this troubled him?

5   A.   It didn't trouble him, I don't think.

6   Q.   Well, why was he recounting this to you?

7   A.   I think it was just normal conversation.  He was like,

8   "Yeah, it was really weird that Pascal called me to

9   congratulate me on this deal."

10          It was -- I think if it was someone he normally spoke

11  to on the phone regularly, he probably wouldn't have mentioned

12  it, but it was someone that was a friend of mine that called

13  him for -- I don't want to say for the first time, but it was a

14  rare -- a rarity.

15  Q.   Now, do you have any recollection as to whether

16  Mr. Gowrish told you that Vaghar and he spoke or whether a

17  voice mail was left?

18  A.   I think it was a voice mail.  I think that's what he said,

19  but I'm not sure.

20  Q.   You never heard the voice mail, if it was a voice mail?

21  A.   No.

22  Q.   Do you know -- is it possible that Mr. Gowrish told you

23  that Mr. Vaghar had called to thank him for the tip?

24  A.   That's not what Vinnie said to me.

25  Q.   Are you confident that this involved TXU instead of Sabre?

1  A.    Sorry, can you repeat that question.

2  Q.    Did you tell Mr. Gowrish in April of 2007, before the ADS

3  tip, that Vaghar got inside information about TXU and traded on

4  it?

5  A.    I did not.

6  Q.    Did you tell him that before you left for New York in June

7  of 2007?

8  A.    I did not.

9          MR. KIDNEY:    I'm now moving on to a new subject, Your

10  Honor.

11          THE COURT:    All right.

12  BY MR. KIDNEY:

13  Q.    You also pled guilty to tipping Khoury and Vaghar about

14  Alliance Data Systems being in play to be acquired, didn't you?

15  A.    Yes.

16  Q.    Did Mr. Vaghar -- did you tell Mr. Vaghar the information

17  came from Mr. Gowrish?

18  A.    Mr. Vaghar told me that the -- Mr. Vaghar told me that he

19  saw something at Vinnie's house that made him think that he

20  might be working on Alliance Data Systems.

21  Q.    What was it?

22  A.    Some kind of documents.  I didn't see it.  It might have

23  been research reports.  He didn't really know what it was and

24  he asked me to try to find out.

25  Q.    Well, did -- and this is -- according to you, you did so,

1  right?

2  A.    Right.  A few weeks later, Vinnie was talking about some

3  crappy data services company that he got staffed on and how he

4  was spinning his wheels for nothing, he felt like, and that --

5  that made me think of probably Alliance Data Systems.  Had

6  Pascal not said that, I don't think I would have been able to

7  figure out what he was working on.

8  Q.    What is it specifically that he said?

9  A.    That Vinnie said?

10  Q.   Yeah.

11  A.   Something along the lines of how he was working on a

12  crappy data services company.  He didn't think that the deal

13  made sense, but they were spinning his wheels on it anyway.

14  And that's -- I can't remember much else.

15  Q.   So based on it being a crappy data services company and

16  Mr. Vaghar supposedly telling you that he had seen something

17  about ADS a few weeks earlier in Vinnie's apartment, you

18  concluded that the company being considered must have been ADS;

19  is that right?

20  A.   Right.

21  Q.   Well, in your experience at Lazard, when you were

22  researching companies, did you just research one company?

23  A.   No.

24  Q.   You researched multiple companies, right?

25  A.   Right.

1  Q.   And they might be in the same industry, right?

2  A.   Correct.

3  Q.   So based on what you knew from your work, how did you jump

4  to the conclusion that ADS, assuming Mr. Vaghar saw it in

5  Mr. Gowrish's apartment, would be the crappy energy -- crappy

6  data services company that TPG was investigating?

7  A.   I don't remember what else Vinnie told me about it at the

8  time.  And, also, I wasn't sure if Pascal saw something that

9  was a TPG work product or -- or, you know, what exactly he saw.

10 So --

11 Q.   If he -- if he did identify what he saw to you, would you

12 believe that was reliable information?

13 A.   I guess I don't understand the question.

14 Q.   Well, do you know Mr. Vaghar to be sophisticated in -- in

15 looking at research data about publicly-traded companies?

16 A.   He can read.

17 Q.   Well, if that were all it took, you wouldn't have gotten

18 paid so much at Lazard, would you?

19 A.   Well, he could identify what the title of a report is.

20 Q.   Right.  And did he tell you that?

21 A.   I believe that he said it was either Alliance Data or ADS,

22 was the report that he was looking at.

23 Q.   Did he tell you what kind of report it was?

24 A.   No, not really.

25 Q.   Did he tell you what company or what name was on it?

```
 1   A.   No.

 2   Q.   Did he claim to have read it?

 3   A.   No, he didn't read it.

 4   Q.   So all he saw was the company name, correct?

 5   A.   Correct.

 6   Q.   Could have been a 10-K?

 7   A.   Probably not.  But I don't know.

 8   Q.   You don't know what it was?

 9   A.   No.

10   Q.   Could have been a memo on a notepad?

11   A.   No, it was something typed.  He called it a report.

12   Q.   Pardon me?

13   A.   He called it a report.

14   Q.   He did?  Do you know what he meant by a report?

15   A.   No.  But I assume that it was more than something written

16   on a notepad, if it was a report.

17   Q.   And you can't remember what else Mr. Gowrish told you,

18   other than they were working on a crappy data research company?

19   A.   I think he told me more than that.  I mean, I'm sure he

20   told me more than that at the time, but I don't remember what

21   else he told me, no.

22   Q.   Now, you knew that Mr. Gowrish telling you all this stuff

23   was in violation of TPG policy, right?

24   A.   I didn't really.

25   Q.   You thought that Mr. Gowrish could come out and just talk
```

1   to you and give you lots of information about the companies

2   they were working on and that wouldn't violate the

3   confidentiality rules of his employer?

4   **A.**   Other companies do the same thing, so I didn't think that

5   he was -- I didn't think that he was doing something wrong.  I

6   knew that when other companies did that with us, we weren't

7   supposed to talk about it with anybody else.  But -- but while

8   he did tell me a little bit more than some other people in the

9   industry talked about, it wasn't something totally out of the

10  norm.

11  **Q.**   Can we return to your plea agreement, Plaintiff's Exhibit

12  1018, on page 4 of the exhibit.

13          **MR. KIDNEY:**  And the second full paragraph from the

14  top.  No, not that one.

15          (Document displayed)

16  **BY MR. KIDNEY:**

17  **Q.**   You testified earlier to this and said that it was

18  truthful, correct?

19  **A.**   I had to sign it.  But, yes, it was truthful.  The vast

20  majority of everything in there was truthful.

21  **Q.**   The vast majority was truthful?

22  **A.**   I guess it's all truthful.

23  **Q.**   Well, it says (as read):

24          "Person A passed to me material, non-public

25          information that Person A knew about, the

1              Company A transactions, in violation of

2              fiduciary and other duties of trust,

3              confidence and confidentiality that Person A

4              owed to Company A."

5   A.    Correct.

6   Q.    Isn't that true?

7   A.    I guess what I'm trying to say is at the time I didn't

8   think there was anything wrong with it because that's what the

9   practice is.  But when I signed this, I was told that it was a

10  violation of fiduciary and other duties of trust.  And I was

11  told to -- to sign it.

12  Q.    So now you're saying you don't believe that?

13  A.    I believe that that is the law, but I don't believe that

14  that's the way that people practice it on the streets,

15  unfortunately.

16  Q.    So it's your view that people on the street -- which means

17  what, in your view?

18  A.    Wall Street.

19  Q.    You're in San Francisco.

20  A.    It's a term used for investment banking.

21  Q.    -- in the investment banking community, that even they --

22  even though there are rules imposed by their employer to keep

23  quiet about this sort of stuff, that it's just okay to go out

24  as long as you don't identify the name of the company?

25  A.    Hedge funds even identify the names of companies.

1  Q.   -- didn't you?

2  A.   Yes.

3  Q.   And you testified that what was in it was true.

4  A.   Yes.

5  Q.   Now, what did you do after Mr. Gowrish told you that TPG

6  was investigating buying a crappy data company after that?

7  What did you do with that information?  Did you do any research

8  of your own?

9  A.   I don't think so.  I worked in the space a little bit

10  before, but I didn't -- I don't think I did any research.

11  Q.   And so that's the basis on which you told Mr. Vaghar to

12  buy the stock?

13  A.   I told him that I thought that Vinnie was probably working

14  on that deal that he thought he was working on.  And I think it

15  was -- I think Vinnie -- I think Pascal called me from his

16  vacation, and one of the things he asked me about was ADS.

17  Q.   So you learned the information while Mr. Vaghar was on

18  vacation?

19  A.   Yes.

20  Q.   Was it a vacation or was it to go to Japan for a job

21  that --

22  A.   I think he worked for a day and was on vacation for three

23  weeks.

24  Q.   And it's your testimony that then -- when did he see

25  this -- supposedly see this ADS information in Mr. Gowrish's

1   apartment?

2   A.   Mid-April.

3   Q.   Mid-April?

4   A.   Yes.

5   Q.   So right before he left?

6   A.   Yes.   And there was an occasion where he actually even

7   spent the night there.

8   Q.   And that was mid -- the weekend before he left?

9   A.   I believe so.

10  Q.   Well, Mr. Khoury, the records will show, bought ADS in

11  early April.

12  A.   Uh-huh.

13  Q.   I believe it was April -- his first purchase was

14  April 9th.   And we've established in the record that Mr. Vaghar

15  did not leave for Japan until about nine days later.

16            Did you tip Mr. Khoury to ADS?

17  A.   I believe Pascal tipped Mr. Khoury.

18  Q.   Well, based on what?

19  A.   I don't know, because I didn't tip Pascal until May that I

20  thought Vinnie was working on it.   That's why I -- I didn't

21  even know Sameer bought those stocks or options.   That's why I

22  was surprised about it myself.

23  Q.   Wasn't part of your plea that you had tipped -- or Mr. --

24  that you or -- or your tips to Mr. Vaghar were tipped

25  directly -- Khoury for ADS?

1  A.    I wanted to rewrite that portion and I was told to accept

2  it as it is.

3  Q.    Who told you that?

4  A.    My lawyer told me that I should just accept it because we

5  weren't going to be able to nitpick the little language there.

6  I was not happy about it and still not happy about it.

7           MR. KIDNEY:  Can we go to the last page of this

8  document, of the plea, in the last paragraph.

9           (Document displayed)

10          THE WITNESS:  I understood that I gave up my rights.

11  BY MR. KIDNEY:

12  Q.    And that was all explained to you?

13  A.    Yes.

14  Q.    And your decision to plead guilty was knowing and

15  voluntary?

16  A.    Yes.

17  Q.    Did you tell the Assistant U.S. Attorney, "Oh, no, I

18  shouldn't be having to do this about ADS"?

19  A.    Yes.

20  Q.    You told him that?

21  A.    Or at least my lawyer had told him that in an e-mail.

22  Q.    Do you have the e-mail?

23  A.    I don't have anything.

24  Q.    So your belief is that Mr. Vaghar tipped Mr. Khoury, but

25  you don't know based on what information he had?

1  A.   I don't know who tipped Mr. Khoury.  I didn't tip him.

2  Q.   But it turned out the tip was about ADS.

3  A.   Correct.

4  Q.   Out of all the thousands of companies in the stock market,

5  his tip was about ADS that you then later confirmed in your

6  story for Mr. Vaghar, right?

7  A.   That's when Pascal bought it after I confirmed it.  That's

8  why I was told that I can't -- that's why I was told I should

9  plead guilty about my involvement in ADS because Pascal bought

10 it after I told him that I thought Vinnie was working on it.

11 Q.   Now, you met with Mr. Vaghar -- I mean, with Mr. Gowrish

12 on the weekend before Mr. Khoury bought ADS on April 9, didn't

13 you?

14 A.   It's possible.

15 Q.   Do you remember meeting for brunch at something called

16 Cinda?

17 A.   I don't remember.  But we went to brunch often, so it's

18 definitely possible I went to brunch at Cinda that weekend.

19          MR. KIDNEY:  Do you have Exhibit 1070?

20          MR. HEMANN:  1070?

21          MR. KIDNEY:  Yes.

22 BY MR. KIDNEY:

23 Q.   If you could turn to 1070.

24          MR. HEMANN:  We have no objection.

25          THE COURT:  Thank you.  It will be received.

1          (Plaintiff's Exhibit 1070 received in evidence.)

2          (Document displayed)

3   BY MR. KIDNEY:

4   Q.   Can you identify Plaintiff's Exhibit 1070?

5   A.   Can I identify it?

6   Q.   Yeah.   What is it?

7   A.   It's an e-mail from me to Vinnie.

8   Q.   And first to you from Vinnie and then you back, right?

9   A.   Right.

10  Q.   What's the date on it?

11  A.   April 7.

12  Q.   And it talks about having brunch at Cinda, correct?

13  A.   Well, I'm glad I didn't have brunch at Cinda, because it's

14  apparently a furniture store.

15  Q.   Okay.   I guess it is.   The label is "brunch."   Did you

16  meet at Cinda?

17  A.   Probably.

18  Q.   Do you have any reason to think you didn't have brunch

19  that day with Mr. Gowrish?

20  A.   No.

21  Q.   Did you talk about ADS?

22  A.   I really don't think so.   There's got to be dozens and

23  dozens of e-mails like this where we have brunch or lunch or

24  dinner.

25  Q.   Because you saw each other all the time?

1  A.   But I did it at the request of Pascal, to help him.

2  Q.   Very gracious.

3       MR. KIDNEY:   Can you turn to page 8 of the exhibit,

4  please.   Highlight the top e-mail.

5       (Document displayed)

6  BY MR. KIDNEY:

7  Q.   Can you identify that?

8  A.   It was an e-mail from Pascal saying he got the job.

9  Q.   Thank you.

10      Now, before he left for Japan, did Mr. Vaghar still

11 owe you money for his profit sharing from the tips?

