IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>VINAYAK S GOWRISH,<br><br>    Defendant.<br>_____ / | No. C 09-05883 SI<br><br>**ORDER RE: MOTION FOR ENTRY OF FINAL JUDGMENT** |

On July 12, 2011, the Court heard argument on plaintiff's motion for entry of proposed final judgment. Having considered the arguments of counsel and the papers submitted, the Court hereby rules as follows. A final judgment will be entered separately.

**BACKGROUND**

This is a civil prosecution of defendant Vinayak Gowrish for insider trading. The SEC alleged that defendant was a tipper in an insider trading scheme that involved Adnan Zaman, Pascal Vaghar, and Sameer Khoury. The SEC alleged that defendant provided Adnan Zaman with information that three companies were likely to be acquired; and that Zaman then tipped Vaghar and Khoury, who invested in the three companies. The SEC calculates that Vaghar and Khoury made $374,912 in profits. *See* Pl. Exs. to Memo. in Supp. of Proposed Final Judgment (Doc. 156), Ex. A ("Calculation of unlawful trading profits"). Defendant does not contest that number.

Mr. Zaman pleaded guilty to criminal securities fraud and was sentenced to 26 months in prison. *See* Case No. CR 09-1178, Doc. 33. A consent judgment was entered again him in this civil case, and

he was ordered to disgorge $68,790 in profits and $9,666 in prejudgment interest. Doc. 8. A consent judgment was entered against Sameer Khoury, he was found liable for disgorgement of $172,985 in profits and $25,622 in prejudgment interest, but he was not ordered to pay the SEC any disgorgement money. Doc. 11. A consent judgment was entered against Pascal Vaghar, he was found liable for disgorgement of $318,784 in profits and $47,217 in prejudgment interest, but he was only ordered to pay the SEC $33,000 in disgorgement. Doc. 10.[1]

At trial, the SEC and defendant presented different accounts of the insider trading scheme. The SEC argued that defendant knew of the scheme, intended to participate in it, received some cash from Vaghar, intended to benefit from providing tips primarily by receiving friendship and an ego boost, and tried to cover up the scheme once the SEC began its investigation. In support of its theory, it elicited testimony from Vaghar that Vaghar thanked defendant for information, paid him cash in exchange for that information, and worked with defendant to come up with explanations for his trades when the SEC was investigating; and that defendant paid for Vaghar's attorney for a time during the SEC investigation. Defendant's theory was that he accidentally divulged confidential information from which the perpetrators of the scheme deduced how they should invest, and that he received no financial benefits. In support of his theory, he elicited testimony from Zaman that defendant knew nothing of the insider trading scheme. Defendant also testified at the trial, and he attempted to impeach Vaghar with evidence that Vaghar has significant cognitive deficiencies, including memory problems, as a result of a traumatic brain injury.

Vaghar is the only witness who testified that defendant benefitted financially from the insider trading scheme. He testified at trial that defendant shared in the earnings, and in particular that Vaghar wrote checks to cash on his Charles Schwab account, and paid either Zaman or defendant that cash. He testified that he believed that Zaman would share the cash Zaman received with defendant. TR 215. The SEC presented evidence of a check dated April 16, 2007 for $5,000 with the words "VIN DOG" in the subject line. PX 1005. Vaghar testified that he paid the $5,000 directly to defendant. TR 215.

---

[1] Elias Khoury, Sameer Khoury's brother, was named as a relief defendant; a consent judgment was entered against him; and he was ordered to disgorge $5,836 in profits and $864 in prejudgment interest. Doc. 9. He has satisfied his obligation to the SEC.