12 A.   Yes, he did.

13 Q.   Did he pay you before he left?

14 A.   He paid me some of it, yes.

15 Q.   He still owed you money after he paid you some of it?

16 A.   Yes.

17 Q.   Now, if Vaghar actually took the job in Japan and was gone

18 for some months, it would be more difficult for him to give you

19 cash for tip -- tips, wouldn't it?

20 A.   Correct.

21 Q.   And, in fact, you asked him for money several times and

22 wanted to collect as much as possible before he left for Japan,

23 correct?

24 A.   Correct.

25 Q.   So Vaghar going to Japan and owing you money, there was no

1    point in giving him more tips, correct, before he left?

2    **A.**    Correct.

3    **Q.**    So as far as you were concerned, if he left for Japan and

4    stayed there, the insider trading deal you had reached with him

5    would be over, right?

6    **A.**    Yes.

7    **Q.**    Did you later learn that Mr. Vaghar decided once he got to

8    Japan he did not want to take the job?

9    **A.**    Yes.

10    **Q.**    And that he was coming back to San Francisco, correct?

11    **A.**    Yes.

12    **Q.**    Now -- so now that Mr. Vaghar was coming back, it was

13    going to be possible for him to purchase another stock and

14    share profits with you, right?

15    **A.**    I suppose so, but I don't think that was going through my

16    head at the time.

17    **Q.**    Well, didn't you communicate with him in Hawaii by

18    telephone?

19    **A.**    He called me, yes.

20    **Q.**    He called you?

21    **A.**    Yes.

22    **Q.**    Is that when you told him about ADS?

23    **A.**    Yes, I think so.

24    **Q.**    Well, the trading started on May the -- May the 4th.  And

25    let me show you -- and that's while he was in Hawaii.  Do you

1    recall?

2    A.    Correct, yes.

3    Q.    Did you -- did you place the orders for ADS or did he?

4    A.    I don't know.

5    Q.    Could have been either of you?

6    A.    Right.

7    Q.    Okay.  I'd like to have you look -- you've seen this

8    before, Plaintiff's Exhibit 1024.  It's another record of your

9    phone calls.

10            MR. KIDNEY:  This is stipulated to?

11            MR. HEMANN:  1024?  Oh, the phone record?  Yeah,

12    absolutely.  I'm sorry.  No objection, Your Honor.

13            THE COURT:  Thank you.  It will be received.

14            (Plaintiff's Exhibit 1024 received in evidence.)

15            (Document displayed)

16   BY MR. KIDNEY:

17   Q.    So Plaintiff's Exhibit 1024 is your cell phone records

18   for -- covering the period April 13 through May 12 of '07,

19   correct?

20   A.    Yes.

21   Q.    If you look at page 25, the last -- last two lines, that

22   shows calls to Honolulu, doesn't it?

23   A.    Yes.

24   Q.    And I notice if you look up the page, it shows when it's

25   an incoming call and when it's not -- and when it's an incoming

1    call, correct?

2    A.    Correct.

3    Q.    These two are not incoming calls, are they?

4    A.    That's right.

5    Q.    And they were made on May 4th?

6    A.    Correct.

7    Q.    And as we said, I'll represent to you May 4th is the day

8    ADS -- somebody started buying ADS in Mr. Vaghar's account.

9    Does that refresh your recollection as to how this all came

10   about?  Did you call him?

11   A.    If I can have a second.

12   Q.    Sure.  Of course.

13   A.    There must have been some way that he contacted me because

14   I would have no way of -- this was some random person's phone

15   number in Hawaii.  He was staying at the Hilton and he used

16   someone else's phone.  So I would have no way of calling a

17   random person and knowing that Pascal happened to be with that

18   person.  So he must have somehow conveyed that information to

19   me.  I don't know how.

20   Q.    So he may have e-mailed you a phone number or something?

21   A.    Possibly.  I --

22   Q.    Were you aware --

23   A.    Or a text or something.  I don't know.  I was just looking

24   at the text, and I didn't see anything.

25   Q.    Okay.  Fair enough.

1          Well, at least there were a couple of phone calls you

2   made to him?

3   A.    Yes.

4   Q.    And maybe you had other communications while he was in

5   Honolulu, correct?

6   A.    Yes.

7   Q.    Now, didn't Mr. Vaghar usually -- well, always, when you

8   told him what stocks to buy, what options to buy, didn't he

9   execute those almost immediately as soon as he could?

10  A.    Yes.

11  Q.    Thank you.

12        **MR. KIDNEY:**  Your Honor, now would be a convenient

13  time for a lunch break if you wish.

14        **THE COURT:**  All right.  Ladies and gentlemen, we'll

15  take our lunch recess at this time.  If you would be ready to

16  come back, please, at 25 minutes after 12:00.  In the meantime,

17  please do not speak to each other or anyone else about this

18  case.  Don't make up your minds.  You have not heard all the

19  evidence yet.

20        (Jury out at 11:46 a.m.)

21        **THE COURT:**  Okay.  We are in recess.

22        (Recess taken from 11:47 a.m. to 12:37 p.m.)

23        (The following proceedings were held in open court,

24        outside the presence of the jury.)

25        **THE COURT:**  Ready?

1          MR. KIDNEY:  We have one issue we would like to

2    revisit.

3          THE COURT:  All right.

4          MR. KIDNEY:  Plaintiff's Exhibit 1069, which Your

5    Honor rejected the offer of, which is the *Business Wire*, I

6    would just like to say that the offer is not for the truth of

7    the matter asserted.

8          THE COURT:  May I see it?

9          MR. KIDNEY:  After all, it's just that Sabre was

10   acquired.  We don't care about the details.  It's just the date

11   of the formal public announcement, the time of it, Your Honor.

12         THE COURT:  Well, how do we know that this is the

13   formal public announcement?

14         MR. KIDNEY:  Well, the witness said usually it's done

15   on the *Business Wire*.

16         THE COURT:  Well, he didn't say this is it, though.

17         MR. KIDNEY:  We don't need the -- it's just when it

18   hit the street.  I mean, that's the *Business Wire* article which

19   announces the acquisition.  So certainly --

20         THE COURT:  You said that, but nobody has said

21   that --

22         MR. KIDNEY:  Well, that's what it says.  That's what

23   it is.  It's a record kept in the normal course of business by

24   *Bloomberg*.

25         THE COURT:  You just said that.  *Bloomberg* didn't say

1  that.  I don't have any proof of that.

2          MR. KIDNEY:  What do you mean?  No proof of what?

3          THE COURT:  For all I know, you could have typed this

4  in the basement last night.

5          MR. KIDNEY:  I don't think the defense is claiming

6  that.

7          MR. HEMANN:  I will tell you what, Your Honor, I have

8  a solution.  Maybe it will be acceptable.  Maybe it won't.

9  There are two *New York Times* articles from the previous day,

10  not offered for the truth of the matter asserted, offered for

11  when it hit the street, when the news hit the street.  If these

12  come in, I'm happy with that.

13         THE COURT:  Well, did you offer those, also?

14         MR. KIDNEY:  No.

15         MR. HEMANN:  These are the offers --

16         MR. KIDNEY:  They don't actually --

17         THE COURT:  What is the fight about?  Can you tell

18  me?  I don't understand.

19         MR. KIDNEY:  Because they saw our graphic which talks

20  about the --

21         THE COURT:  The clocks.

22         MR. KIDNEY:  -- the clocks.

23         THE COURT:  Yeah.

24         MR. KIDNEY:  And they don't like the notion we are

25  using that to show when the announcement was.  It's not that

1   serious.   The only problem I have with these exhibits is they

2   clearly state -- they are, A, both the same thing; but, two --

3          **THE COURT:**   Right.  None of them would come in unless

4   you've got some witness to do it, unless you stipulate.  That's

5   my only point.  Nobody is stipulating, so they don't come in

6   like they are.

7          **MR. HEMANN:**   I believe the *New York Times* articles

8   are self-authenticating.  I can't remember the exact -- maybe I

9   do know the rule.  9026.

10         **THE COURT:**   What does it say?

11         **MR. HEMANN:**   It says that newspaper articles are

12  self-authenticating.

13         **THE COURT:**   What is that there?  Is that --

14         **MR. HEMANN:**   *New York Times* article.

15         **THE COURT:**   Yeah.  Well, it talks about newspapers to

16  come in, newspapers.  It doesn't talk about the Internet.

17         **MR. HEMANN:**   Well, I think the rule applies to --

18         **THE COURT:**   I don't know.

19         **MR. KIDNEY:**   We'll agree to your suggestion.

20         **MR. HEMANN:**   I think we can -- I think that we have

21  just reached a stipulation.

22         **THE COURT:**   If you stipulate, that's fine.

23  Otherwise, I need some witness to say what this document is.

24  And he didn't do it for you.  So that's my only concern.

25         **MR. KIDNEY:**   Okay.  Can I have it back?  I think the

1  Court has a copy.

2        **THE COURT:**  It's probably in a book somewhere.  Thank

3  you.

4        **MR. HEMANN:**  So --

5        **MR. KIDNEY:**  So --

6        **MR. HEMANN:**  -- we have a stipulation that our two

7  *New York Times* and your one *Bloomberg* are admissible?

8        **MR. KIDNEY:**  Correct.

9        **THE COURT:**  Okay.  They are all three in by

10 stipulation.

11       **MR. HEMANN:**  Then we'll mark these, and we'll be

12 offering them with Mr. Zaman later.

13       **THE COURT:**  What number is yours, Mr. Kidney?

14       **MR. KIDNEY:**  Plaintiff's Exhibit 1069.

15       **THE COURT:**  Okay.  1069 is in by stipulation.

16       (Plaintiff's Exhibit 1069 received in evidence.)

17       (Defendant's Exhibits 2191 and 2192 received in

18       evidence.)

19       (Reporter interrupts)

20       **THE COURT:**  The two *New York Times* articles off of

21 the Internet are stipulated and admitted as well.  And you'll

22 get me the two numbers --

23       **THE CLERK:**  Are we admitting 1069?  Because I'm

24 losing track of what --

25       **THE COURT:**  Yes.

 1          THE CLERK:  Okay.  1069.

 2          And then you are admitting two other things.

 3          MR. HEMANN:  And they will be numbered 2191 --

 4          THE CLERK:  Okay.

 5          MR. HEMANN:  -- and 2192.

 6          THE COURT:  Okay.

 7          THE CLERK:  And these are newspaper articles?

 8          MR. HEMANN:  *New York Times*.  Yes.

 9          MR. KIDNEY:  Internet articles.

10          MR. HEMANN:  Internet articles.

11          THE COURT:  Or so says Mr. Hemann.

12          MR. HEMANN:  I don't think I've read a paper

13  *New York Times* in like -- when they stop publishing it for

14  free, maybe I'll start reading the newspaper again.

15          THE COURT:  Age difference, Mr. Hemann.

16          Other than that, are we ready?

17          MR. KIDNEY:  Yes.

18          THE COURT:  Okay.

19          (Jury enters at 12:41 p.m.)

20          THE COURT:  Welcome back, ladies and gentlemen.  You

21  may all be seated.

22          All right.  Mr. Kidney, you may proceed.

23          You are still under oath, sir, from this morning.

24  BY MR. KIDNEY:

25  Q.   Mr. Zaman, I would like you to turn to Plaintiff's Exhibit

1    1022 in your notebook, if you could.  If you need help, I will

2    be glad to come help you find it.

3    A.    I got it.

4    Q.    Can you look through the -- well, really, the first --

5    just the first -- it's really more than we need in there just

6    for completeness.  But can you look at the first two pages of

7    the exhibit.  That's principally what I'm interested in.  You

8    can look at the whole thing to put you in context.

9    A.    I just read the whole thing.

10   Q.    Pardon me?

11   A.    I read the whole thing.

12   Q.    Can you identify for the Court what it is?

13   A.    It's an e-mail communication between me and Vinnie

14   Gowrish.

15          MR. KIDNEY:  We move the admission of Plaintiff's

16   Exhibit 1022, Your Honor.

17          MR. HEMANN:  No objection, Your Honor.

18          THE COURT:  Thank you.  It will be received.

19          (Plaintiff's Exhibit 1022 received in evidence.)

20          MR. KIDNEY:  I'll go from Elmo to plaintiff.  I'll go

21   to the Elmo later.

22          THE CLERK:  Hold on.

23          MR. KIDNEY:  We want to get out of the Elmo and into

24   plaintiff's.

25          THE WITNESS:  1022.

1          **MR. KIDNEY:**  Let's go to page 2 first and highlight

2    for me, please, the first -- that's fine.

3              (Document displayed)

4    **BY MR. KIDNEY:**

5    **Q.**   I would like you to turn to page 2 of the exhibit, please.

6    You can see it on your screen.

7          **MR. KIDNEY:**  Blow up that first part.

8    **BY MR. KIDNEY:**

9    **Q.**   Is this an e-mail in which Mr. Gowrish is sending to you

10   on the afternoon of April 16th saying, "Does it make sense to

11   hit up Rat today?"

12   **A.**   Yes.

13   **Q.**   Do you have any understanding as to what -- what did what

14   Mr. Gowrish said mean to you?

15   **A.**   About an hour and a half earlier, there were e-mails

16   between me and Mr. Gowrish talking about getting a check from

17   Pascal Vaghar for a condo that the three of us were thinking

18   about purchasing in Puerto Vallarta, and I believe that he was

19   asking about that check right there.

20   **Q.**   And you say this relates to what, an earlier e-mail about

21   an hour and a half earlier?

22   **A.**   Yes.

23   **Q.**   In which you brought up getting a check?

24   **A.**   Correct.

25   **Q.**   And then to what do you respond?  How do you respond?  Is

1   there a response on the next page forward?

2   A.   I respond, "Why didn't you ask him when you were with him

3   yesterday?"

4   Q.   So what did you -- what were you trying to communicate to

5   him with that?

6   A.   I was trying to communicate, "Why didn't you ask him when

7   you were with him yesterday, for the check?"

8   Q.   And it's your testimony that this was a check for what?

9   A.   For a deposit on a condo in Puerto Vallarta.

10  Q.   There is no reference there to a check.

11  A.   If you printed the other e-mail that discussed the check,

12  you would see the reference to the check.