2

The SEC also presented evidence of a check dated June 12, 2007 for $5,500 with the words "V DOG & RAT" in the subject line. PX 1006. As to the second check, Vaghar testified "the cash was for both of them, but I don't recall if I gave it directly to Vinnie or if I gave it directly to Adnan and Adnan was going to give Vinnie his cut." TR 215.[2]

On February 4, 2011, a jury found defendant liable on all three claims of insider trading in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5. Doc. 133. The jury found (1) that defendant knowingly provided material, non-public information regarding three companies to Zaman, in breach of defendant's duty to his employer; (2) that defendant did so knowing, expecting or recklessly disregarding the fact that Zaman would trade, or tip others to trade, securities in those three companies on the basis of that information; (3) that a recipient of that information did use that information to trade securities in those three companies while the information was both material and nonpublic; and (4) that defendant provided the information to Zaman with the intent to benefit himself, directly or indirectly. *Id.*

In a joint pre-trial statement, the parties agreed that "the appropriate equitable and legal relief [would] be determined by the Court in the event the defendant [were] found liable for the claims brought by the SEC." Doc. 78 at 2–3. Pending before the Court is the SEC's motion for entry of final judgment.

**DISCUSSION**

The SEC requests that the Court enter judgment enjoining defendant from further violation of

---

[2] During a February 2009 proffer session with the FBI, Vaghar was also asked about a March 15, 2007 check for $4,300 with the words "VIN DOG" in the subject line, but it does not appear that the SEC presented evidence of this check at trial. *See* Def. Sealed Appx. of Ev. in Support of Def. Oppo. to Pl. Mot. for Entry of Final Judgment ("Sealed Appendix"), Ex. 19 at 44.

During an April 2009 proffer session, Vaghar stated that Zaman had told him "that profits must be equally split between Zaman, VAGHAR, and Gowrish." *Id.* at 54. The SEC has not argued that the proceeds were divided evenly.

During a May 2009 proffer session, Vaghar stated that a July 23, 2007 check for $14,000 "could have been to pay" Zaman and defendant, and that he gave defendant $7,000 or $8,000 of the cash. *Id.* at 71. Vaghar testified as to the existence of the check during trial, and that "it must have been, you know, money that was for -- for Mr. Zaman and, I believe, for Vinnie, and maybe it was some money for myself, too, like we were going somewhere or doing something or -- I don't remember exactly." TR 209. After being shown additional exhibits, he testified "I wrote this check in order to -- to get money out to pay off -- to pay towards Mr. Zaman and Vinnie, I think, to -- towards the debt that I had towards them." TR 212.

3

Section 10(b) of the Securities and Exchange Act and Rule 10b-5; ordering defendant to disgorge the entire $374,912 of profits earned by all of the participants in the insider trading scheme, along with $85,479 in prejudgment interest; and assessing a substantial civil penalty (perhaps the maximum permitted by law, $1,124,737.23). As part of its request, the SEC suggests that defendant should be held jointly and severally liable with his codefendants, and that the Court should not consider defendant's ability to pay.

The SEC also suggests that, when calculating the appropriate disgorgement figure in this case, the Court not consider the amount of money that his codefendants were ordered to disgorge to the SEC. Specifically, the SEC argues that the codefendants participated in a broader insider trading scheme, and that the disgorgements ordered against the codefendants should be considered to offset the profits earned from the parts of the scheme in which defendant did not participate.[3]

Defendant argues that the Court should not enter an injunction, should order defendant to disgorge no more than $6,000, and should assess civil penalties no higher than $12,000.[4] Defendant also requested an evidentiary hearing, in which he would have the opportunity to examine Vaghar in light of what he calls "new evidence" of Vaghar's cognitive disability. The Court already denied this request during a separate hearing, *see* Minute Entry (Doc. 185), and discusses that decision in more detail below.

**1.    Defendant's request for an evidentiary hearing**

While Pascal Vaghar was serving in the military in the 1990s, he was in a car accident. A drunk driver hit his car, his skull was fractured, and he retired early from the Navy.

Before trial, the SEC filed a motion in limine to bar any references to any disabilities that might have resulted from the accident. Doc. 79. The Court denied this motion in large part. *See* Doc. 117. The Court permitted defendant to cross examine Vaghar regarding his psychiatric diagnoses to the

---

[3]    The disgorgements ordered total $101,790, and the profits from that other scheme total $115,000.