13  Q.   And you're saying that was about an hour and a half before

14  these e-mails?

15  A.   An hour and a half, hour 40 minutes, something like that.

16  Q.   So it would be roughly noon or so, a little before noon --

17  A.   Correct.

18  Q.   -- on April 16?

19  A.   Correct.  Someone had showed me that e-mail before.

20  That's how I know it so well.

21  Q.   Someone showed it to you in the deposition?

22  A.   Either the deposition or one of the 302s.

23  Q.   Then are you responding to him the next e-mail up?  Is

24  that your response?

25  A.   That's Vinnie's response.

1  Q.   I'm sorry.  That's -- we first want Vinnie's response to

2  you.   So he responds how?

3  A.   He responds (as read):

4           "Slipped my mind - I should have.  What time

5           do you get out of work?  We can drive over or

6           something."

7  Q.   And it's your testimony that this still relates to a check

8  for a condominium?

9  A.   Correct.

10  Q.   Where was this condominium located?

11  A.   Puerto Vallarta.

12  Q.   Where?

13  A.   Puerto Vallarta.

14  Q.   Is that in Mexico?

15  A.   Yes.

16  Q.   And had -- was Mr. Gowrish supposed to provide a check?

17  A.   No.  Mr. Vaghar was.  That's why it says, "Why don't we

18  hit up Rat today."

19  Q.   And was Mr. Vaghar expected to provide a check for --

20  well, what was this condo for?

21  A.   It was an investment.

22  Q.   How much was Mr. -- how much of a share of the deposit was

23  Mr. Vaghar expected to pay?

24  A.   I was trying to get Pascal to write a check for the whole

25  $10,000 so that I wouldn't have to put in any of my own cash.

1  Q.   And then moving up to the next e-mail, is that from you to

2  Mr. Gowrish?

3  A.   Yes.

4  Q.   Can you read it to the jury.

5  A.   (As read:)

6         "Told him to come by tonight - we'll grab

7         some drinks at Sutra.  Make sure you get a CD

8         changer.  I'm getting a check for Icon

9         Vallarta too.  Nice."

10 Q.   Now you say, "I'm getting a check for Icon Vallarta

11 too" --

12 A.   Correct.

13 Q.   -- why did you use the word "too" if you -- the previous

14 communications were only about a check getting from Mr. Vaghar

15 for Icon Vallarta?

16 A.   I don't think I really sat there -- there's no punctuation

17 or anything.  It's just what I wrote.  You know, we are going

18 to grab drinks at Sutra and I'm getting a check, too.

19 Q.   But you were only expecting one check from Mr. Vaghar,

20 correct?

21 A.   Right.  That's why I said a check.

22 Q.   Yet this says, "Icon Vallarta too."  Doesn't "too" usually

23 mean something like in addition?

24 A.   Here, the way I wrote it, it sounds like it's in addition

25 to grabbing drinks at Sutra.

1              THE COURT:   It will be received.

2              MR. HEMANN:   Okay.

3              (Plaintiff's Exhibit 1077 received in evidence.)

4              MR. KIDNEY:   Please put Plaintiff's Exhibit 1077 on

5    the screen.   First lets look at the bottom part.

6    BY MR. KIDNEY:

7    Q.    Do you recognize that, sir?

8    A.    Yes.

9    Q.    What is it?

10   A.    It's an e-mail from a representative at Icon Vallarta, the

11   condo that we were looking at purchasing.

12   Q.    Okay.   And that's timed off at 8:39 p.m. Mountain Standard

13   time, right?

14   A.    Correct, on the 15th.

15   Q.    Pardon me?

16   A.    On April 15th.

17   Q.    On April 15th, the day before the series of e-mails we

18   looked at on 1022?

19   A.    Correct.

20   Q.    And she is basically soliciting you to -- quickly to get a

21   deposit in before they are all gone, right?

22   A.    Correct.

23   Q.    Now let's go up to the top of the page.

24              Is that an e-mail from you to Mr. Gowrish?

25   A.    Yes.

```
 1  A.    If it's Pacific time, yes.

 2  Q.    And then on -- in the afternoon of April 16, p.m., you got

 3  an e-mail from Mr. Gowrish saying, "Does it make sense to hit

 4  up Rat today?"  Correct?

 5  A.    Correct.

 6  Q.    And you say that's about the condominium deposit, right?

 7  A.    Correct.

 8  Q.    But then you say, "Why didn't you hit him up when you were

 9  with him yesterday?"  Correct?

10  A.    Correct.

11  Q.    And then on Plaintiff's -- can you listen to my question,

12  please.  If there's any exhibits I want to show you, I will be

13  glad to --

14  A.    I'm just looking at the exhibit we were talking about a

15  minute ago.

16        Sure.

17  Q.    The one that -- the one that I showed you a minute ago?

18  A.    Yes.

19  Q.    Oh, good.  I'm glad you had a look at it.

20        And then you respond -- after there's colloquy about

21  meeting him that night, you respond, "I'm getting a check for

22  Icon Vallarta, too."

23        And you say the "too" was just a throwaway line?

24  A.    Or in addition to drinks or something.

25  Q.    Yeah.
```

1          And by the way, this was just a day or two -- in

2   fact, the night -- on the night of the 16th, did you have a

3   little going -- did you and Mr. Gowrish throw a little going

4   away party for Mr. Vaghar?

5   A.    Yes, we did.

6   Q.    Where was that?

7   A.    Either Shanghai 1930 or Sutra, one of those.

8   Q.    Okay.  Thank you.

9          Didn't you tell the FBI -- let me ask you this before

10  I ask you that question.

11          As far as you know, did Mr. Gowrish know that Vaghar

12  was going to cover at least your share of a condominium

13  deposit, whenever that was?

14  A.    I think he -- he might have known that.

15  Q.    Pardon me?

16  A.    I think he knew that.

17  Q.    How do you think he knew that?

18  A.    I might have said it to him.

19  Q.    Why did you tell him that?

20  A.    I don't know.

21  Q.    Did he ask, Well, how come Vaghar's going to cover

22  two-thirds of the deposit cost?

23  A.    Pascal was going to write a check for the whole 10,000,

24  and then we were going to settle the amounts when we put in

25  more money.  And I don't remember if I went into detail that

1  Pascal was going to cover my third of it.  I might have.  I

2  don't remember.

3          But Pascal was going to write the whole check, and

4  then, as I said before, we were going to -- when more money was

5  due, that's when we were going to put in the rest of the money

6  and adjust for whatever we owed him on the first amount.

7  **Q.**   When did you have this conversation with Mr. Gowrish that

8  Vaghar was going to pay your share of the --

9  **A.**   I don't know.

10  **Q.**   Did you collect any money from Mr. Gowrish on the night of

11  the -- of the 16th --

12  **A.**   From Mr. Gowrish?

13  **Q.**   On the night of the 16th of April, from Mr. Vaghar.

14  **A.**   Yes, I did.

15  **Q.**   And how much did you get?

16  **A.**   Somewhere between 5- and 10,000.  I think 10.  I'm not --

17  **Q.**   Can you describe how you got that money, where you got it,

18  the circumstances?

19  **A.**   It was in his car.

20  **Q.**   It was in whose car?

21  **A.**   In Pascal's car.

22  **Q.**   Pascal's car.  You got it.  Where were you?

23  **A.**   We were downstairs from my apartment.  We had just left

24  Vinnie's apartment and Pascal was dropping me off at my

25  apartment.

1  Q.   And your testimony is you got the money that night?

2  A.   Correct.  He had told me that he didn't have a check for

3  Icon Vallarta for me and that's why he gave me more money than

4  he originally was going to.

5  Q.   But you never did purchase a condominium or make a deposit

6  with Mr. Vaghar's money, correct?

7  A.   Correct.

8  Q.   Did you ever give the money back to him?

9  A.   I didn't have to.

10 Q.   Why not?

11 A.   He never asked for it back and he let me keep it.

12 Q.   Now, in or around June of 2007, did you transfer to

13 Lazard's offices in New York?

14 A.   I did.

15 Q.   Now, in your experience, did Mr. Gowrish have many

16 friends?

17 A.   Not really.

18 Q.   In fact, you were one of his closest friends and you left

19 town, right?

20 A.   Correct.

21 Q.   Did you still keep in close touch with him?

22 A.   Yes.

23 Q.   To your knowledge, did Mr. Gowrish establish a stronger

24 friendship with Mr. Vaghar after you left town?

25 A.   He did.

1  A.   No.  But after I tipped Mr. Vaghar.

2  Q.   What conversations did you have about ADS after you tipped

3  Mr. Vaghar?

4  A.   I spoke about it in my deposition and also I think in the

5  302s.  But it was -- right before the deal was announced, I

6  talked to Vinnie and I asked him -- I said, "Are you guys still

7  working on ADS?"  And his response to me was, "No, I think we

8  are going to pass on that deal.  Why are you guys -- are you

9  guys looking at ADS," implying that Lazard might have been

10  working for another potential bidder.  And that's when I

11  realized I had made a slip and tried to backtrack.

12        But I didn't want to say that Lazard was advising

13  someone else with ADS because I figured that he would probably

14  figure out that I was lying about it, if not right then, later.

15  That's when I told him that Pascal had seen something at his

16  house a while back that suggested he might have been working on

17  ADS.

18  Q.   How did Mr. Gowrish respond?

19  A.   He freaked out.  And his first line of thinking was that

20  Pascal had been snooping around his house and he was worried

21  that Pascal was going through his personal documents and other

22  things like that.  And I had to try to calm him down.  And

23  Vinnie wanted to go kind of confront Pascal about what had

24  happened, and I convinced him to let me go talk to Pascal.

25  Q.   So he didn't call Vaghar or do anything, as far as you

1              Can you start the question over again, please.

2   **BY MR. KIDNEY:**

3   Q.   Under your testimony, you told Mr. Vaghar that information

4   came from Mr. Gowrish.  You accepted some money from Mr. Vaghar

5   for Mr. Gowrish, which you did not pay him.  And, again, under

6   your testimony, you got Mr. Gowrish involved in this whole

7   thing.

8              Yet, as I understand it, you also watched the World

9   Cup right before you went to prison with Mr. Gowrish; is that

10  right?

11             **MR. HEMANN:**  Objection, Your Honor.  Compound.

12  **BY MR. KIDNEY:**

13  Q.   I'm trying to find out why -- does -- does Mr. Gowrish, to

14  your knowledge, ever talk to Mr. Vaghar?

15  A.   Ever?

16  Q.   Since all this SEC investigation.

17  A.   No.

18  Q.   But he still does talk to you, correct, at least before

19  you went to prison?

20  A.   On those two occasions.

21  Q.   Yeah.  Okay.  Never mind.

22             **MR. KIDNEY:**  May I confer a minute, Your Honor?

23             (Pause)

24  **BY MR. KIDNEY:**

25  Q.   Did Mr. Vaghar ever tell you directly that he had given

1    deals, Sabre, TXU and Alliance Data.

2    Q.    How did Mr. Gowrish react to that news?

3    A.    He was like -- he was upset that it was more than ADS.    He

4    was just like, "What do you mean?    How did he get this

5    information?"    And the other ones, I think, he just didn't --

6    he was trying to figure out like how he could have gotten this

7    information.    And I was just like, "I don't know."

8    Q.    Why were you -- you said, "I don't know how he got this

9    information"?

10   A.    Yeah, because I didn't -- I mean, I didn't want to tell

11   him that I was passing this information to Pascal.

12   Q.    Why not?

13   A.    Because we were friends and I thought that -- you know, I

14   didn't want -- I didn't want to tell him that I had betrayed

15   him like that.    And I was hoping it would just go away.

16   Q.    Why did you think it would just go away?

17   A.    Because the SEC settles with so many people and they just

18   write them a check and they settle and things go away.

19   Q.    Didn't you consider the possibility that Mr. Gowrish might

20   need this information?

21   A.    It was again just the way I did things.    I was just like

22   hopefully things will -- I always had a positive outlook on

23   things and thought hopefully things will be all right.

24   Q.    Now, at the point in time that you're having that

25   conversation that you just described with Mr. Gowrish and you

1  told him that there were these other companies, did you have a

2  copy of Mr. Vaghar's trading records?

3  **A.**    I don't think so.  Maybe.  I can't remember.

4  **Q.**    In New York, when you had the conversation about --

5  **A.**    I didn't have them when I was talking to Vinnie at the

6  time.  I think that was when Vinnie was like, "I really want to

7  see those trading records," I think.  And I can't be a hundred

8  percent sure about it.

9  **Q.**    When Mr. Gowrish said, "I really want to get those trading

10  records," did you make an effort after that to try to get the

11  trading records?

12  **A.**    I think I had them already at that point because when I

13  went to -- to visit Pascal and we worked on this, that's when I

14  got them myself.

15  **Q.**    Did you tell Mr. Gowrish you had them?

16  **A.**    No.

17  **Q.**    And do you have a rough approximation, at least, or an

18  approximation as to when this conversation was in New York?

19  **A.**    I want to say late March, early April sometime.

20  **Q.**    After that, you meet with Mr. Gowrish in New York.  What's

21  the next thing that happens with regard to the investigation,

22  to your knowledge?

23  **A.**    Nothing, really, for several months.  Just once every

24  month or two Pascal would call me and tell me really nothing

25  other than he's pleading the Fifth and he's not -- nothing is

1   and ADS did you give them the trading records?

2   **A.**   I feel like I left them for him at some point, and I don't

3   remember exactly when it was.  So I didn't -- I don't remember

4   handing them to him or anything.  I recall leaving them for him

5   somewhere.

6   **Q.**   After you delivered the trading records to -- first of

7   all, where did you get the trading records?

8   **A.**   From Pascal.

9   **Q.**   How did Pascal -- Mr. Vaghar deliver them to you?

10  **A.**   He just gave them to me.

11  **Q.**   In person?

12  **A.**   Right.

13  **Q.**   In San Francisco?

14  **A.**   Yes.

15  **Q.**   Did you review the trading records with Mr. Vaghar when he

16  gave them to you?

17  **A.**   I -- I already knew pretty much what he had traded in.  So

18  I didn't -- we didn't review it together.  He just gave it to

19  me.