[4]    At the hearing on plaintiff's motion, defendant conceded that it would be "very fair" to order disgorgement and civil penalties totaling $50,000.

4

extent that they might affect his memory or perception. The Court also permitted defendant to cross examine Vaghar to the extent that any inconsistencies in his reports about his disability might affect his credibility as a witness.

At trial, Vaghar was cross examined extensively about his memory and any cognitive impairments stemming from the car accident. *See, e.g.,* TR 321:15–321:23; 323:22–324:10; 373:2–373:8. When asked if he was fifty percent cognitively disabled, he agreed that he was, though he also noted that he was not confident about the exact number. TR 321:15–321:18. The jury and the Court were able to observe Vaghar's confusion as to details, dates, and sequences of events. Vaghar himself testified dozens of times that he was unable to remember things. Defendant's attorney argued to the jury that Vaghar's memory was "unreliable" and his testimony was not to be believed. *See, e.g.,* TR 129:4.

After the jury found defendant liable for insider trading, defendant hired a new attorney. The new attorney requested that the Court order the VA to produce Vaghar's medical records, and, over the SEC's objection, the Court did so.[5] *See* Docs. 151, 158, 159. Defendant now argues that the records produced by the VA constitute new facts, and on that basis argues that a new examination of Vaghar would elicit testimony relevant to the penalties phase of this case.

On June 30, the Court heard argument as to whether Vaghar should again be compelled to testify, and denied defendant's request. Defendant argued that Vaghar's testimony would demonstrate that "there is no reliable evidence that *proves* that Mr. Gowrish" earned money from the insider trading scheme, which it argues is necessary before the Court orders disgorgement. Def. Oppo. to Pl. Mot. for Entry of Final Judgment (Doc. 165), at 20 (emphasis added). Defendant was not able to explain,

---

[5] On March 12, 2010, the parties in this case filed a joint proposed discovery plan in which defendant indicated that he intended to subpoena the VA for documents that would "shed light on" Vaghar's "competency as a witness." Doc. 18 at 6; *see also* Joint Case Management Statement (Doc. 20) at 6. The SEC indicated that it would not oppose such a subpoena as long as Vaghar were provided sufficient notice and opportunity to challenge it on his own behalf. *Id.* At the case management conference two weeks later, the Court set a discovery cutoff date of September 24, 2010. Doc. 21.

On December 13, 2010, six weeks before trial, nearly three months after the discovery cutoff, and nearly four months after Vaghar's deposition in this case, defendant requested a trial subpoena for all Veterans Administration records related to the diagnosis and treatment of Vaghar for what defendant argued was a mental disability resulting from the car accident. Doc. 72. The Court denied this request, finding that the defendant was not diligent in seeking the information, and that the SEC would be prejudiced due to the proximity of the trial date. *See* Order (Doc. 76).

however, how the Court would be assisted at the remedies phase by more testimony from Vaghar, who testified extensively at trial and was cross examined vigorously, especially since the Court is in possession of the VA records themselves. Additionally, defendant's argument fails to take into account the different burdens that the parties are under at the remedies stage. As discussed below, the relevant question for the Court at the remedies phase is whether the SEC can meet its "burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010). It need not "prove" how much money defendant received. The burden then "shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* (quotation marks omitted). Defendant has not explained how impeaching Vaghar's already challenged testimony on the basis of documents that are before the Court would enable or even assist him to meet this burden.

**2.     Injunction from further violation of Section 10(b) and Rule 10b-5**

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of [Section 10(b) or Rule 10b-5], the Commission may . . . bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b); *see also* 15 U.S.C. § 78u(d)(1). "The granting or denying of injunctive relief rests within the sound discretion of the trial court." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (quotation marks omitted).