20  **Q.**   And you had had access to the records?

21  **A.**   In the past.

22  **Q.**   Where did you deliver the trading records to Mr. Gowrish,

23  if you remember?

24  **A.**   I can't remember.

25  **Q.**   At some point after delivering the trading records to

1  Mr. Gowrish, did you talk to Mr. Gowrish about the trading

2  records?

3  A.   I think he was just surprised by the amount of the

4  trading.   I don't -- I don't recall a specific conversation

5  about it though.

6  Q.   You have no recollection of a conversation where he said

7  anything about the trading records?

8  A.   It was a while later, so I don't -- I don't -- I don't

9  remember exactly.   He was surprised by how much it was and --

10  but I guess at that point he figured that if the SEC was

11  investigating, it wasn't about -- you know, it probably wasn't

12  about $10,000 or something.   So maybe it had set in by that

13  point.   I don't know.

14  Q.   Now, at the point in time that you're -- and when you say

15  "by that point in time," what point in time are you talking

16  about?

17  A.   I think it was like early summer maybe.

18  Q.   2008?

19  A.   Right.

20  Q.   By this point in time, does Mr. Gowrish have a lawyer?

21  A.   I don't think so.   Not that I knew of.

22  Q.   Not that he talked to you about?

23  A.   Right.

24  Q.   At this point in time, do you have a lawyer?

25  A.   I do not.

1    Q.    Who is Person C?

2    A.    Sameer.

3    Q.    Why isn't Person A listed in this paragraph?

4    A.    Uhm, I don't know.  I guess they didn't think he benefited

5    from it.  I don't know.  I think it was written like that.  I'm

6    not sure.

7    Q.    Did the United States Attorney's Office ever take the

8    position with you that Mr. Gowrish benefited from this scheme?

9    A.    They didn't say it to me.  They never told me.

10   Q.    And when they sent this document to you, did it say

11   Person A, Person B, Person C and I and you scratched out

12   Person A?

13   A.    No, I just focused on my things, primarily.

14   Q.    Are you aware, Mr. Zaman, of any benefit that Mr. Gowrish

15   received at any time from the insider trading conduct in which

16   you and Mr. Vaghar and Mr. Khoury engaged?

17   A.    No.

18   Q.    You had the three conversations that we discussed with the

19   FBI, correct?

20   A.    Correct.

21   Q.    At some time -- at some point in time you were sentenced

22   for your conduct, correct?

23   A.    Correct.

24   Q.    And in connection with that, the United States Attorney's

25   Office filed a sentencing memorandum, correct?

1              possibility that the government will, in the

2              future, continue to benefit from Zaman's

3              cooperation."

4    Q.   Thank you.  You can put that one away.

5              I want to take a step back.  And just to finish this

6    thread, you were sentenced to 26 months in prison, correct?

7    A.   Correct.

8    Q.   You began serving your sentence when?

9    A.   July 6th.

10   Q.   How much were you ordered to pay by the Court in

11   connection with your criminal sentencing?

12   A.   Approximately $78,000.

13   Q.   And how -- how was that number calculated?

14   A.   My alleged gain was 68,000 -- 68,800, and there was about

15   $10,000 of interest tacked on to it.

16   Q.   You mentioned something earlier and I -- and forgive me, I

17   don't know if I got it completely right.

18             You said the $68,000, the underlying pre-interest

19   amount, included money that you told Mr. Vaghar you were going

20   to give to Mr. Gowrish.  Did you say that?

21   A.   Yes.

22   Q.   Can you explain what money was included and how much it

23   was.

24   A.   I think it was the first kind of 5,000 or so that Pascal

25   had given me in March that was included in there.  And I

1  believe there was another few thousand in April that -- I think

2  there was some back and forth whether it was meant for Vinnie

3  or not, and that -- that was also included.  So those are the

4  two -- two amounts that were included.

5  Q.   And those correspond to the three checks that either in

6  their original form or on the carbon copy reference Mr. Gowrish

7  by calling him Vin Dog?

8  A.   I think it might have been -- two of them were included,

9  but I'm not sure.  Maybe all three.

10 Q.   So the first check was March of 2007 --

11 A.   Correct.

12 Q.   -- for $5,000, correct?

13 A.   Roughly, four or five.  I don't know the exact amounts

14 anymore.

15      MR. KIDNEY:  Your Honor, objection.  The way this is

16 phrased, it suggests that this witness has seen these checks.

17 I believe that foundation has not been established.

18      MR. HEMANN:  I can do that, I believe.

19      THE COURT:  All right.  Thank you.

20 BY MR. HEMANN:

21 Q.   Have you seen these checks?

22 A.   I've heard a lot about the checks.  I don't think I've

23 seen the physical checks or copies of them.

24 Q.   How did you hear about them?

25 A.   From past questioning, interviews.

1   Q.   Including in the interviews with the government?

2   A.   The interviews with the government, yes.

3   Q.   And Mr. Kelly and Ms. Riewe participated in those

4   interviews, correct?

5   A.   Correct.

6   Q.   Either in person or on the telephone, correct?

7   A.   Correct.

8   Q.   And people during the interviews with the SEC present

9   referred to these checks, correct?

10  A.   Correct.

11  Q.   The first check, March of 2007, you had to pay the fine

12  for that check, correct?

13  A.   Correct.

14  Q.   And that's on the theory that you kept the money, correct?

15  A.   I believe so, yes.

16  Q.   The second check is in mid April 2007, correct?

17  A.   Right.

18  Q.   And you had to own a portion of that check because you

19  kept the money that was designated for Mr. Gowrish, correct?

20  A.   Correct.

21  Q.   The rest of the money from that check, the balance was for

22  what?

23  A.   I think the second check said both Rat and Vin Dog.  So

24  the other half was attributed to me anyways.

25  Q.   So you had to own the whole thing but also the part

1  attributable to Mr. Gowrish, right?

2  **A.**   Correct.

3  **Q.**   Now, there is a third check, dated mid-June 2007, correct?

4  **A.**   Right.

5  **Q.**   And that check you didn't own and nobody owned because no

6  money went to you, correct?

7  **A.**   I did say that I got money in June.  I had never heard of

8  any money being intended for Vinnie in June, though.

9          But I did acknowledge receiving somewhere around

10  $5,000 before I left for New York, and I believe I took

11  ownership of it -- or I'm paying for that, too, in my

12  restitution, or whatever.

13  **Q.**   The --

14  **A.**   Fine.  I don't know what it's called.

15  **Q.**   Ordered by the Court?

16  **A.**   Right.

17  **Q.**   I want to go back to the interview, the first interview

18  with the United States Attorney's Office, SEC and FBI in March

19  of 2009.

20          At any point subsequent after that, did you talk to

21  Mr. Gowrish about this case?

22  **A.**   After March 2009?

23  **Q.**   Yes.

24  **A.**   Not until right before I was going to -- like right before

25  I was going to prison.

1  more closed lip with bankers because they think bankers are

2  kind of more rumor mongers and they might use the information,

3  as Mr. Kidney suggested, to help a competitor.

4          But it was common for people in all of those

5  industries and more so with hedge funds to be talking to each

6  other about potential investments and all kinds of details

7  about investments.

8  Q.   Now, there's a distinction, is there not, between talking

9  to somebody like an accountant that you've hired to do a job

10 and talking to somebody in sort of the social network in the

11 local Wall Street community, correct?

12 A.   Right.

13 Q.   Do both things happen?

14 A.   Both things happen.  I mean, the first one, when you hire

15 an expert or a consultant, you are obviously much more open.

16 And if they sign a confidentiality agreement, you mention the

17 name and everything.  The latter is what I was describing, and,

18 you know, people don't talk about names in that case.

19          MR. KIDNEY:  Your Honor, I'm going to object.  I

20 think that we are asking this witness to stretch himself into

21 becoming an expert.  I think it should be limited to his own

22 experience.

23          THE COURT:  Well, I think that's how the question was

24 framed.  And, of course, the question is really going into the

25 questions that you asked him on your examination.

1          **MR. KIDNEY:**  Which were about his discussions.  He

2    volunteered all that other stuff.

3          **MR. HEMANN:**  I'm comfortable with this being about

4    Mr. Zaman's experience, as he described it previously.

5          **THE COURT:**  I think that's a correct limitation.  But

6    I have understood that's what he was talking about.

7              In any event, limit yourself, sir, to your experience

8    in the business.

9          **THE WITNESS:**  So my experience, the way I conducted

10   myself and colleagues of mine and other people who I had

11   contact with in the industry, the way they conducted

12   themselves, that's what I was referring to.

13   **BY MR. HEMANN:**

14   Q.    And in your experience, why is it that you were

15   comfortable having these conversations without fearing -- or

16   maybe I should ask it more open-endedly.

17            Were you comfortable having these conversations

18   without fearing that people were going to run around and trade

19   on the information that you're giving them?

20   A.    Because all bankers and private equity employees, their

21   trades are heavily monitored, and I don't think anyone would

22   trade their own account without fear of getting in trouble for

23   it.

24            The -- that's the answer, yeah.

25   Q.    Now, it's true that Lazard and TPG and Morgan Stanley and

1  everybody else -- and Morgan Stanley doesn't exist anymore.

2  When it did exist -- all of the investment bankers, all of the

3  private equity firms that you are familiar with have policies

4  that say you can't go running around having these social

5  network conversations, correct?

6  **A.**    I believe so.

7  **Q.**    So why do people do them, in your experience?

8  **A.**    People who I knew that did it, they did it because a lot

9  of what we did was share information with one another so that

10 we could find out about the next deal so that we can, you know,

11 potentially advise somebody else on a deal or the PE shops

12 would try to find other PE shops to participate on a deal.

13            Same thing with hedge funds.  And it was kind of a --

14 like a tit for tat where if you didn't share anything, other

15 people wouldn't share things.  And it's a knowledge business,

16 and the more knowledge you have, the better you are at it.

17 **Q.**    So when you said "PE," you meant private equity, correct?

18 **A.**    Correct.

19 **Q.**    This level of comfort that you just described, did you

20 have additional or further comfort in your communications with

21 Mr. Gowrish?

22 **A.**    I think we were probably more open with each other than --

23 I don't know how Vinnie was with other people, but I was

24 probably a little bit more open with him.

25 **Q.**    Why is that?

1  A.    Just based on the closeness of our friendship and the

2  trust that was there.

3  Q.    Do you feel like Mr. Gowrish was relatively open with you?

4  A.    Yes.

5  Q.    Did you adhere with Mr. Gowrish, notwithstanding that

6  openness, to some limitations on the information that you would

7  share with each other?

8  A.    Did I adhere him to it?

9  Q.    Did you adhere, did you follow some limitations on the

10 information you would share with him?

11 A.    Oh, yes.   We would never -- we would never use names of

12 companies.

13 Q.    Why would you never use names?

14 A.    That would be kind of a direct violation of -- of policy.

15 That's something that we always -- we learned kind of the first

16 day that we show up at work is that you don't -- you know,

17 because a lot of people take phone calls at airports and other

18 public places where technically you are not supposed to be

19 talking about deals in front of other people.   But I would say

20 almost every banker I have ever seen does take phone calls in

21 public places, but they don't mention the name of the company.

22 They will talk about all kinds of things about the company, but

23 when it comes to the name, they will use a code word or say

24 something else.

25 Q.    You also mentioned in your testimony something about you

1  wouldn't share bid price; is that correct?

2  A.    Correct.

3  Q.    Is it bid price, did you say?

4  A.    Right.

5  Q.    What is that, and why wouldn't you share it?

6  A.    Well, just, for example, with ADS, if -- if Lazard was

7  advising another company, whether it was another private equity

8  company or another competing company, in bidding for ADS and

9  Vinnie had told me that, you know, he was working on some

10  crappy data services company and so on and so forth and they

11  were going to bid $24 a share, that would greatly harm TPG's

12  ability to -- to bid on that company because if I use that

13  information and shared it with Lazard and we decided to bid

14  24.25 or 24.01, then our client would win the company -- or

15  could win the company, and Vinnie's client or Vinnie's company

16  would not.

17           That's why the names of the companies and the prices

18  that were potentially going to be offered were things that were

19  never shared.

20  Q.    Now, notwithstanding, fair to say that this limitation on

21  not mentioning the company's name could be a little artificial

22  sometimes, right?

23  A.    I don't understand.

24  Q.    Fair to say that Mr. Gowrish -- that you might be able to

25  figure out what Mr. Gowrish is talking about even if he doesn't

1  mention the name, right?

2  A.    Oh, yeah.   Yes.

3  Q.    And conversely, you'd be talking about something that

4  you're doing and he would be able to figure it out even though

5  you didn't say, "We're advising on ABC company," right?

6  A.    Yes.   Not all the time, but sometimes.

7  Q.    Why are you still comfortable talking about it with

8  Mr. Gowrish if he might be able to figure it out?

9  A.    What's he going to do with the information?   You know,

10  that's -- without -- without knowing -- I mean, without knowing

11  what you're going to bid for it, I mean, potentially that could

12  cause him to start looking at that acquisition, too.   So there

13  was that potential risk.   But, you know, without knowing the

14  bid -- I mean, usually when -- when a company was in the

15  process kind of like, you know, Alliance Data was or TXU, a lot

16  of different private equity firms knew anyway because there was

17  a process going on.

18  Q.    And we'll probably wind up about here.

19         So as of Thanksgiving 2006 you had known Mr. Gowrish

20  professionally after college for how many years?

21  A.    A little over five years.

22  Q.    You had how many conversations during that period of time

23  about what you guys were doing at work?