In *Fehn*, the Ninth Circuit described the SEC's burden to obtain an injunction as follows:

> To obtain a permanent injunction, the SEC ha[s] the burden of showing there [i]s a reasonable likelihood of future violations of the securities laws. . . . [T]here is no per se rule requiring the issuance of an injunction upon the showing of a past violation, but . . . the existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction.
> In predicting the likelihood of future violations, [the Court] must assess the totality of the circumstances surrounding the defendant and his violations, and [the Court] consider[s] such factors as (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

97 F.3d at 1295–96 (internal citations, quotation marks, and alteration marks omitted).[6]

### A.    Scienter

To make a showing of "a reasonable likelihood that the wrong will be repeated . . . it will almost always be necessary for the Commission to demonstrate that the defendant's past sins have been the result of more than negligence." *Aaron v. SEC*, 446 U.S. 680, 703 (1980). The D.C. Circuit has explained that "[i]njunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public." *See SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) (vacating permanent injunction). The Ninth Circuit, however, upheld an injunction imposed in a case where the SEC did "not allege" intent to defraud and "that degree of scienter" was "not necessary to prove" the type of past violation alleged in the case. *Fehn*, 97 F.3d at 1296.

In this case, scienter was an element found by the jury. The SEC proved that defendant knowingly provided material non-public information, and that he intended to benefit from providing that information. The SEC proved at least reckless disregard with respect to knowledge that tipee would trade or tip others. *See* Verdict (Doc. 133). Thus, this factor weighs somewhat in favor of entering an injunction, though not as strongly as it would in a case where the SEC had proven intent to defraud.

Courts occasionally look beyond the simple question of whether the defendant was held liable for a violation that requires scienter to the more complicated question of the level of the defendant's

---

[6] In the Second Circuit, "'the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion.'" *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972). Defendant argues that the practical effect of an injunction is that "the SEC may bring an action to bar him from associating with an investment adviser . . . with no new or current predicate acts of misconduct." Def. Oppo. at 14 (citing Investment Advisers Act § 203(f) (1940)). Additionally "a state securities agency could deny him a license" and "he would be barred from raising monies for an investment adviser." Def. Oppo. at 15. Defendant also states in a declaration that a fraud injunction is "a de facto lifetime bar — SEC and FINRA rules disqualify anyone with a fraud injunction from employment in virtually every aspect of the financial services industry" and "[w]ith the passage of Dodd-Frank legislation, virtually the entire industry is now subject to SEC regulation." Decl. of Vinayak Gowrish, Sealed Appendix, Ex. 1, ¶¶ 8–9. Defendant does not present any evidence that would indicate that an injunction would have a more burdensome effect on him than on another insider trading tipper. Assuming the Court is permitted to consider the effect of the injunction, that factor is neutral in this case, and it does not influence the Court's determination as to how to exercise its discretion.

culpability. *See, e.g., SEC v. 800america.com, Inc.*, No. 02 Civ. 9046(HB), 2006 WL 3422670, * 11 (S.D.N.Y. 2006). The government's theory in this case is that, at most, defendant was a knowing participant in the insider trading scheme, not the person who initiated it. Additionally, although defendant was the tipper, defendant's intent to benefit may have been limited to an intent to benefit from intangible friendship and ego rewards, and therefore he is arguably less culpable than a person who intended to benefit monetarily. To the extent that any monetary benefit was obtained, it was quite small—limited to several thousand dollars, while the other participants in the scheme made over $300,000. Even considering the more complicated question of culpability, the Court's analysis does not change: this factor weighs somewhat in favor of entering an injunction, but not as strongly as it might in another case.

### B.  Recurrence or isolation

"'[F]irst offenders' are not immune from injunctive relief." *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974). However, the passage of time "without incident" can "undercut[]" the SEC's argument that a defendant "pose[s] a continuing risk to the public." *SEC v. Jones*. 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007). One district court, in denying a permanent injunction, found that a two-and-one-half year fraudulent scheme that involved "public filings . . . created from falsified bank statements, general ledgers and invoices," failure to disclose significant information related to the officers, directors, and employees of the company, and the impermissible public sale of shares by control persons, all of which led to $2,731,760.27 in proceeds, was an "isolated incident." *See 800america.com,* 2006 WL 3422670, at * 2, * 11.