24  A.    I don't know.   Many.

25  Q.    Ballpark.

```
 1  A.    Dozens.

 2  Q.    Dozens?

 3  A.    Maybe more.  I don't know.

 4  Q.    And in any of those conversations, based on information

 5  you learned in any of those conversations with Mr. Gowrish over

 6  that period of time, had you ever gone off and bought stock?

 7  A.    No.  I guess before he worked at TPG, the -- we didn't

 8  really talk about deals as much.  It was more --

 9  Q.    So it was a shorter period of time that those dozens of

10  companies --

11  A.    We still did talk about, you know, industry and things

12  that we were working on and -- I guess we both tried to help

13  each other get better at our jobs.

14  Q.    In terms of advancing professionally and legally?

15  A.    Legally, right.

16  Q.    And in all of that time that you had been friends and

17  talked about work, had you ever abused that trust relationship

18  by purchasing stock?

19  A.    No.

20          MR. KIDNEY:  Foundation, please.

21          THE COURT:  "By purchasing stock"?

22          MR. KIDNEY:  No.  I think the better question would

23  have been, is he aware of whether Mr. Vinayak Gowrish ever --

24          MR. HEMANN:  No, I was asking him if he had based on

25  information that Mr. Gowrish had communicated.
```

1          MR. KIDNEY:   Sorry.  Withdrawn.

2  BY MR. HEMANN:

3  Q.   Have you ever gone out and bought stock based on these

4  work conversations you had with Mr. Gowrish?

5  A.   No, I did not.

6  Q.   And to your knowledge, had Mr. Gowrish ever done that with

7  information he had gotten from you?

8  A.   No, not that I knew of.

9          MR. HEMANN:   I think this is a good spot, Your Honor.

10          THE COURT:   All right.  Ladies and gentlemen, we'll

11  take our afternoon recess at this time.  If you would be back

12  by 8:30 tomorrow morning, please.

13          As I told you before, Thursday will be our last day

14  for the week.  We don't sit on Fridays.  So tomorrow will be

15  your last day this week.  Have a great evening.  Don't speak

16  with anyone or let anyone speak to you.  Don't make up your

17  minds.  We'll see you in the morning.

18          (Jury out at 3:28 p.m.)

19          THE COURT:   You need to be back at 8:30 tomorrow

20  morning.

21          Are we in recess?

22          MR. HEMANN:   Your Honor, we'll have jury instructions

23  for you first thing tomorrow morning.

24          THE COURT:   Okay.

25          MR. KIDNEY:   Assuming we get them from them early

1        **MR. KIDNEY:**  No objection.

2        **THE COURT:**  All right.  Both of them are received.

3        Tracy, you probably need to turn the machine over.

4        (Discussion held off the record.)

5        (Document displayed)

6    BY MR. HEMANN:

7    Q.    You mentioned that people talk.  Is this the kind of thing

8    that people talk about, Mr. Zaman?

9    A.    Right.  This is one of the things I mentioned when I said

10   rumors or leaks.

11   Q.    And these are *New York Times* publications, correct,

12   regarding the Sabre acquisition?

13   A.    What you just handed me is, yes.

14   Q.    And there's two of them, one from *The New York Times blog*

15   and another actually published in *The New York Times*, correct?

16   A.    Correct.

17   Q.    And both of these are dated what?

18   A.    December 11th.

19   Q.    And that would explain a bump in the stock price on

20   December 11th, correct?

21   A.    Correct.

22   Q.    Do you remember if you spoke to Mr. Vaghar on

23   December 11th?

24   A.    I may have.  I don't know.

25   Q.    Could you look at Plaintiff's Exhibit 1120.  I will hand

1    Q.    Is this the kind of e-mail Mr. Gowrish would send you

2    periodically to let you know what he was doing at work?

3    A.    Yes.

4    Q.    Thank you.

5          Several months -- or a couple of months later after

6    the Sabre deal was completed -- before I get there, you got

7    some money from Mr. Vaghar about Sabre -- from Sabre, correct?

8    A.    Correct.

9    Q.    Did you share any of that money with Mr. Gowrish?

10   A.    I did not.

11   Q.    Did you tell Mr. Gowrish that you had gotten money from

12   Mr. Vaghar regarding, you know, Sabre trading?

13   A.    No.

14   Q.    Why not?

15   A.    Never thought about it.  I never thought about telling

16   him.  There was no reason to tell him.

17   Q.    Didn't you get the information from him?

18   A.    Right.  But he didn't know that we traded on it, so I

19   didn't have any reason to tell him that I made any money or got

20   any money from it.

21   Q.    A couple of months later is when the TXU transaction came

22   about, correct?

23   A.    Correct.

24   Q.    And this was a -- the energy company, right?

25   A.    Right.

1  A.   He acknowledged that they were working on some kind of an

2  energy deal, and even though he wasn't working on it, he said

3  that he had been reading up a lot on it because of his TPG

4  Credit job. And it seemed like he had been studying the

5  industry and, I guess, kind of doing a case study of the deal

6  on his own.

7         And he, I guess, used me as kind of a -- almost as if

8  he was in an interview kind of going through things like the

9  energy industry, marginal cost of producing energy and like

10  curves and all kinds of different things like that.

11  Q.   Now, did all of that stuff, as if he was sitting in an

12  interview, part of this, did that concern TXU at all? Did that

13  concern a specific company at all?

14  A.   No.

15  Q.   Explain to the jury the distinction between -- he did tell

16  you some stuff about the deal they were working on, right?

17  A.   Right, yes.

18  Q.   But there's -- this whole "as if he was in an interview"

19  thing, what was that about?

20  A.   That was just about general kind of dynamics or kind of

21  background on the industry. And I just remember he had like --

22  you know, coal was the cheapest to produce and then there was

23  like natural gas and -- or nuclear and then natural gas and it

24  kind of had this curve. And I think he said -- he might have

25  said something about how the deal that they were working on, it

1   had a whole bunch more -- maybe coal plants.  I don't remember

2   exactly now.  But -- you know, and then he used that as a segue

3   to say why that -- their deal was such a good deal but that it

4   was mired in all these regulatory issues that they needed to

5   get through.

6   Q.   You mentioned he talked about the size of the deal in some

7   respect.

8   A.   Correct.

9   Q.   And you said what about the -- he said what about the size

10   of the deal?

11   A.   He said it was going to be a huge deal like Texas Genco,

12   only a lot bigger.  I don't remember exactly.  I think he said

13   something like tens of billions.

14   Q.   Now, when somebody in your industry talks about the size

15   of a deal, what are they talking about?

16   A.   How much they are going to acquire the company for.

17   Q.   And that relates to what metric?

18   A.   What metric?

19   Q.   Market capitalization or --

20   A.   Oh, yes, market cap.

21   Q.   Does it relate to revenue?

22   A.   Not really.  I mean, it's more based on the profitability

23   of the company.

24   Q.   Okay.  So --

25   A.   Market cap is usually dependent somewhat on the

1  profitability, but it may or may not be.

2  **Q.**    So when someone is talking about the size of a deal, they

3  are talking market capitalization?

4  **A.**    Actually, the enterprise value.

5  **Q.**    What is --

6         **MR. KIDNEY:**  Objection, Your Honor.  This man was an

7  analyst.  I don't believe he's been qualified as an expert to

8  render opinions here that really are those of an expert.  He

9  was a junior analyst.

10         **THE COURT:**  Sustained.

11         You can ask him about his understanding of what he

12  was doing, if you want, but he can't just --

13         **MR. HEMANN:**  Well, I'm trying to lay the foundation

14  because there were all these SEC documents shown to Mr. Zaman

15  yesterday with regard to operating expenses and things and --

16  operating revenues and things like that.  I'm just trying to

17  lay a foundation for talking about whether those were actually

18  relevant to his discussion -- his analysis.

19         **THE COURT:**  You can ask him what his understanding of

20  something is.

21         **MR. HEMANN:**  Okay.

22         **THE WITNESS:**  Can I correct something real quick?

23  BY MR. HEMANN:

24  **Q.**    Sure.

25  **A.**    I was an analyst and associate and then a vice president.

1  So not a junior analyst.  And I think the articles written

2  about me quoted that I was a vice president at Lazard.

3          I don't like being referred to as a junior analyst.

4  Q.  With that experience, when Mr. Kidney was showing you --

5  first of all, in your experience, when Mr. Gowrish said "size

6  of the deal," what was he referring to?

7  A.    In my experience, he was referring to how much it would

8  take to acquire the company, which is the enterprise value of a

9  company.

10  Q.  What does enterprise value mean?

11  A.    Enterprise value is the market capitalization plus any net

12  debt the company has.

13  Q.  And what is market capitalization?

14  A.    Market capitalization is the number of shares outstanding

15  times the share price.

16  Q.  All right.  So yesterday Mr. Kidney showed you some SEC --

17  some Form 10-Qs that were filed with the SEC, correct?

18  A.    It was a 10-K, yes.

19  Q.  I'm sorry.  10-K.

20          Did the part of the 10-K that related to revenue --

21  was that the same thing as market capitalization?

22  A.    No.

23  Q.  So when Mr. Gowrish said "size of the deal," would you

24  have said, "Oh, I need to go figure out what the -- the revenue

25  is"?

1  A.    No.

2  Q.    Okay.  What would you need to go figure out?

3  A.    I'd need to figure out the enterprise value of the

4  companies.

5  Q.    And you said that you went back after you talked to

6  Mr. Gowrish and you looked at comps, correct?

7  A.    Correct.

8  Q.    When you say "comps," what do you mean?

9  A.    Comps are comparable company analyses that show a

10  company's market cap, net debt, enterprise value, and then it

11  shows, typically, multiples of -- enterprise values as a

12  multiple of revenue and EBITDA and sometimes P/E.

13             (Reporter interrupts.)

14             THE WITNESS:  EBITDA.

15             MR. HEMANN:  E-B-I --

16             THE WITNESS:  -- T-D-A.

17  BY MR. HEMANN:

18  Q.    What did you say after "EBITDA"?

19  A.    And sometimes P/E.  P slash E.

20  Q.    Now, where would you find these things called comps?

21  A.    Usually in research reports, Wall Street research reports.

22  Q.    So you went back home after you got a ride home from

23  Mr. Gowrish or borrowed his car, correct?

24  A.    Correct.

25  Q.    And you got on the computer and you looked at comps,

1  correct?

2  **A.**    Maybe not immediately.  At some point.

3  **Q.**    And when you started looking for comps, what did you look

4  for?  Where did you look?

5  **A.**    In Wall Street research reports.

6  **Q.**    And did you look at any particular reports?

7  **A.**    I don't remember which one right now.  I mean, it might

8  have been like Morgan Stanley or UBS or Deutsche Bank, but I

9  don't remember which ones I looked at right now.

10  **Q.**    Okay.  Did you look at a research report for NRG Energy?

11  **A.**    Yes, initially.

12  **Q.**    Why did you do that?

13  **A.**    Well, first, I looked up what happened with Texas Genco

14  and realized Texas Genco was acquired by NRG, and I figured

15  that by looking at NRG, I would be able to find who the comps

16  of NRG were.

17  **Q.**    Did you look at an NRG research report?

18  **A.**    Yes.

19  **Q.**    I'm showing you a document and ask if you recognize that.

20  **A.**    I can't really sit here right now and say that I read this

21  particular report, but given it's pretty long, it is likely,

22  because I was looking for the longer reports because the longer

23  reports have more information about the industry and other

24  companies instead of just about the company itself.

25          **MR. HEMANN:**  Your Honor, we would move admission of

1  Q.  Now, there was a lot of purchasing activity during the

2  month of February in Mr. Vaghar's account in TXU, correct?

3  A.  Correct.

4  Q.  Did you have a reaction to that?

5  A.  Yes.  At some point, you know, I didn't look at his

6  account like every day, but at some point I looked at it and I

7  was surprised.  He just kept buying more and more almost every

8  day or every few days.

9        And I told him that he had way too much, and I

10  told -- and I gave him the two reasons, you know, the -- I was

11  like, you know, A, I'm not even a hundred percent sure and I

12  think -- I forget how much he had bought, but probably like

13  $10,000 worth or something like that.  And I told him, you

14  know, if we're not right, you stand to lose a lot of money.  If

15  we are right, we're going to make so much that it could put us

16  kind of on the radar to get in trouble.

17  Q.  And --

18  A.  And then I sold some.

19  Q.  Because you were afraid of getting in trouble?

20  A.  Both reasons that I just mentioned.

21  Q.  At any time after that conversation in Mr. Gowrish's

22  office until you told him that you were involved in this TXU

23  situation and you showed him the trading records before that,

24  did you have a conversation with Mr. Gowrish about you and

25  Mr. Vaghar purchasing TXU call options?

1  remember exactly what he said though.

2  Q.   Do you remember where the conversation took place?

3  A.   No.

4  Q.   Okay.  How formal or informal was this conversation that

5  you're recalling?

6         MR. KIDNEY:  Objection.  What does that mean?

7         THE COURT:  Sustained.

8  BY MR. HEMANN:

9  Q.   Okay.  So you remember nothing about the circumstances of

10  the conversation?

11  A.   Correct.  Yeah.

12  Q.   And you don't remember at all what Mr. Gowrish told you?

13  A.   Beyond what I just said, not really.

14  Q.   Crappy data services company.

15  A.   Right.

16  Q.   What is a data services company?

17  A.   They can do anything from credit card processing or

18  processing other types of data, information, whether -- it

19  could be healthcare records, it could be credit card records,

20  bank statements, different things like that.  Mostly processing

21  data and information.

22  Q.   And are there many or few -- obviously, everything is

23  relative, but are there many or few data services company out

24  there?

25  A.   Several.

1  Q.   Not just one or two like the Sabre situation?

2  A.   Right.

3  Q.   So if -- when Mr. Gowrish said, "I'm working on a crappy

4  data services company," if you had not known what Mr. Vaghar

5  said, would you have thought, oh, it has to be ADS?

6  A.   No, I wouldn't have been able to figure it out.

7  Q.   Would you have been able to go home and like look up

8  research reports and figure out which crappy data services

9  company it was?

10  A.   No.

11  Q.   Because there's, at least in that period of time, a fair

12  number of kind of shaky data services companies out there,

13  right?

14  A.   Right.

15  Q.   So what is it then that gave you the confidence to start

16  buying ADS with Mr. Vaghar?

17  A.   I didn't have a lot of confidence, but I think at that

18  point Pascal was feeling pretty good because of all the money

19  that we had made in the past.  And at that point, I wasn't even

20  telling him buy exactly this or that like I was before.  And I

21  think when he -- when he -- and I personally -- you know, I was

22  kind of done with it.  I was getting ready to leave for

23  New York and had some issues with my wife.  And I wasn't

24  really, you know -- hadn't even really planned to do anything

25  like this at the time.