Here, defendant has been found liable for tipping on three separate occasions and with regard to three different companies. However, all three tips occurred during a six month window, involved the same people and the same general scheme, and ceased before the SEC became involved. *Compare id.* (noting that the "isolated incident" only ceased when the SEC obtained a preliminary injunction). This factor is neutral.

### C. Recognition of wrongfulness of conduct

A person's "lack of remorse" can be "apparent in" the person's "continued insistence on the validity of his" conduct that has been found to be a violation of the Securities and Exchange Act. *See Fehn*, 97 F.3d at 1296. "Promising to stop doing wrong while denying any wrongdoing is the wrong way to establish that wrongdoing will not reoccur." *Ginsburg*, 362 F.3d at 1305. *But see SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) (explaining that securities defendants "are not to be punished because they vigorously contest the government's accusations").

Here, defendant has stated that he now recognizes that his conduct was "unwise," but he insists that his "tips" consisted of careless statements that the tipees then used to trade without his knowledge. He continues to maintain that he did not commit insider trading, despite the jury's clear findings to the contrary. This factor weighs in favor of an injunction.

### D. Present occupation

Defendant holds no securities licenses, and he no longer works for TPG. He is now a consultant doing valuation analysis. Defendant argues that his current position "is not the type of professional work that gives him any type of extraordinary access to material, non-public information about publicly-traded companies." The SEC argues that if defendant has *any* access to material, non-public information in his current job, that supports a conclusion that future violations are likely. This factor weighs slightly in the SEC's favor – given the fact that defendant is still working in the business world, a future violation is more likely than if he had switched careers entirely. *See also SEC v. Bonastia*, 614 F.2d 908, 913 (3d Cir 1980) ("[A] change in occupation, without more, will not provide a complete defense to an injunction suit.").

### E. Sincerity of assurances against future violations

"Promises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, but neither is conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught." *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978); *see also Fehn*, 97 F.3d at 1296 ("[S]incere assurances of an intent to refrain from aiding and abetting

9

future violations are insufficient, without more, to militate against an injunction."). Defendant has made assurances that he will be more careful in the future. The sincerity of his assurances are weakened in part by the fact that defendant has not completely recognized the wrongfulness of his past conduct. Because the Court already considered defendant's equivocal recognition of the wrongfulness of his conduct in weighing factor three, however, this factor is neutral.

Based on these five factors, all of which are neutral or weigh in favor of entering an injunction, the Court finds a reasonable likelihood that defendant will violate the securities laws in the future. Therefore, the Court will enjoin defendant from further violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

### 3.  Disgorgement of profits, including prejudgment interest

The SEC has requested that the Court find that defendant is jointly and severally liable for all proceeds from the trading scheme and order him to disgorge $374,912 in profits and pay prejudgment interest in the amount of $85,479. The government stated at the hearing on this motion that defendant did not personally earn more than $12,000. Defendant does not contest the SEC's figure as to the total proceeds of the trading scheme, but he argues that he did not make a single dollar from any tipping, and therefore that no disgorgement should be ordered. In the alternative, he argues that he did not earn more than $6,000, and therefore not more than $6,000 should be ordered disgorged. Defendant also argues that the SEC has calculated prejudgment interest incorrectly.

#### A.  Disgorgement of profits

> A district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. The amount of disgorgement should include all gains flowing from the illegal activities. Disgorgement need be only a reasonable approximation of profits causally connected to the violation.

*Platforms Wireless*, 617 F.3d at 1096 (internal citations, quotation marks, and alteration marks omitted). The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates

the amount of unjust enrichment." *Id.* That burden then "shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* (quotation marks omitted).

"Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they may be held jointly and severally liable for the disgorgement of illegally obtained proceeds." *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1117 (9th Cir. 2006) (alteration marks omitted); *see also id.* (upholding joint and several liability of three defendants that had "the requisite close relationship and jointly benefitted from the illegal scheme"). However, where one party to a fraudulent scheme has an agreement with the principal to participate in the scheme but retain only a small portion of the proceeds, it is an abuse of discretion to require that party to disgorge all proceeds. *See Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993); *see also JT Wallenbrock*, *supra*, 440 F.3d 1109 (distinguishing *Hateley*, which involved a "preexisting agreement limiting the defendants to only a share of the ill-gotten gain or requiring them to pay a portion of the proceeds to third parties" and explaining that "[t]he manner in which" a defendant chooses "to spend the illegally obtained funds has no relevance to the disgorgement calculation").

"It is well settled" in the Ninth Circuit "that a tipper can be required to disgorge his tippees' profits, whether or not the tippees themselves have been found liable." *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990) (citations and quotation marks omitted). "Such a rule is a necessary deterrent to evasion of Rule 10b-5 liability by either: (1) enriching a friend or relative; or (2) tipping others with the expectation of reciprocity." *Id.* In *Clark*, the Ninth Circuit upheld a district court decision to order a tipper to disgorge $47,466.32 of his own profits, $1,664.67 of his wife's profits, and $7,812 of his tipee's profits. *Id.* at 442, 453–54.

Exercising their discretion, however, some courts have ordered defendants to disgorge only the profits they personally earned from the insider trading scheme. For example, one district court ordered a tipper-defendant to disgorge approximately $872,000 in trading profits over his argument that one third of his profits were attributable to his wife and a trust of which defendant was the sole beneficiary; but the court declined to order the tipper-defendant to disgorge profits earned by his tippee brother because the SEC "failed to show how [he] was enriched by his brother's trades." *See SEC v. Downe*, 969 F. Supp. 149, 158 (S.D.N.Y.1997), *aff'd sub nom. SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998).

11

Another district court required a securities company to disgorge "the profit it made," but did not hold it "financially responsible for" the activities of two "more responsible parties." *See SEC v. World Gambling Corp.*, 555 F. Supp. 930, 934–35 (S.D.N.Y 1983), *affirmed without reported opinion*, 742 F.2d 1440 (2d Cir. 1983); *see also SEC v. Falbo*, 14 F. Supp. 2d 508, 528 & n.25 (S.D.N.Y. 1998) (holding tipper liable for profits he realized trading, but declining "to hold him jointly and severally liable for anyone else's illicit gains" where "the SEC fail[ed] to present any evidence indicating that [he] derived any financial benefit from the illegal trading of anyone he tipped").

Under *Clark*, the Court has the discretion to order that defendant disgorge all of the profits of the insider trading scheme; but the Court is not required to do so. In *Clark*, the disgorgement order was against a defendant who personally earned 83% of the proceeds of the trading scheme. Here, at most, defendant personally earned 3% of the proceeds of the scheme. Although the trading would not and could not have occurred without defendant's tips, the government does not argue that defendant initiated the insider trading scheme, that he was motivated by an intent to earn money from the scheme, or that he was ever in control of almost any of the proceeds. Although its holding is somewhat circumscribed by *JT Wallenbrock*, *Hateley* counsels the Court to consider whether the severity of the SEC's disgorgement request is "justified under the circumstances," or whether it is "unreasonable and excessive as to the [defendant]." *Hateley*, 8 F.3d at 655–56; *see also id.* at 655 ("The purpose of disgorgement is to deprive a person of 'ill-gotten gains' and prevent unjust enrichment." (quoting *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)).[7]

Through Vaghar's trial testimony and documentary evidence, the SEC has met its burden under *Platforms Wireless* to show that $12,000 reasonably approximates the amount of defendant's unjust enrichment in this case. *See SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998)