1          And I just told Pascal that, you know, "I think that

2    Vinnie is working on that ADS deal that you were talking about,

3    and, you know, I'm not sure -- I'm not sure exactly and I don't

4    know the timing of it, but if you want to, you can buy some

5    call options."

6    Q.   Mr. -- at the beginning of this scheme, you'd write sort

7    of directions out on like a yellow sticky pad or something like

8    that and give them to Mr. -- or communicate with him somehow,

9    buy these options at this price, at the beginning?

10   A.   Right.  They weren't always yellow or sticky but usually

11   pieces of paper.

12   Q.   Okay.  Did you write out directions for ADS for

13   Mr. Vaghar?

14   A.   I did not.

15   Q.   Because he was in Hawaii or Asia somewhere, correct?

16   A.   He was in Hawaii.

17   Q.   And you didn't need -- he had become sophisticated enough

18   to do this by himself at that point, correct?

19   A.   I don't know if he was sophisticated enough, but he was

20   familiar with how to look up calls and things like that by that

21   point.

22   Q.   If you could look at plaintiff's -- or, sorry, Defense

23   Exhibit 2147.

24          And it's an e-mail chain between you and Mr. Gowrish,

25   correct?

1  A.   Correct.

2  Q.   Do you remember where that conversation took place?

3  A.   Probably around our offices somewhere.

4  Q.   And did ADS come up in that conversation?

5  A.   It did.

6  Q.   What did -- how did it come up?

7  A.   I don't remember what we were talking about before it came

8  up, but at some point I asked him if they were still working on

9  ADS.

10  Q.   How did Mr. Gowrish react when you said that?

11  A.   He was a little bit surprised, and he was like, "I think

12  we are going to pass on the deal.  Why?  Are you guys advising

13  someone, or are you guys looking at it," something like that.

14  Q.   How did you respond to that?

15  A.   I just realized that I had kind of slipped up and tried to

16  backtrack.  And instead of trying to lie about it and say that

17  we were advising someone, I told him that I knew he was working

18  on it because -- or I thought he was working on it because

19  Pascal had seen some papers at his house lying around that said

20  Alliance Data or ADS on it.

21  Q.   How did he react to that?

22  A.   That's when he got a little bit more freaked out about it,

23  and he was -- he was like, "What's this guy doing snooping

24  around my house?  Has he been sifting around my personal

25  information?"

1          And he just thought Pascal was kind of -- I think he

2    already knew Pascal was a shady character.  He was like -- he

3    was like, "I don't feel comfortable around that guy."

4    Q.    So he then, after that, kind of hangs out with him a lot

5    after you moved to New York, right?

6    A.    That was surprising to me.

7    Q.    Did he ever -- did you have an understanding from him as

8    to why he was hanging out with Pascal?

9    A.    Not really other than he was just bored, because I think

10   he wasn't working for maybe a month or two during that time,

11   and he was just going out more than he had in the past.

12   Q.    And this brings us back to where we started yesterday.

13   Did Mr. Gowrish ever tell you or Mr. Vaghar ever tell you that

14   they had engaged in any trading activity when they were hanging

15   out together in August?

16   A.    No.

17   Q.    Did either of them ever tell you that they spoke to each

18   other about the trading activity other than what you testified

19   to about the Mexico conversation?

20   A.    No.

21          MR. HEMANN:  And that's the last thing that I'll

22   have, Your Honor.

23   BY MR. HEMANN:

24   Q.    The Mexico conversation that took place in New York,

25   Mr. Vaghar said to you that he had paid -- paid Mr. Gowrish

1  some money?

2  **A.**    It started with him saying that he asked Vinnie for some

3  stock tips.  And then Vinnie asked him if he had traded on ADS.

4  And somehow or other it got to him, him saying that he gave

5  Vinnie some money.  And that the context of that was when

6  Pascal gave me the money, I told Pascal, "Look, I think you

7  still owe me some more money, but don't worry about it.  I'm

8  done with this.  You keep whatever else you owe me."

9         And he was like, "Are you sure I still owe you money?

10  Because I gave you all that money before, plus the money I gave

11  to Vinnie."

12         And then he said he gave money -- I don't remember if

13  he said he gave it to Vinnie in Mexico or around -- after

14  Mexico or something like that.  That was it.

15  **Q.**    But the context of it was that he was telling you that he

16  didn't owe you as much as he said he did?

17  **A.**    Correct.  And I said, "That's fine.  You don't owe me any

18  more.."

19         **MR. HEMANN:**  I think that's it for now, Your Honor.

20  Thank you.

21         **THE COURT:**  Thank you.

22         Mr. Kidney, how long do you think you'll be?

23         **MR. KIDNEY:**  Ten minutes.

24         **THE COURT:**  Okay.  Go ahead.

25         **MR. KIDNEY:**  Can we have the Elmo back on, please.

1                          **REDIRECT EXAMINATION**

2    BY MR. KIDNEY:

3    Q.   Mr. Zaman, where were you living in August of 2007?

4    A.   At 200 Chambers in New York.

5    Q.   You were living in New York, correct?  You weren't living

6    in San Francisco?

7    A.   No.

8    Q.   You went through with Mr. Hemann a discussion of how it

9    came to be that this 65 -- $68,000 that was in your plea

10   agreement that you paid the government, or at least started,

11   you haven't finished paying that, right?

12   A.   I have made one of the payments so far.

13   Q.   For how much?

14   A.   For roughly $20,000.

15   Q.   So you owe the rest still?

16   A.   Correct.

17   Q.   Right now you're not in a position to pay the rest, are

18   you?

19   A.   I intend to pay it as quickly as I can when I get out of

20   prison.

21   Q.   When you -- when these calculations were made, was the SEC

22   staff, Ms. Riewe or Mr. Kelly, present?

23   A.   I don't think so.

24   Q.   Do you have any understanding as to whether the SEC just

25   adopted the calculations that the U.S. Attorney derived with

# Exhibit 14

 1  little dry.  Sorry about that.

 2          **MR. HEMANN:**  Thanks, Tracy.

 3  **BY MR. HEMANN:**

 4  Q.   So you sent a letter before this, did you say, resigning?

 5  A.   Yes.

 6  Q.   And then you sent this?

 7  A.   Correct.

 8  Q.   Why did you send this letter?

 9  A.   I think by this point it was becoming increasingly clear

10  that, you know, there would be a trial, and so, you know, uhm

11  counsel and I decided that it would probably be a good time to

12  inform TPG.

13  Q.   And have you worked since leaving TPG Credit?

14  A.   I have.

15  Q.   Where have you worked?

16  A.   So I'm trying to start a advisory slash -- strategic

17  advisory/consulting company called Silicon Valley Partners.

18  Q.   Do you work with somebody there?

19  A.   Yes.

20  Q.   What's your position there?

21  A.   I guess the best way to describe my position there is as a

22  contractor/consultant.

23  Q.   What do you do?

24  A.   Basically, the same stuff that I was doing at TPG.  You

25  know, a lot of valuation analysis, putting together

1 Q. And after you got married, at some point did you go on a

2 honeymoon?

3 A. I did.

4 Q. Where did you go?

5 A. So right after the wedding, we kind of drove down the

6 coast and stayed near Carmel for a weekend. And then later on

7 we went to Bali.

8 Q. When did you go to Bali?

9 A. In November of 2007. I'm sorry, 2006.

10 Q. While you were in Bali, did anything happen with regard to

11 your work obligations?

12 A. Yes.

13 Q. What happened?

14 A. I got a call from my boss and said, "Hey, look, I know

15 you're on your honeymoon, but we're kind of jammed here. Would

16 it be a huge deal for you to come back a little early?"

17 Q. And what did you do?

18 A. I came back a little early.

19 Q. And what -- what did you end up working on that you had to

20 come back from your honeymoon?

21 A. Sabre.

22 Q. What is it that you were doing on Sabre?

23 A. I was one of two associates on the deal. Or, rather, the

24 investment. I basically did all the valuation work and returns

25 analysis. A big portion of that investment thesis was cost

1  rationalization, streamlining the IT systems and stuff.  So

2  kind of modeling all that out.

3  Q.    When you returned from Bali to work on the Sabre deal, did

4  you communicate with Mr. Zaman?

5  A.    Yes.

6  Q.    Why?

7  A.    Well, he was my friend.  We communicated frequently.  I

8  think the -- the first time I spoke to him I was just

9  complaining that, you know, crap, I had to fly back from Bali

10 for this thing.

11 Q.    And when you told him, "I had to fly back from Bali for

12 this thing," did you tell him what "this thing" was?

13 A.    No.

14 Q.    What's that?

15 A.    No.

16 Q.    Okay.  Now, you worked at a private equity firm.  Would he

17 have known, generally, what the thing was?

18 A.    Yeah.  That's what we did, right.  We made investments in

19 companies.  So if I'm working on something, we're buying a

20 company.

21 Q.    Did you identify for him then what it was you were working

22 on?

23 A.    At that point?

24 Q.    Yes.

25 A.    No.

1   Q.    After telling him you were back because you had to work on

2   something, did you have another conversation with Mr. Vaghar

3   about what you were working on at TPG?

4   A.    I think you mean Mr. Zaman.

5   Q.    I'm sorry.  I do mean Mr. Zaman.  Thank you.  Mr. Zaman.

6   A.    Yes.

7   Q.    And was that before the announcement of Sabre?

8   A.    Yes.

9   Q.    What do you remember about that conversation?

10  A.    I don't remember exactly what the conversation was.  I'm

11  paraphrasing, but -- and it was part of a larger conversation,

12  but he -- the setting was, I believe, he was over at my

13  apartment and we were just having drinks.  And, you know,

14  again, I'm paraphrasing, but effectively he said, you know, How

15  is that deal going?  Are you still getting crushed?

16        Yeah, it's pretty busy, but I think it's going to be

17  a good deal.  I'm pretty excited about it.

18        He said, Oh, yeah, you know, how's that?

19        And, you know, I kind of described for him what it

20  was.  He said -- and then I realized he had worked on Amadeus.

21  And one of the -- one of the kind of scary things about Sabre

22  is that -- so, you know, what it is, it's a -- it's a

23  computerized kind of travel distribution system.  So travel

24  agents -- you know, if you go to like your travel agent and

25  say, you know, I need a taxi to take me to the airport, and

1    then I need a flight to here, and then I need a car to take me

2    here, then I need a hotel, then I need a rental car, then I

3    need another flight, all that information comes from different

4    places -- different places, and Sabre puts them all in one

5    place.

6          Now, the problem is, with the advent of the Internet,

7    uhm -- like American Airlines now just goes through AA.com,

8    they don't -- right?  So all that business is kind of moving to

9    websites, you know, like Hertz website or AA website, or things

10   like that, as opposed to going through Sabre.  So we call that

11   direct/indirect shift.

12         And that's pretty scary, right, because your market

13   is kind of getting smaller over time.  That's one of the things

14   I was concerned about, you know.  I just couldn't wrap my head

15   around as to, you know, where that stops.

16   Q.   Slow down a little bit.

17         Second of all -- and you had to wrap your head around

18   it because -- what were you doing at work that required you to

19   wrap your head around it?

20   A.   Well, we were trying to decide if Sabre was a good

21   investment and, you know, how much to pay for it if it was a

22   good investment.

23   Q.   Value?

24   A.   Sorry.  That's right.  Yes.

25   Q.   So the conversation you had with Mr. Zaman, where was --

1  where was it?

2  **A.**   It was in my condo.

3  **Q.**   About how long was the whole conversation?

4  **A.**   I wasn't looking at my watch, but we probably had two

5  drinks during that time.  So maybe an hour or two.

6  **Q.**   And what portion of that hour or two, again,

7  approximately, did you spend talking about what you were doing

8  at work?

9  **A.**   It was very short.  Again, I -- I hesitate to give you a

10  time, but the best I can estimate is maybe five or ten minutes.

11  **Q.**   Did you mention the name Sabre?

12  **A.**   No.

13  **Q.**   Were you intending to communicate to Mr. Zaman that you

14  were working on a company called Sabre?

15  **A.**   No.

16  **Q.**   Did you suggest that he buy Sabre stock?

17  **A.**   No.

18  **Q.**   Did you believe that he would buy Sabre stock based on

19  what you were telling him?

20  **A.**   No.

21  **Q.**   Why don't you believe that?

22  **A.**   Well, I mean, I have known Adnan for a long time.  He's in

23  the -- you know, I trusted him at that point.  He was a

24  licensed securities professional.  And, you know, there's --

25  when you're in the industry, you're kind of -- you're

1  conditioned to talk a certain way, and you never mention

2  company names.

3        And so, you know, one, I never would have believed

4  that Adnan would have done this, unless he had actually done

5  this; and, two, I didn't think at the time that whatever I

6  disclosed was sufficient for someone to trade.

7  Q.  Does it surprise you, Mr. Gowrish, now having thought

8  about it, that Mr. Zaman was able to deduce from what you said

9  that you were working on Sabre?

10  A.  I mean, I suppose he could have put it all together, yeah.

11  Q.  Why do you suppose that?

12  A.  Because he did.

13  Q.  After that conversation in your apartment, did you have --

14  before the announcement of Sabre on the 12th of September, did

15  you have any further conversations with Mr. Zaman about what

16  you were doing at work?

17  A.  We may have, but that's the one that comes to mind.

18        MR. KIDNEY:  What date did you say?

19        MR. HEMANN:  September 12th.

20        THE WITNESS:  It would be December 12th.

21        MR. HEMANN:  I'm sorry.  I meant September 12, if I

22  said December.

23        MR. KIDNEY:  December 12.

24        THE WITNESS:  No, no.  You said September 12.

25        MR. HEMANN:  Oh, I meant December.  Sorry about that.

1  A.    No.

2  Q.    Why not?

3  A.    You know, like I said, there's -- in this industry -- and

4  I've been in it for a while, and I have worked at a bunch of

5  different firms -- you know, there's kind of a protocol by

6  which you communicate.  And, you know, you're taught, Don't

7  tell people company names.  You're not supposed to do that.