---

[7] Although the *Platforms Wireless* Court quoted the *JT Wallenbrock* Court's use of the word "should" to say that "[t]he amount of disgorgement should include all gains flowing from the illegal activities," *Platforms Wireless*, 617 F.3d at 1096 (quoting *JT Wallenbrock*, 440 F.3d at 1114), those cases did not overrule *Hateley*, and they do not stand for the proposition that a Court is required, under all circumstances, to order a tipper to disgorge all downstream profits from an insider trading scheme, no matter the tipper's level of culpability and no matter the actual amount of money received by the tipper. Rather, as the *Clark* Court made clear, "a tipper *can* be required to disgorge his tippees' profits." *Clark*, 915 F.2d at 454; *see also Hateley*, 8 F.3d at 656. *Platforms Wireless* is further distinguishable from this case, as defendant Gowrish at no point controlled all of the illegally obtained funds that the SEC requests that the Court order disgorged. *See* 617 F.3d at 1098.

12

1 ("The district court was not required to trace every dollar of the . . . proceeds fraudulently
2 retained . . . ."). The burden has thus shifted to defendant to demonstrate that $12,000 is not a
3 reasonable approximation. Defendant has attempted to meet this burden by pointing to inconsistencies
4 in Vaghar's testimony, Vaghar's cognitive disabilities, his own testimony and the testimony of Zaman,
5 and the fact that the checks that referenced "VIN DOG" and "V DOG" were made out to cash, not to
6 defendant. This is insufficient to meet defendant's higher burden. *First City Financial*, 890 F.2d at
7 1232 ("[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created that
8 uncertainty."). The Court finds that $12,000 reasonably approximates the amount of defendant's ill-
9 gotten gains, and therefore that is the amount of unjust enrichment this is ordered disgorged.[8]

### B. Prejudgment interest

The government argues that the Court should order defendant to pay prejudgment interest on the money to be disgorged, calculated based on the rate provided in 26 U.S.C. § 6621 for tax underpayment. Defendant does not contest the appropriateness of prejudgment interest, but he does argue it should be calculated based on the treasury-bill rate found at 28 U.S.C. § 1961, which is typically used to calculate postjudgment interest.

"The SEC has adopted the tax underpayment rate for prejudgment interest on orders of disgorgement in all administrative proceedings." *Platforms Wireless*, 617 F.3d at 1099 (citing SEC Rules and Regulations, 60 Fed. Reg. 32,738, 32,788 (June 23, 1995), *codified at* 17 C.F.R. § 201.600(b)). *Platforms Wireless* reviewed the district court's decision to use the Section 6621 rate, and affirmed. Although it noted that district courts had, on occasion, used the Section 1961 rate, it also determined that the defendants had essentially obtained a loan through their fraudulent scheme, and that

> [t]he proper measurement of the benefit of the "loan" is the interest rate the defendants would have otherwise paid to finance their business operations with a comparable, unsecured loan. The interest rate reflected in Section 6621, "a widely published, floating rate based on a fixed margin above the rate for treasury bills," is a reasonable proxy for the interest rate that would ordinarily be charged on an unsecured loan.

---

[8] In this case, the Court does not find it appropriate to consider defendant's ability to pay when ordering disgorgement. *See SEC v. Robinson*, No. 00 Civ.7452 RMB AJP, 2002 WL 1552049, * 8 (S.D.N.Y. July 16, 2002) (discussing cases).

13

*Id.* at 1099 & n.16 (quoting 17 C.F.R. § 201.600(b)).

The Court finds that it is appropriate to order prejudgment interest on the $12,000 disgorgement award, to be calculated based on the rate provided in 26 U.S.C. § 6621.

### 4.     Civil penalties

The government has requested that the Court assess "substantial" civil penalties, perhaps the maximum penalty allowed by law. Defendant argues that, at most, he should be assessed $12,000 in civil penalties (twice what defendant argues is the highest amount his personal profits could have been).