8          And though I trusted Adnan, though he had been a

9  longtime friend and, you know, he's a Series 7 guy and he knew

10  kind of what you were and weren't supposed to do, we still

11  nevertheless kind of behaved -- behaved by kind of how we are

12  taught, which is, Don't say company names, so...

13  Q.    And the policies -- well, let me ask you:  Had you read --

14  at the time of these conversations, had you read TPG's

15  policies?

16  A.    No.

17  Q.    Did you sign them?

18  A.    I did.

19  Q.    Can you -- when you signed them, though, why didn't you

20  read them?

21  A.    I might have kind of paged through it, but I certainly

22  didn't peruse them.

23  Q.    The policies, which are thick, are marked as exhibits.

24  We're not going to go through them right now.  Have you read

25  them after you got them in discovery in this case?

1  A.    Yes, I have.

2  Q.    Do you think now, as you sit there on the witness stand,

3  that you violated either the insider trading policy or the

4  confidentiality policy?

5  A.    I -- I -- I did not violate the insider trading policy.

6            Now, as I read the confidentiality policy today, you

7  know, it scares me.  I mean, the way it's written, if I went

8  home and said to Priya, "Gee, the Sabre deal is killing me,"

9  that would be a violation of the confidentiality agreement.

10 So -- or if I went home and said, you know, "Ben Adams' bonus

11 was 2X mine" or something, I -- yeah, that might have violated

12 the confidentiality agreement.  So, yeah, I probably did.

13 Q.    Do you feel like you violated -- you said earlier you

14 didn't feel like you had violated the insider trading policy.

15 Why is that?

16 A.    Well, because I didn't engage in any trading.  I didn't

17 assist with any trading.  I didn't know about any trading.  I

18 had no reason to believe that there was any trading.  I mean, I

19 didn't -- I didn't do any insider trading.  I mean, I didn't

20 break that policy.

21 Q.    You -- there was some testimony from Mr. Zaman about a

22 party that you went to after the TXU transaction was announced.

23 Do you remember Mr. Zaman testifying about that?

24 A.    So I think the party that you're referring to is that --

25 was Adnan's birthday party in 2007.

1  worried.  I had just been promoted.  I was moving up in my

2  career.  I was really, really worried.  I was scared.  I didn't

3  want to talk to Pascal.  I didn't know what to do.

4  Q.   By the way, your attorney asked you if you had been

5  invited by the SEC to tell your side of the story before you

6  were sued.  And I believe your testimony was that you had been,

7  correct?

8  A.   That's correct.

9  Q.   Were you also asked by the FBI to come in and make a

10 proffer?

11 A.   I don't believe so.

12 Q.   Did your attorney tell you that the FBI was interested in

13 talking to you?

14         MR. HEMANN:   Objection, Your Honor.   Privilege.

15         THE COURT:   Sustained.

16         MR. KIDNEY:   Withdrawn.

17 BY MR. KIDNEY:

18 Q.   Did you ever learn that the FBI had asked to speak to you?

19 A.   I don't recall.  I don't think so.

20 Q.   By the way, if we go to one of the -- I think it was the

21 last exhibit that -- the next to last exhibit that Mr. Hemann

22 showed you, which is Defense Exhibit 2018.

23         MR. KIDNEY:   Put that up.  It's just a housekeeping

24 matter.   First page.

25         (Document displayed)

1  move Plaintiff's Exhibit 1042 into evidence.

2          **THE COURT:** It's received. Thank you.

3          (Plaintiff's Exhibit 1042 received in evidence.)

4          (Document displayed)

5  BY MR. KIDNEY:

6  Q.  And this is another document you were shown during your

7  deposition, correct, Mr. Gowrish?

8  A.  That is correct.

9  Q.  And were you able to identify it then?

10  A.  I'm sorry?

11  Q.  Are you able to identify it as you did then?

12  A.  Yes.  It's -- it appears to be an Open Table -- I guess, a

13  printout from the Open Table reservation system.

14  Q.  For what restaurant?

15  A.  For Kokkari.

16  Q.  Up in the upper --

17  A.  Kokkari.

18  Q.  -- left-hand corner.

19          And if we could turn to the third page of this

20  exhibit.  We probably need to highlight it.  I do not know who

21  put that black mark.  Maybe it was Kokkari, somebody at

22  Kokkari.  This was produced pursuant, I believe, to an FBI

23  request or subpoena or something.

24          (Document displayed)

25          Do you see what's written there at 8:30 p.m.?

# Exhibit 15

1    TXU stock.  Zaman did tell Khoury not to

2    share any stock information Zaman passed to

3    him with Vaghar.

4    "Khoury confirmed that on February 8, 2007,

5    he made his first purchase of options in TXU

6    stock.  Zaman told Khoury if Khoury bought

7    options, he should sell them when the prices

8    spike.  Based on Zaman telling him this,

9    Khoury knew to sell the TXU options at the

10   time it was announced KKR had bought TXU.

11   "Khoury made $90,000 when he sold the TXU

12   options.  He did not recall the exact date he

13   sold the TXU options.  Khoury traded TXU in

14   Elias's account and made approximately

15   $42,000.

16   "Zaman did provide Khoury with information to

17   trade ADS.  Khoury lost approximately $8,000

18   on trading ADS.  Khoury made approximately

19   $2,100 on Sabre Holdings.

20   "Khoury bought ADS in both his and Elias's

21   accounts.  Vaghar told him about ADS and that

22   Vaghar was buying ADS because he thought it

23   would be a good stock.  Khoury lost

24   approximately $7,000 in his account on ADS.

25   Elias made $36,000 profit on ADS.  Zaman said

1          if the price spiked, you should sell."

2          That's it.

3 Q.    Thank you, Special Agent Fuelling.

4          Just drawing your attention to two statements, on

5 page 9 (as read):

6          "Zaman did" -- and I think he pronounced it

7          Zaman when he testified today.

8          "Zaman did provide Khoury with information to

9          trade ADS."

10          And then on page 11, at the top (as read):

11          "Vaghar told him," Khoury, "about ADS and

12          that Vaghar was buying ADS because he thought

13          it would be a good stock."

14          There appears to be a potential contradiction there,

15 Special Agent Fuelling.  Did you go back to your notes and

16 attempt to resolve that contradiction?

17 A.    Yes, I did.  My notes do reflect the statement on page 9

18 that Zaman did provide Khoury with information to trade ADS.

19 However, later in the interview he does say, as stated on page

20 11, that Vaghar told him about ADS and that Vaghar was buying

21 ADS because he thought it would be a good stock.

22          **MR. HEMANN:**  One moment, Your Honor, please.  I think

23 that's all, Your Honor.  Thank you.

24          **THE COURT:**  Mr. Kidney.

25          **MR. KIDNEY:**  Ms. Riewe is going to take him.

# Exhibit 16

1  provided the information in breach of his duty."

2          **MR. KIDNEY:**  Thank you, Your Honor.

3          **MR. HEMANN:**  Thank you, Your Honor.

4          **THE COURT:**  Thank you.

5          **MR. HEMANN:**  We'll start right away, then?  You are

6  going to instruct first, and then --

7          **THE COURT:**  I'm going to instruct first.

8          Were you planning to like flash things up on the

9  screen?  Because while you're talking, I was going to fix this.

10         **MR. HEMANN:**  I was planning on flashing the jury

11 instructions up there.

12         **THE COURT:**  Well, then, let's fix that right now.

13         **MR. HEMANN:**  Thank you, Your Honor.  Appreciate that.

14         (Recess taken from 10:29 to 10:38)

15         (Jury enters at 10:38 a.m.)

16                    **JURY INSTRUCTIONS**

17         **THE COURT:**  Welcome back, ladies and gentlemen.  You

18 may all be seated.

19         What will happen now is, first, I'm going to read you

20 some instructions, which will tell you what the law is that you

21 are to apply in this case.  After that, it will be the

22 opportunity of counsel to give their closing arguments.  And,

23 after that, you will go deliberate.

24         I'm going to read you these instructions now, so

25 listen to them.  When you're in the jury room, you will have

1    Evidence may be direct or circumstantial.  Direct

2  evidence is direct proof of a fact, such as testimony by a

3  witness about what that witness personally saw or heard or did.

4  Circumstantial evidence is proof of one or more facts from

5  which you could find another fact.  You should consider both

6  kinds of evidence.  The law makes no distinction between the

7  weight to be given to either direct or circumstantial evidence.

8  It is for you to decide how much weight to give to give any

9  evidence.

10    By way of example, if you wake up in the morning and

11  see that the sidewalk is wet, you may find from that fact that

12  it rained during the night.  However, other evidence, such as a

13  turned on garden host, may provide a different explanation for

14  the presence of water on the sidewalk.  Therefore, before you

15  decide that a fact has been proved by circumstantial evidence,

16  you must consider all the evidence in the light of reason,

17  experience and common sense.

18    In deciding the facts of this case, you may have to

19  decide which testimony to believe and which testimony not to

20  believe.  You may believe everything a witness says or part of

21  it or none of it.  Proof of a fact does not necessarily depend

22  on the number of witnesses who testify about it.

23    In considering the testimony of any evidence [sic],

24  you may take into account the opportunity and ability of the

25  witness to see or hear or know the things testified to; the

1  witness's memory; the witness's manner while testifying; the

2  witness's interest in the outcome of the case and any bias or

3  prejudice; whether other evidence contradicted the witness's

4  testimony; the reasonableness of the witness's testimony in

5  light of all the evidence; and any other factors that bear on

6  believability.

7           The weight of the evidence as to a fact does not

8  necessarily depend on the number of witnesses who testify about

9  it.

10          When a party has the burden of proof on any claim by

11  a preponderance of the evidence, it means that you must be

12  persuaded by the evidence that the claim is more probably true

13  than not true.  You should base your decision on all of the

14  evidence, regardless of which party presented it.

15          I will now describe for you the civil offense of

16  insider trading.

17          A person is liable for a violation of the securities

18  laws if that person, in breach of a duty, provides material,

19  non-public information to someone else so that that person may

20  buy or sell or tip others to buy or sell securities before the

21  information becomes public.

22          The SEC claims that Mr. Gowrish is liable as a tipper

23  for providing material, non-public information to Adnan Zaman.

24  In order for Mr. Gowrish to be found liable for tipping, the

25  SEC must prove each of the following elements by a

1  preponderance of the evidence:

2          1.  Mr. Gowrish owed a fiduciary or other duty of

3  trust, confidence or confidentiality to his employer, TPG;

4          2.  Mr. Gowrish possessed material, non-public

5  information regarding Sabre, TXU, or ADS as a result of his

6  relationship with his employer, TPG;

7          3.  Mr. Gowrish knowingly provided this material,

8  non-public information regarding Sabre, TXU, or ADS to another,

9  in this case Adnan Zaman, in breach of his duty to TPG;

10          4.  Mr. Gowrish did so knowing, expecting or

11  recklessly disregarding the fact that Adnan Zaman would trade

12  or tip others to trade securities in Sabre, TXU, or ADS on the

13  basis of that information through a national securities

14  exchange or through the use of interstate commerce;

15          5.  A recipient of that information did use the

16  information to trade securities in Sabre, TXU, or ADS through a

17  national securities exchange or through the use of interstate

18  commerce, while that information was both material and

19  non-public; and

20          6.  Mr. Gowrish provided the information to Mr. Zaman

21  with the intent to benefit himself directly or indirectly.

22          A "security" is commonly defined as a stock, bond,

23  note, convertible debenture, option, warrant or other document

24  representing a share of stock in a company.  In this case, the

25  securities involved are call options and stock of Sabre Holding

1   Corporation, which we are calling Sabre, call options of TXU

2   Corporation, we're calling TXU, and call options of Alliance

3   Data Systems, or ADS.  During the relevant time period, the

4   securities of Sabre, TXU, and ADS were traded on a national

5   securities exchange.

6        Information is "material" if there is a substantial

7   likelihood that a reasonable investor would consider the

8   information important in making an investment decision.  There

9   must be a substantial likelihood that a reasonable investor

10  would view the information as significantly altering the total

11  mix of information available.  However, it is not necessary

12  that the information be of such importance that it would cause

13  an investor to change his or her mind about buying, selling, or

14  holding stock.  Materiality may be affected by the probability

15  that an event will occur and the anticipated magnitude of the

16  effect of the event on the public company.  Statements of

17  optimism or opinions are generally not material.

18       "Non-public information" is information which is not

19  generally available to the public through such sources as press

20  releases, trade publications, or other publicly available

21  sources.  Information is considered non-public for purposes of

22  insider trading liability until such information has been

23  effectively disseminated in a manner sufficient to ensure its

24  availability to the investing public.

25       An act is done knowingly if the defendant is aware of

1 the act and does not act or fail to act through ignorance,

2 mistake or accident.  Proof of knowledge consists of showing an

3 awareness of the underlying facts.  You may consider evidence

4 of the defendant's words, acts or omissions, along with all the

5 other evidence, in deciding whether the defendant acted

6 knowingly.

7        To act "recklessly" means to act in a highly

8 unreasonable manner that is an extreme departure from ordinary

9 care and in a manner that presents a danger that is either

10 known to the defendant or is so obvious that the defendant must

11 have been aware of it.

12        The SEC must prove that Mr. Gowrish expected to

13 receive a personal benefit from providing material, non-public

14 information to another person.  A benefit includes anything of

15 value, including money or friendship, and may be inferred from

16 when an insider makes a gift of non-public information to a

17 friend.

18        The SEC must establish by a preponderance of the

19 evidence that a recipient of the information allegedly tipped

20 by Mr. Gowrish, either Mr. Vaghar or Mr. Khoury, purchased or

21 sold securities on the basis of the information they received

22 from Mr. Gowrish.  The SEC need not prove, however, that

23 Mr. Vaghar and Mr. Khoury purchased or sold securities solely

24 because of that information.