The Insider Trading Sanctions Act of 1984, as amended, provides for civil penalties for insider trading. *See* 15 U.S.C. § 78u-1. "The amount of the penalty which may be imposed . . . shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided" as a result of the unlawful conduct. *Id.* 78u-1(a)(2). The Act defines "'profit gained' or 'loss avoided'" as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." *Id.* § 78u-1(e). The Act's use of impersonal language to define "'profit gained' or 'loss avoided'" indicates that the maximum penalty is three times the *total* profits of the insider trading scheme, rather than the profits realized personally by the defendant. Therefore, the maximum penalty allowed in this case is $1,124,737.23.

There is no Ninth Circuit law discussing the application of this civil penalties provision. The First Circuit has explained that a court may consider the following factors when evaluating whether or not to assess a civil penalty and how much it should be:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry.

*SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004); *see also SEC v. Mellert*, No. C03-0619 MHP, 2006 WL 927743, * 1 (N.D. Cal. March 29, 2006) (same).

Although the SEC does not argue that defendant was the instigator of this insider trading scheme, he has been found to be the tipper: he obtained information from his employer in the securities industry,

14

and he shared that information with others in breach of his duty to his employer. He was an indispensable actor in the insider trading scheme and broke not only the law but also abused a position of trust. Factor one and factor six weigh in favor of imposing a civil penalty.

As discussed above, factor two is neutral.

In considering the defendant's financial condition, the Court is to consider whether defendant's worth is "so high as to require civil penalties." *See SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir. 2003); *see also id.* at 42 n.6 (noting that the Court is not to consider a defendants "legal expenses . . . as an additional mitigating factor"). Defendant's net worth is not high, and factor three weighs against imposing a civil penalty.

Defendant did not himself trade, but the SEC has presented some evidence that defendant actively attempted to conceal the trading scheme by working with Vaghar to come up with explanations for Vaghar's trades when the SEC was investigating, and then by paying for Vaghar's attorney for a time during the SEC investigation. Factor four weighs in favor of imposing a civil penalty.

"The penalties authorized by the ITSA are intended to supplement traditional equitable remedies of disgorgement to enhance deterrence of insider trading." *See SEC v. Henke*, 275 F. Supp. 2d 1075, 1083 (N.D. Cal. 2003) (citing H.R. Rep. No. 355, 98th Cong., 1st Sess. 7-8 (1983)). In this case, defendant is enjoined from further violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5, but he faces no criminal penalties and is ordered to disgorge only $12,000 in profits—the appropriate amount in this case, but an insignificant sum when considering the goal of deterrence. Factor five weighs heavily in favor of a high civil penalty.

Based on the facts and circumstances of this case, the Court finds that the appropriate civil penalty is $100,000. This is approximately equivalent to the disgorgement ordered from the other defendants for their participation in the broader insider trading scheme. It is an amount that is sufficient to fulfill the purposes of the ITSA, recognizes defendant's role as a tipper working inside the securities industry, but also accounts for defendant's limited financial gain and his participation in only part of the greater trading scheme.

**CONCLUSION**

The Court hereby finds as follows:

- There is a reasonable likelihood that defendant will violate the securities laws in the future.
- $12,000 reasonably approximates the amount of defendant's ill-gotten gains.
- An award of prejudgment interest is appropriate in this case.
- The appropriate civil penalty is $100,000.

For the foregoing reasons and for good cause shown, the SEC's motion to entry of its proposed final judgment is GRANTED IN PART and DENIED IN PART. Defendant is hereby ENJOINED from further violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5. Defendant is ORDERED to disgorge $12,000, plus prejudgment interest, calculated based on the rate provided in 26 U.S.C. § 6621. And defendant is ORDERED to pay a civil penalty in the amount of $100,000. A final judgment will be entered separately. (Doc. 155.)

**IT IS SO ORDERED.**

Dated: July 14, 2011

SUSAN ILLSTON
United States District Judge