25        When a person trades while in possession of material,

1    non-public information, a strong inference arises that such

2    information was used by that person in trading.  However, that

3    inference may be rebutted by evidence that there was no

4    connection between the information the person possessed and the

5    trade.  That is, if you conclude that the same trades must have

6    occurred regardless of whether Mr. Vaghar or Mr. Khoury

7    possessed the material, non-public information, then you should

8    find that they did not trade on the basis of that information.

9          In this case, the plaintiff is the United States

10   Securities and Exchange Commission, or SEC.  That agency is

11   authorized by federal law, including the Securities Exchange

12   Act of 1934, to bring a civil lawsuit in certain cases.  The

13   fact that a governmental entity or agency is involved as a

14   party must not affect your decision in any way.  A governmental

15   agency and all other persons stand equal before the law, and

16   must be dealt with as equals in a court of justice.

17         The remedies provided by the law for an insider

18   trading claim brought by the SEC are for the court -- that is

19   to say me -- to decide.  You may not consider the remedies in

20   deciding whether the SEC has proved its case against

21   Mr. Gowrish by a preponderance of the evidence.

22         Although other defendants in this action have settled

23   with the SEC, it does not follow that if other defendants have

24   settled with the SEC, then Mr. Gowrish should settle with the

25   SEC or be held liable.  Similarly, although Mr. Zaman entered

1  into a criminal plea agreement, this does not mean that

2  Mr. Gowrish should settle with the SEC or be held liable.

3        Mr. Gowrish is entitled to a fair consideration of

4  his own defense, and is not to be prejudiced by the fact that

5  other defendants in this action have settled with the SEC

6  and/or entered into criminal plea agreements.

7        You have heard evidence regarding an insider trading

8  policy of a company.  Whether or not information is material or

9  non-public is a matter for you to decide based on the

10 definitions I have given to you and is not controlled by any

11 definitions of material or non-public which might be contained

12 in a company policy.

13       A violation of a company policy may be considered by

14 you, along with all other evidence in the case, to determine

15 whether the civil offense of insider trading has been proved.

16       That completes the substantive instructions, so at

17 this point it's the opportunity of counsel to make their

18 closing arguments.  The SEC has the burden of proof and,

19 therefore, it may go first.

20       Is that you, Mr. Kidney?

21       **MR. KIDNEY:**  That's me, Your Honor.

22       **THE COURT:**  All right.

23                    CLOSING ARGUMENT

24       **MR. KIDNEY:**  Good morning, ladies and gentlemen.

25 On behalf of the SEC, I want to thank you for your

# Exhibit 17

1  an investigation began.  And combined with the evidence of

2  knowing violation, he was at least reckless in whether Zaman

3  was tipping Vaghar.

4       As the judge has instructed you, this reckless

5  disregard for consequences is also sufficient to find

6  Mr. Gowrish liable for insider trading.

7       Let's start by taking these deals one at a time.  But

8  before I do so, I want to remind you that Zaman and the

9  defendant were close friends.

10      The first thing Zaman did when Mr. Vaghar got his

11 phone call from the SEC in January 2008 and let Mr. Zaman know

12 about it, was to fly to San Francisco to confer with

13 Mr. Gowrish.  Not to confer with Mr. Vaghar.

14      They continued their communications on a regular

15 basis, Mr. Zaman and Mr. Gowrish.  Gowrish even had Zaman to

16 his house to watch the World Cup last June, just before both of

17 them gave their depositions in this case, and only a week or so

18 before Zaman began his prison sentence.

19      There was lots of time over the last three years for

20 them to confer.

21      In addition, you heard Mr. Gowrish testify that it

22 was a litigation strategy for him to obtain the reports of FBI

23 interviews with, among others, Zaman and Vaghar and Khoury

24 before he himself was put under oath.

25      He rejected an invitation from the SEC to tell his

1    story to Mr. Kelly and Ms. Riewe before he was sued.  He denies

2    knowing that the FBI also invited him to the same kind of

3    interview as Vaghar and Zaman.  But ask yourself if it is

4    likely, based on what Vaghar and Zaman said, that the FBI would

5    not ask Gowrish's lawyer to make him available.

6         Mr. Gowrish obtained those interview notes of Vaghar,

7    Zaman, Khoury and others, and testified that he read them, in

8    his words, multiple times before telling his own story under

9    oath.

10        So there was ample opportunity for Zaman and the

11   defendant to conform their stories.  And even if they did not

12   do so, which I submit is unlikely, Gowrish knew what Zaman told

13   the FBI, and he knew what Vaghar told the FBI before he had to

14   come forward finally and tell his own story.

15        Now to the deals in which Vaghar and Zaman and Khoury

16   have admitted to insider trading based on information from the

17   defendant.

18        The first is Sabre, Sabre Holdings.  Here is a graph

19   of the Sabre price movement.  It's like you saw during my

20   opening statement, but here we've added the dates of purchase

21   and sale of Sabre Securities by Vaghar and Khoury, the fourth

22   member of the conspiracy whose statements you only heard

23   through the FBI agent.

24        According to Mr. Zaman, Mr. Gowrish knew that Zaman

25   had also worked in the acquisition of a travel reservation

 1  told Mr. Khoury, and then waited weeks, didn't trade until

 2  Mr. Zaman contacted him on his way back, that is -- there is no

 3  evidence to support that.  The trading suggests much more

 4  strongly that Zaman knew about it early on, and tipped the one

 5  remaining guy he could count on to at least get some free rent,

 6  Mr. Khoury.

 7        That takes care of the three deals.  We submit that

 8  the evidence is very strong that it was -- Mr. Gowrish knew

 9  that when he told Mr. Zaman the information, he knew that

10  somebody was going to trade on it.

11        There is more.  I'll highlight it for you quickly.

12        Checks and money payments.  Of course, you'll

13  probably remember the checks that Vaghar wrote to Rat with a

14  memo line.  He wrote them to cash or to himself, but with a

15  memo line to Rat or Vin Dog while the scheme was ongoing.

16        Why would Vaghar write a check with a note that the

17  money was going to go to Vin Dog if it wasn't so?  Again, is he

18  the cleverest perjurer in the world, writing checks in early

19  2007 with the notation "Vin Dog" because he anticipated getting

20  a deferred prosecution agreement three years later, in

21  March 2010, from the U.S. Attorney's Office?

22        And as to payments to the defendant, again,

23  independent evidence, which Vaghar could not know existed,

24  confirms his testimony.  He has a clear recollection of paying

25  Gowrish, and then going with Gowrish to the Kokkari Restaurant

1    in July of -- on August 1st -- his recollection as to the date

2    he can't testify to.  He can't remember.  But we've seen the

3    evidence that shows on August 1st, he made numerous phone calls

4    to Mr. Gowrish.  He had the cash from a check.  Plaintiff's

5    Exhibit 1016, which he deposited in the Bank of America on

6    July 23rd, $14,000, and withdrew $13,000 a week later, just two

7    days before the record shows --

8              Did you find it, PX1016?

9         **MR. KING:**  I don't see it.

10        (Document displayed)

11        **MR. KIDNEY:**  There it is.

12             It says "Rat," which refers to Mr. Zaman.  But

13   Mr. Zaman had gone to New York at this time.  I asked him, and

14   he said he was in New York on August 1st.

15             So Mr. -- it's likely that Mr. Vaghar simply decided

16   to give the money to Mr. Gowrish, because a week later he took

17   $13,000 out of the bank, on July 30.  And on August 1st, he

18   made numerous phone calls to Mr. Gowrish.

19             And there's a reservation record, Plaintiff's

20   Exhibit No. 1042, which shows that indeed Mr. Gowrish had a

21   reservation at Kokkari, for two.  Two people.

22             And then there are phone records showing that during

23   the meal there was a conference call between Zaman, Gowrish,

24   and Vaghar.

25             Now, in response to questions from his own lawyer,

1    Mr. Gowrish said Kokkari was often noisy.  What better reason

2    for a man sitting across from you to conference himself in on a

3    conversation with a friend, rather than two people trying to

4    listen on the same cell phone in a public place at that?

5          These gentlemen had nearly grown up with cell phones.

6    They were popular while they were still in college, at least.

7    Nothing could have been more natural, under the circumstances,

8    than to conference each other in.

9          So Mr. Vaghar, again, his clearest recollection of

10   payment to Mr. -- Mr. Gowrish is fully reflected by the phone

11   records and a restaurant reservation that Mr. Vaghar had no

12   hand in creating.  That's the kind of information we are

13   relying on Mr. Vaghar for, what can be corroborated; not his

14   vague recollections.

15         And then there's the April 16 check with the notation

16   "Vin Dog."  Vaghar testified that by this time the conspirators

17   were getting careless.  Zaman knew he was moving to New York.

18   Gowrish knew he was moving to Minneapolis.  And Vaghar thought,

19   at the time, he was going to take up long-term residence in

20   Japan for some job.  The e-mails between Gowrish and Zaman show

21   that Vaghar was right; they were getting careless.

22         Remember Plaintiff's Exhibit 1022, which has got two

23   very interesting parts to it?  This is in the afternoon of

24   April 16th.  "Does it make sense to hit up Rat today?" Gowrish

25   asks Zaman.  Zaman responds, "Well, why didn't you do it the

1    previous night?  Why didn't you do it last night?"

2              Can we get that up?

3              (Document displayed)

4              "Why didn't you ask him when you were with him

5    yesterday?"

6              A Sunday.

7              And so the suggestion -- what Mr. Gowrish and

8    Mr. Zaman say is this refers to a check for a condominium

9    deposit.  But we showed them Plaintiff's Exhibit 1077, which

10   makes it clear that that notion didn't come up until early in

11   the morning, early Monday morning, presumably long after

12   Mr. Vaghar and Mr. Gowrish had stopped socializing together on

13   Sunday.  After all, it was a work night, a night to get up and

14   go to work.

15             So this didn't come up.  Well, in response to this,

16   Mr. Zaman and Mr. Gowrish say, Oh, well, we certainly were

17   going to involve him in a condominium.  And the defense brought

18   up a bunch of e-mails going all the way through June, in which

19   Mr. Vaghar and Mr. Zaman discussed the condominium.

20             I invite you to look at those e-mails and see how

21   many of them included Mr. Vaghar.  I think the answer is zero,

22   or maybe there's one.

23             And Mr. Zaman even said later they decided that they

24   didn't want Mr. Vaghar in their condo.  I submit that the condo

25   is an excuse.

# Exhibit 18

FILED

FEB X 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

  v.

VINAYAK S GOWRISH,

        Defendant.

_____/

No. C 09-05883 SI

**SPECIAL VERDICT**

We, the jury in this matter find unanimously on the questions put to us:

340

**A.  Re: Sabre Holdings**:

The parties have stipulated or agreed that  Mr. Gowrish owed a fiduciary or other duty of trust, confidence, or confidentiality to his employer, TPG; that Mr. Gowrish possessed material, non-public information regarding Sabre Holdings as a result of his relationship with his employer, TPG; and to some other matters.  The jury must only answer the following questions:

Did plaintiff Securities and Exchange Commission prove, by a preponderance of the evidence, the following with respect to Sabre Holdings?

1.    That Mr. Gowrish knowingly provided this material, non-public information regarding Sabre Holdings to another, in this case Adnan Zaman, in breach of his duty to TPG;

Yes _____X_____        No _____

2.    That Mr. Gowrish did so knowing, expecting or recklessly disregarding the fact that the Adnan Zaman would trade, or tip others to trade, securities in Sabre Holdings on the basis of that information;

Yes _____X_____        No _____

3.    That a recipient of that information did use that information to trade securities in Sabre Holdings, while that information was both material and nonpublic;

Yes _____X_____        No _____

4.    That Mr. Gowrish provided the information to Mr. Zaman with the intent to benefit himself, directly or indirectly.

Yes _____X_____        No _____

341

**B.  Re: TXU Energy**:

The parties have stipulated or agreed that  Mr. Gowrish owed a fiduciary or other duty of trust, confidence, or confidentiality to his employer, TPG; and that Mr. Gowrish possessed material, non-public information regarding TXU Energy as a result of his relationship with his employer, TPG; and to some other matters.  The jury must only answer the following questions:

Did plaintiff Securities and Exchange Commission prove, by a preponderance of the evidence, the following with respect to TXU Energy?

1.      That Mr. Gowrish knowingly provided this material, non-public information regarding TXU Energy to another, in this case Adnan Zaman, in breach of his duty to TPG;

Yes _____X_____      No _____

2.      That Mr. Gowrish did so knowing, expecting or recklessly disregarding the fact that the Adnan Zaman would trade, or tip others to trade, securities in TXU Energy on the basis of that information;

Yes _____X_____      No _____

3.      That a recipient of that information did use that information to trade securities in TXU Energy, while that information was both material and nonpublic;

Yes _____X_____      No _____

4.      That Mr. Gowrish provided the information to Mr. Zaman with the intent to benefit himself, directly or indirectly.

Yes _____X_____      No _____

**C. Re: Alliance Data Systems**:

The parties have stipulated or agreed that Mr. Gowrish owed a fiduciary or other duty of trust, confidence, or confidentiality to his employer, TPG; and to some other matters, TPG. The jury must only answer the following questions:

Did plaintiff Securities and Exchange Commission prove, by a preponderance of the evidence, the following with respect to Alliance Data Systems?

1.     That at the time of the trades in question, Mr. Gowrish possessed material, non-public information regarding Alliance Data Systems as a result of his relationship with his employer, TPG;

Yes ____X____     No _____

2.     That Mr. Gowrish knowingly provided this material, non-public information regarding Alliance Data Systems to another, in this case Adnan Zaman, in breach of his duty to TPG;

Yes ____X____     No _____

3.     That Mr. Gowrish did so knowing, expecting or recklessly disregarding the fact that the Adnan Zaman would trade, or tip others to trade, securities in Alliance Data Systems on the basis of that information;

Yes ____X____     No _____

4.     That a recipient of that information did use that information to trade securities in Alliance Data Systems, while that information was both material and nonpublic;

Yes ____X____     No _____

5.     That Mr. Gowrish provided the information to Mr. Zaman with the intent to benefit himself, directly or indirectly.

Yes ____X____     No _____

Dated: ____February 3, 2011____          _____
                                                              FOREPERSON

343